**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | |
| **Plaintiff,** | 22 Civ. 3822 (VEC) |
| **-against-** | |
| **EDDY ALEXANDRE and EMINIFX, INC.,** | |
| **Defendants.** | |

## INITIAL STATUS REPORT OF RECEIVER DAVID CASTLEMAN

DAVID A. CASTLEMAN
Raines Feldman LLP
1350 Avenue of the Americas
22nd Floor
New York, NY 10019
Tel: (917) 790-7100

*Receiver*

July 20, 2022

## <u>TABLE OF CONTENTS</u>

I.   INTRODUCTION AND EXECUTIVE SUMMARY ........................................................ 1

II.   PROCEDURAL HISTORY ............................................................................................ 9

III.   PRESERVATION AND COLLECTION OF DATA AND RECORDS ........................ 13

IV.   THE RECEIVER'S INITIAL INVESTIGATION ........................................................ 15

    A.   Analysis of Bank Statements and Cryptocurrency Exchange Data .................... 16

    B.   Informal Interviews with Various Employees ...................................................... 17

    C.   Analysis of Data from EminiFX Online Servers ................................................. 18

    D.   EminiFX System .................................................................................................. 19

    E.   Trading and Investing Activity ........................................................................... 22

V.   WINDING DOWN EMINIFX AS AN OPERATING ENTITY .................................. 25

VI.   ASSET RECOVERY AND DISPOSITION ................................................................. 29

    A.   Alexandre Assets Procedure ............................................................................... 29

    B.   Bank and Investment Account Turnovers ........................................................... 30

    C.   Cryptocurrency Account Turnovers .................................................................... 31

    D.   Long Island Real Estate Portfolio ...................................................................... 32

    E.   Manhasset Deposit .............................................................................................. 37

    F.   Additional Asset Recovery and Disposition ....................................................... 37

VII.   COMMUNICATIONS WITH EMINIFX USERS AND CREDITORS ........................ 38

VIII.   RECEIVERSHIP OPERATIONS ............................................................................... 40

IX.    RECOMMENDATIONS AND NEXT STEPS ............................................................. 41

       A.    Application for Approval of Certain Procedures  .................................................. 41

       B.    Complete Forensic Analysis  ............................................................................... 42

       C.    Recovery and Administration of Cryptocurrency Holdings  ................................ 43

       D.    Motion for Approval of Claims Process  ............................................................. 44

       E.    Development of Distribution Plan  ....................................................................... 44

       F.    Evaluation of Potential Litigation Claims  ........................................................... 45

X.     CONCLUSION .................................................................................................................. 45

David Castleman (the "Receiver"), appointed as Receiver pursuant to the Consent Preliminary Injunction (the "Consent Order") entered by this Court on June 15, 2022 [Dkt. 56], files this Initial Status Report to apprise the Court of the activities of the receivership since the appointment of the Receiver as Temporary Receiver on May 11, 2022:

## I.   INTRODUCTION AND EXECUTIVE SUMMARY

On May 11, 2022, the Commodity Futures Trading Commission (the "CFTC") filed a complaint alleging that Defendant Eddy Alexandre ("Alexandre") had operated Defendant EminiFX, Inc. ("EminiFX"), a purported on-line investing platform, as a "Ponzi-like scheme," pooling together investments worth at least $59 million from at least hundreds of investors [Dkt. 5]. The same day, the Receiver was appointed as Temporary Receiver over EminiFX and assets of Alexandre traceable to EminiFX customer funds, pursuant to a Statutory Restraining Order (the "SRO") entered by this Court [Dkt. 9]. On May 12, Alexandre was arrested by the Federal Bureau of Investigation (the "FBI") and charged by the United States Attorney for the Southern District of New York (the "USAO") with one count of Commodities Fraud and one count of Wire Fraud. The FBI executed a search warrant on the EminiFX premises, and the Receiver took control of EminiFX on the afternoon of May 12.

Since then, the Receiver and his team have endeavored to secure the assets of EminiFX, to secure those books and records of EminiFX not in the custody of the FBI, and to begin a detailed assessment of the financial condition of EminiFX. After gaining access to the computer servers hosting the EminiFX platform and certain offshore financial records, the Receiver discovered that there were over 62,000 EminiFX users who collectively invested approximately $250 million, primarily via either cash deposits in the United States or

cryptocurrency deposits using an Estonian exchange.  The Receiver's investigation is ongoing, and the results reported in this report are preliminary and subject to revision over time.

The Receiver has also begun the process of recovering funds for the receivership estate, largely from the turnover of bank and brokerage accounts frozen by the CFTC in conjunction with the SRO.  Those turnovers have exceeded $60 million.  The Receiver has obtained $534,000 in recoveries from unwinding the nascent EminiFX real estate portfolio and is working to obtain additional recoveries.  In addition to those and other smaller recoveries, the Receiver is holding a $535,000 real estate deposit traceable to customer funds paid by Alexandre in connection with the purchase of additional real property, which was turned over pursuant to order of this Court [Dkt. 60].  The total recoveries, maintained in separate General Receivership Estate and Alexandre Assets accounts pursuant to Paragraph 38 of the Consent Order, are as follows:

| Institution | Amount Recovered | Date Recovered |
|---|---|---|
| **General Receivership Estate** | | |
| Bank 1 | $37,493,925.92 | 6/1/2022 |
| Bank 2 | $14,583,152.54 | 6/28/2022 |
| Real Estate Recoveries | $534,000.00 | *various* |
| Miscellaneous Recoveries | $3,300.00 | 6/28/2022 |
| **Total Recoveries** | **$52,614,378.46** | |
| **Alexandre Assets** | | |
| Bank 1 | $6,716,092.43 | 6/21/2022 |
| Brokerage 1 | $1,752,944.40 | 7/6/2022 |
| Real Estate Deposit | $535,000.00 | 6/22/2022 |
| Sale of Office Property | $15,000.00 | 7/13/2022 |
| **Total Recoveries** | **$9,019,036.83** | |
| **TOTAL CASH RECOVERIES** | **$61,633,415.29** | |

The Receiver is maintaining these funds at a financial institution that has substantial experience in managing funds for receivership and class actions.  The Receiver has further paid $236,277.18 in approved expenses, largely consisting of June rent and final payroll for terminated employees

pursuant to orders of this Court [Dkts. 42, 47].  A full ledger of the receivership financial transactions from May 11, 2022 to the filing of this Initial Status Report is attached as Exhibit 1.

The Receiver has also discovered in the course of his investigation that over 3,650 Bitcoin (BTC)—valued at over $85 million based on the July 20, 2022 trading price—have been frozen in an EminiFX cryptocurrency account located in Estonia.  The Receiver and his team are working to secure the turnover of those assets to the receivership estate.  *The timing, amount, and outcome of any turnover effort is uncertain at this time.*  The Receiver is also in the process of securing the turnover to the receivership estate of approximately 22 BTC held in other cryptocurrency exchanges.

Although this receivership is in its early days and will likely take years to come to a complete resolution, the Receiver and his team have taken a number of actions since his appointment to preserve the status quo and secure the assets of the receivership estate and to begin to obtain an accurate picture of the financial condition of EminiFX.  This Initial Status Report is therefore divided into a number of sections:

**Procedural History** (pp. 9-13).  In Part II, the Receiver details the procedural history of this matter, beginning with the Complaint filed by the CFTC and the initial efforts of the Receiver to secure the assets, books, records, and premises of EminiFX.  Most significantly thereafter, the CFTC and Alexandre negotiated the Consent Order, with limited input from the Receiver mostly concerning the creation of a procedure to allow the Receiver to secure and segregate certain assets in Alexandre's name (the "Alexandre Assets").  That order was entered by this Court on June 15, 2022 [Dkt. 56].  The Receiver has also submitted various correspondence to the Court related to the administration of the receivership estate, as detailed in Part II.

**Preservation of Electronic Data** (pp. 13-15).  The Receiver and his forensics team have secured over 170 terabytes (*i.e.*, 170 million megabytes) of data from EminiFX computers and servers, as detailed in Part III.  Soon after the Receiver was appointed, he was able to secure access to the service hosting the EminiFX website.  There, the Receiver located there a database with over 17 million rows containing data on EminiFX users, transactions, account balances, and purported earnings, as well as a copy of the source code used to run the EminiFX platform.  The Receiver and his team have created working copies of the database in connection with the Receiver's investigation of EminiFX's financial condition, and have otherwise secured the original data at an Iron Mountain storage facility.

**The Receiver's Initial Investigation** (pp. 15-25).  As set forth in Part IV, the Receiver and his team have begun their investigation into EminiFX's operations to determine the true financial condition of EminiFX, and to preserve, maintain and administer the receivership estate.  In the near term, the Receiver expects that the investigation will be largely focused on determining the amounts and dates of deposits and redemptions of cash and cryptocurrency by EminiFX users, which will assist the Receiver in determining the scope and size of potential claims against the receivership estate.

The Receiver's initial investigation was generally based on financial records obtained by the estate, analysis of the data from EminiFX servers, and informal interviews with certain EminiFX employees.  Based on his team's initial investigation, users of the EminiFX system created accounts using an email address, social security number and other information, and deposited cash or cryptocurrency into the system.  The account balances were maintained in US dollars, and users maintained funds in either their "e-wallets" or their "trading wallets."  Every Friday, a weekly "ROI" (return on investment) of between 5.00% and 9.99% was applied to

4

increase every EminiFX user's account balance, the same ROI for all users. Although most users did not redeem, some did, and the account balance after the ROIs were applied was the amount that could be withdrawn after EminiFX deducted a 15% withdrawal fee.

The Receiver also begun to investigate all possible investing activity that could support the weekly returns being applied to EminiFX user accounts. The Receiver was unable to locate any evidence for the existence of the Robo Assisted Adviser Account ("RA3") in any EminiFX file or anywhere in the code base. The most significant commodities and trading appears to have occurred in Alexandre's personal brokerage account at Brokerage 1, using company funds, which resulted in over $7 million in losses by the time the Receiver was appointed.

The Receiver also discovered that EminiFX had recently begun investing in the Long Island residential real estate market, entering into contracts to purchase 46 properties out of foreclosure. The Receiver obtained Broker Price Opinions ("BPOs") for each of those properties, which indicated that the total contracted purchase price for the 46 properties was approximately $366,000 more than the total value of the properties, further indicating that the portfolio was not likely to be profitable or able to support the ROIs.

Finally, the Receiver analyzed whether EminiFX's significant exposure to the price of Bitcoin—due to the fact that deposits were made via the Estonian cryptocurrency exchange and held there as Bitcoin—could have supported the ROIs. However, the volatility of Bitcoin from November 2021 to May 2022 could not have resulted in the consistently positive weekly ROIs that were being applied to the EminiFX user accounts.

The Receiver's conclusion that the investing activity discovered could not support the ROIs is consistent with the aggregate trading account balances of the EminiFX users at the time the Receiver was appointed. The total trading account balance at that time was approximately

$512 million.  However, the total value of the EminiFX and Alexandre assets at the time the Receiver was appointed—when the price of Bitcoin was higher than it is now—was around $170 million.

**Winding Down EminiFX as an Operating Entity** (pp. 25-28).  As set forth above, the Receiver's initial investigation confirmed his determination in the June 1 preliminary status report that there is no investing or other business activity of EminiFX that would warrant the cost of continuing the company as an operating entity.  The Receiver has therefore continued his efforts to wind down EminiFX as an operating entity, which is substantially complete, as detailed in Part V.  The Receiver has terminated all the employees and run final payroll for all employees except Alexandre and his wife (the EminiFX chief financial officer), and reserving the final pay with respect to those two individuals.  Having gained control of the eminifx.com website and safely preserved all the data located herein, the Receiver and his team were able to shut down the EminiFX platform and website.  The Receiver has also terminated various business services that are no longer required for the administration of the estate.

The Receiver's team expended considerable efforts to vacate the premises by June 30, which was completed.  The EminiFX premises consisted of 41 units configured into over 30 separate offices, most of which contained significant amounts of computer and other office equipment.  After a competitive bidding process, the Receiver contracted with a remnant buyer (who will re-sell the equipment) to liquidate the office property for $15,000 plus 50% of any sales revenue over $75,000.  That sale was approved by the Court [Dkt. 66].  The sale of the property to the remnant buyer also resulted in cost savings of approximately $25,000 to $50,000 that would have otherwise been incurred to move and store the property.  The Receiver also rejected the license agreement for the office space, where rent was over $100,000 per month.

**Asset Recovery and Disposition** (pp. 29-38).  As set forth in Part VI below and summarized above, the Receiver has secured over $60 million from accounts in the name of EminiFX or Alexandre.  The Receiver is in the process of securing approximately 22 Bitcoin held in onshore cryptocurrency exchanges to a receivership cryptocurrency account, and the Receiver is actively pursuing another approximately 3,658 Bitcoin from an offshore cryptocurrency exchange.  The timing or outcome of the recovery of the Bitcoin held outside the United States is uncertain, and the Receiver will continue to keep the Court apprised those efforts.

The Receiver and his team have spent considerable effort to unwind EminiFX's Long Island real estate portfolio, which consisted of 46 separate contracts to purchase residential properties out of foreclosure for a total of $22,334,525, with $2,310,400 paid in deposits; and an additional two contracts to purchase non-foreclosure properties with a combined $1,920,000 purchase price and $192,000 paid in deposits.  Each of these 48 contracts must be terminated individually, and because each of the 46 foreclosure sales was the result of a separately filed foreclosure proceeding in the New York Supreme Court for either Suffolk or Nassau County, each termination of those sales requires the consent of the Suffolk County court-appointed referee, or an order of the Suffolk or Nassau County Supreme Court itself.  The Receiver's team has made substantial progress in unwinding this portfolio, having received $534,000 in returned deposits as of this Initial Status Report.  The Receiver has agreements signed but subject to approval to recover an additional $639,200, and agreements in principle with counsel for lenders in additional cases to recover a further $948,500.  The exact timing of recovery in these cases is uncertain, as they depend on the cooperation of third parties, including the lenders, their counsel and the Suffolk and Nassau County Supreme Courts.  That said, the Receiver is optimistic that unwinding this portfolio will be substantially complete by September 30, 2022.

**Communications with EminiFX Users and Creditors** (pp. 38-40).  As set forth in Part VII, the Receiver's claims administration agent has set up a website to keep all interested parties informed.[1]  *All EminiFX users are encouraged to review that website before seeking additional information*.  The website contains all key filings and status reports (including this one), and has an additional "Civil Docket" tab that contains all the ECF filings in this case.  The Receiver's team has also set up an email address to which inquiries may be directed,[2] although the Receiver cautions users that due to the enormous volume of communications, not every inquiry can receive a response.  The Receiver anticipates moving the Court in short order for approval of a Form of Initial Notice to be sent to the users located in the EminiFX database plus other known potential creditors and interested parties.  Due to the large French-speaking EminiFX user base, the website has been translated into French, and the Receiver plans to translate the approved Form of Initial Notice into French.

**Receivership Operations** (pp. 40-41).  Part VIII, *infra*, describes the manner in which the Receiver is holding receivership assets denominated in US dollars, and how the Receiver intends to hold cryptocurrency.  The Receiver also summarizes the professionals he has engaged to assist in the administration of the estate, with court approval [Dkt. 47].

**Recommendations and Next Steps** (pp. 41-45).  In Part IX, the Receiver concludes with recommendations and next steps.  Shortly after filing this Initial Status Report, the Receiver intends to file a short application for approval of a number of items related to the administration of the estate.  Those items include authority related to notice procedures, resolution of assets and other contracts under $50,000 without the need for further court approval, approval

---

[1]     *See* http://www.eminifxreceivership.com.

[2]     EminiFXInquiries@Stretto.com.

of certain actions in aid of securing the estate's cryptocurrency, and liquidation of certain vehicles owned or leased by the estate.

The Receiver also intends to complete a more detailed forensic analysis of the financial and transaction records obtained by the Receiver in connection with his investigation, to define specifically the scope of the potential claims against the estate, especially by EminiFX users based on their investments.   The Receiver will attempt to recover as much cryptocurrency as possible, and will formulate a plan for the administration of those assets, subject to approval by this Court for the resolution of such portfolio.

Once the scope of the potential claims is better defined, the Receiver intends to move this Court to approve a claims process by which both investors and non-investors will be able to submit claims. The Receiver cautions potential claimants that, given the enormous volume, such claims process will likely not be substantially complete for many months, probably some time in 2023.   In the future, the Receiver also anticipates moving this Court for approval of a distribution plan, and eventually to distribute funds to claimants as soon as the Receiver can do so.

## II.      PROCEDURAL HISTORY

On May 11, 2022, the CFTC filed the Complaint and motion for an *ex parte* SRO [Dkt. 5-6].  That same day, the Court granted the CFTC's motion and entered the SRO that, among other things, froze certain of Defendants' assets, allowed the CFTC access to certain of Defendants' records, and appointed the Receiver [Dkt. 9].  The Receiver was appointed with full powers of an equity receiver over EminiFX and over "all customer funds and property and other assets traceable to customers in the possession of or under the control of Eddy Alexandre."  (SRO ¶ 30.)  The SRO was extended twice, first to June 7, and then to June 17 [Dkts. 31, 43].

The Complaint alleged numerous violations of the federal commodities laws in a "Ponzi-like" scheme whereby Defendants "pooled at least $59 million from hundreds of members of the general public ('participants'), to purportedly trade foreign currency exchange ('forex') and cryptocurrencies as well as futures and options in an investment club."  (Compl. ¶¶ 1, 14-15.) Alexandre allegedly promised returns of 5% to 9.99% per week and "gave the impression that EminiFX was profitably trading the participants' contributions," which the Complaint alleged "was false." (Compl. ¶¶ 21-22.)  Instead, the Complaint alleges, although his trading at an online brokerage incurred over $6 million in losses, Alexandre misappropriated over $14.7 million for his personal accounts and "continued to report to participants that their account balances were actually increasing by 5% to 9.99% every week."  (Compl. ¶¶ 18, 23.)

Also on May 11, 2022, USAO filed a sealed criminal complaint against Alexandre on one count of Commodities Fraud and one count of Wire Fraud, alleging the same conduct that forms the basis for this Action.  *United States* v. *Alexandre*, No. 22 Cr. 326 (JPC), Complaint, Dkt. 1 (S.D.N.Y. filed May 11, 2022) (the "Criminal Action").  On May 12, the FBI executed an arrest warrant for Defendant Alexandre and placed him into federal custody, where he remained until being released on bail at the end of the month.  Also on May 12, the FBI executed a search warrant for the premises of EminiFX, collecting dozens of boxes of documents and electronic data storage devices.

After the FBI concluded its search, the Receiver took control of EminiFX and began to secure both the premises and the electronic equipment therein.  The size and scale of EminiFX became more apparent at that time, with EminiFX having expanded into over 30 offices at the premises and employing over 40 people either directly or through the Robert Half employment agency.  The Receiver and his team located more than 100 desktop computers (and more than

twice as many monitors), a server room, other computer equipment throughout the premises, and a video studio with a substantial amount of audiovisual equipment. On the first day, the Receiver secured the equipment containing data in certain offices and immediately changed the locks in those offices. There were, however, almost no paper or hard copy documents of any note, and the Receiver is working with the USAO and the FBI to have documents returned to his custody to the extent possible.

On June 1, 2022, the Receiver filed a Preliminary Status Report and Emergency Request for Instructions, seeking authority (1) to pay June rent for the EminiFX premises with the express goal of vacating the premises by June 30; (2) to pay pre-receivership wages of employees other than those of Defendant Alexandre or EminiFX's Chief Financial Officer (Alexandre's wife); and (3) to establish a procedure for the Receiver and his team to dispose of contracts that EminiFX had recently executed to purchase real estate properties on Long Island [Dkt. 38]. The request for instructions was granted on June 1 [Dkt. 42]. On June 10, the Receiver filed a request for confirmation of employment of his law firm Raines Feldman LLP and Forchelli Deegan Terrana LLP as additional counsel, J.S. Held LLC as financial and forensic advisers, Crowe LLP as tax advisers, and Stretto, Inc. as claims and administrative agent [Dkt. 46]. That request was granted on June 10 [Dkt. 47].

On June 14, 2022, after negotiations between the CFTC and Alexandre, with limited participation by the Receiver, the parties filed a Proposed Consent Preliminary Injunction [Dkt. 48]. An objection was filed by Christopher and Maureen Beil (the "Objecting Parties"), concerning the Receiver's recovery of a $535,000 deposit that Alexandre had placed on a $5.35 million house in Nassau County [Dkt. 49]. On June 15, the Receiver filed a response, explaining that the turnover of the deposit would be without prejudice to the Objecting Parties' right to file a

claim in the receivership, and subject to the Receiver's right and obligation to analyze such claim pursuant to the claims process that will later be established by the Court [Dkt. 51]. The Receiver also filed a proposed order to turn over the deposit [Dkt. 58]. The Court overruled the objection [Dkt. 55], denied reconsideration [Dkt. 59], and ordered the turnover of the deposit [Dkt. 60].

On June 15, the Court entered the Consent Order [Dkt. 56], which "shall remain in full force and effect until the final trial of this case, or until further order of this Court." (Consent Order ¶ 59.) The Court also appointed the Receiver, who had previously been appointed as Temporary Receiver, as Receiver with full powers of a federal equity receiver. (*Id*. ¶ 37.) The Court granted the Receiver authority to demand turnover of assets in Alexandre's name based on a reasonable, good-faith belief that such assets are traceable to EminiFX customers, to be administered by the Receiver in a protected "Alexandre Assets" segregated account, until this Court can make a final determination as to whether such assets are traceable, or not, to EminiFX customers. (*Id*. ¶ 38.) The Receiver believes that this procedure will allow him to fulfill his duty to secure and administer the Receivership Estate, while preserving Alexandre's right to litigate traceability in the future. The Court further established a procedure for Alexandre to request reasonable and necessary living expenses, in writing to the CFTC and the Receiver. (*Id*. ¶¶ 44-46.)

On June 23, 2022, the Receiver filed a request to liquidate the office property and equipment pursuant to a procedure that also permitted the Receiver to vacate the EminiFX premises without incurring substantial moving costs, as set forth in more detail below [Dkt. 61]. The Receiver then worked with counsel for Alexandre to ensure that Alexandre and his wife's personal property were delivered to agents of Alexandre, and to provide Alexandre with inventories of the items to be sold. The Receiver will also hold any proceeds of the liquidation in

the Alexandre Assets segregated account.  After counsel for Alexandre confirmed he had no objection to the Receiver's course of action, the Court granted the Receiver's request [Dkt. 66].

On July 7, 2022, counsel for Alexandre filed a letter with the Court, with the consent of the parties, advising of the USAO's intention to seek a stay of this Action during the pendency of the Criminal Action, and requesting a briefing schedule [Dkt. 67].  On July 8, the Court granted the request, setting deadlines of July 25 for the USAO's motion to intervene, August 12 for any response to such motion, and August 19 for any replies to such responses, as well adjourning *sine die* the deadlines for the answer, the CFTC's discovery responses, and the Initial Pretrial Conference [Dkt. 68].  If necessary, the Receiver will request that any stay will permit the continued operation of the receivership, including but not limited to the Receiver's right to conduct certain discovery in aid of his duties as set forth in the Consent Order.

## III.    PRESERVATION AND COLLECTION OF DATA AND RECORDS

Beginning on May 12, 2022, as soon as the FBI concluded its search and the Receiver was able to take control of the EminiFX premises, the Receiver and his experienced forensics team began their efforts to secure the books, records, and premises of EminiFX.  The Receiver notes at the outset that he was not initially provided with the records seized by the FBI pursuant to the search warrant, although the Receiver has been discussing with the USAO the possibility of obtaining any records that may be released to the Receiver.  Very few paper records remained in the EminiFX office after the execution of the search warrant.  Nevertheless, the Receiver and his team have been able to obtain a substantial amount of electronic records in this case from various sources.

**Server**.  Beginning on May 12, the Receiver began efforts to obtain access to the website hosting service (the "Service") that housed the entire EminiFX platform as well as the

EminiFX email accounts. The Receiver and his team obtained access to the data from the Service the following week, and immediately began to secure the data. The Receiver has now secured and is in possession of a complete backup of the data located on the web hosting service, which included a SQL database with over 17 million rows, containing data on EminiFX users, transactions, account balances, and earnings, as well as a copy of the source code used to run the EminiFX platform.

**Email/Slack**. Access to the website hosting service also allowed the Receiver's team to preserve 70 email boxes from eminifx.com, in addition to other emails, containing over 33 gigabytes of data in nearly 600,000 emails and attachments. They also were able preserve data from the messaging service Slack for 49 active users, containing over 15 gigabytes of data.

**Hard Drives**. The Receiver and his team located 247 data storage devices left at the EminiFX premises, largely in 106 desktop computers, but also drives in a server room (which did not appear to be fully operational as of May 12) as well as other devices. The total data downloaded from these devices exceeded 160,000 gigabytes of data.

In total the Receiver's forensics team has collected over 170 *terabytes* of data, as set forth above and summarized in the following table:

| Type of Storage Device | Number of Items | Sum of Collection Size (GB) |
|---|---|---|
| Desktop | 124 | 152225.5 |
| Google Chrome password manager | 1 | 0.0 |
| Google Drive | 1 | 1.9 |
| Laptop | 4 | 3012.0 |
| Loose Hard Disk Drive | 2 | 1500.0 |
| Microsoft Office 365 - SharePoint (@eminifx.com) | 1 | 0.0 |
| Microsoft Office 365 - SharePoint (@EminifxInc802.onmicrosoft.com) | 1 | 0.0 |
| Microsoft Office 365 Email (@bwwibooks.com) | 1 | 0.0 |
| Microsoft Office 365 Email (@eminifx.com) | 71 | 26.3 |
| Microsoft Office 365 Email (@EminifxInc802.onmicrosoft.com) | 20 | 0.1 |
| Microsoft Office 365 Email (@podolex.com) | 1 | 0.0 |
| Microsoft Office 365 OneDrive (@eminifx.com) | 4 | 0.1 |

| Type of Storage Device | Number of Items | Sum of Collection Size (GB) |
|---|---|---|
| Microsoft Office 365 OneDrive (@EminifxInc802.onmicrosoft.com) | 7 | 0.1 |
| Mobile | 2 | 256.0 |
| Network Appliance | 5 | 3770.0 |
| Server | 6 | 9235.9 |
| Slack | 49 | 15.0 |
| Smartscreen | 2 | 512.0 |
| Telegram (Chat) | 1 | 0.0 |
| Thumb Drive | 2 | 64.0 |
| Website | 1 | 0.0 |
| Website Backup (EMINIFX) | 1 | 217.6 |
| Website Database Backup (EMINIFX) | 1 | 0.5 |
| YouTube | 2 | 0.4 |
| **Grand Total** | **310** | **170837.3** |

The Receiver's forensics team has preserved copies of the electronic data on hard drives that will be stored securely at Iron Mountain, in addition to the working copies they are using in connection with the Receiver's investigation, and has kept detailed logs to preserve the chain of custody. The Receiver expects that any records obtained from the FBI or the USAO will be similarly preserved.

**Other Records**. The CFTC turned over a number of financial records to the Receiver at the outset of the receivership. Further, the Receiver has served a number of subpoenas on third parties that the Receiver believed may have relevant information regarding the administration of the estate. These documents primarily included additional financial records.

## IV.    THE RECEIVER'S INITIAL INVESTIGATION

The Receiver and his team have begun their investigation into EminiFX's operations in order to preserve, maintain, and administer the receivership estate and determine the true financial condition of EminiFX. The primary goals of the Receiver's investigation are (1) to determine the location and amount of any assets that should be turned over to the receivership estate; (2) to obtain all data necessary to preserve and administer the receivership estate; (3) to discover the date and amount of the deposits and redemptions of cash and cryptocurrency, largely in aid of determining the scope of potential claims against the receivership estate; and (4) to

determine whether there is a basis for the Receiver to pursue any cost-effective claims against third parties.  Given the enormous amount of data, reflecting tens of thousands of users making hundreds of thousands of transactions resulting in millions of account balance changes, the Receiver expects that it will be some time before his investigation will be complete.  Therefore, because the investigation is ongoing, the discussion below is based only on a preliminary review and is subject to revision as the investigation is ongoing.

      A.    *Analysis of Bank Statements and Cryptocurrency Exchange Data*

The Receiver has been provided with over 30,000 pages of records from Bank 1, over 4,000 pages of records from Bank 2, and over 400,000 pages of records from Brokerage 1. The Receiver and his team have been reviewing those records for three primary purposes: (1) to discover possible assets of the receivership estate, (2) to support the Receiver's good-faith belief that Alexandre Assets were traceable to EminiFX users, and (3) to assist the Receiver and his team in determining the amount of cash paid in by EminiFX users in aid of the eventual claims and distribution process.  The analysis of the amounts deposited is somewhat complicated by the prevalence of substantial numbers of identical cash deposits on the same day.  For example, at Bank 2, on February 7 alone, there were 25 "Counter Credits" in the amount of $5,000, and most of the deposit slips provided by the bank do not list the depositor.  On the other hand, the Receiver and his team have generally been able to identify and summarize the withdrawals from the bank accounts, including transfers to other bank and brokerage accounts.

The Receiver also obtained a substantial amount of data from Crypto Exchange 4 in the form of a 95-megabyte text file containing over 150,000 individual cryptocurrency transactions, most of which are stored in somewhat complex manner, but none of which are associated with a user by username or email.  Those transactions indicate that over $180 million

was deposited to EminiFX accounts by users using Crypto Exchange 4, and nearly $35 million was paid back out in what generally appear to be redemptions.  The Receiver and his team have analyzed certain data recovered from the EminiFX server and remain hopeful that the data obtained from Crypto Exchange 4 will be helpful in determining the amount of money that EminiFX users both paid and received.  In addition, the Receiver last week obtained additional data from Crypto Exchange 3 with details of several thousand transactions.

B.     *Informal Interviews with Various Employees*

The Receiver also met informally with a number of former employees, generally when they came to the EminiFX office to retrieve their personal effects.  None of these employees were interviewed via a deposition or placed under oath.  A number of these were employed in the accounting department, although based on their descriptions of their job functions, they appear to have functioned as account managers for EminiFX users.  Those employees were helpful, especially in the days before the Receiver was able to gain access to the EminiFX online server systems, in showing the Receiver and his team how the EminiFX platform generally worked.  Those interviews gave the Receiver and his team their first indications (1) of the true size of the EminiFX active user base, (2) of the fact that redemptions were actually processed and received by EminiFX users, and (3) how deposits were made and through which institutions, especially Bank 1, Bank 2, and Crypto Exchange 4.

Each of these employees, as well as all other employees to whom the Receiver spoke, said they had no direct involvement with any active trading of EminiFX assets, or in writing any of the software code that powered EminiFX's system.  Each of them said that those aspects of EminiFX's business were handled personally by Alexandre.

C.    *Analysis of Data from EminiFX Online Servers*

Approximately one week after he was appointed, after repeated requests starting May 12, the Receiver was given access and control of EminiFX's online server account at GoDaddy, Inc.  After careful analysis, the Receiver discovered that the account contained the production database for the EminiFX system, the source code for the EminiFX website, and the email boxes of the eminifx.com work emails of all the employees.  The Receiver and his team spent substantial amount of time cataloguing and safely preserving the data found there.  Once the data was sufficiently preserved, the Receiver shut down the live EminiFX system and redirected the website to the Receiver's initial website, and subsequently redirected to the current website.

The Receiver's initial forensic goal was to understand what information was contained in the databases, and how that information could assist the Receiver in the administration of the estate.  A list of users (each of whom was given a unique six-digit user ID) was discovered in the data and includes email addresses and contact information, for over 62,000 individual users.  That number was consistent with the information provided by the former employees, a number of whom told the Receiver that there were tens of thousands of active users.  The Receiver expects to use that list as the primary basis for the list of potential investor claimants.

The database also contained a substantial amount of what appeared to be transaction data, spread across a number of tables, some of which contained millions of rows.  The Receiver does not have, and does not expect to receive in the near future, any significant documentation created by EminiFX or Alexandre concerning the structure or operation of this data.  The Receiver and his forensics team have spent considerable time attempting to understand the data, especially with respect to validating transaction data showing the deposit of actual cash or cryptocurrency by EminiFX users into their EminiFX accounts, any paid redemptions by EminiFX users, and internal

account transfers.  The Receiver and his team believe this data will be critical in determining and validating how much each user invested and redeemed, which will form the core of any claims and distribution process, subject to court approval at a later date.

      D.    *EminiFX System*

Although the Receiver's investigation and conclusions at this early stage are preliminary, the Receiver and his team have been able to come to a general understanding as to how the EminiFX system worked.  EminiFX was an exclusively online platform, maintained on the website eminifx.com.  EminiFX touted itself as an investing club, where its users (or "members") purportedly earned the same weekly return ("ROI") of between 5.00% and 9.99% per week.  Generally, users appear to have been recruited by other users, and commission bonuses were applied based on a user's recruits, plus all their recruits, and so on down for each level.  Users were able to log into the system and view a highly polished dashboard that included their account balances, the weekly EminiFX ROI, the commissions paid, and other information.

EminiFX users generally funded their accounts by making deposits using cash or cryptocurrency, although all EminiFX account balances appear to have been denominated as cash, from the user's perspective.  Deposits in cash were made via Bank 1 or Bank 2, sometimes via wire transfer, sometimes via check, and often via cash deposit at a teller.  Deposits in cryptocurrency appear to have been made primarily through Crypto Exchange 4.[3]  Deposits to Crypto Exchange 4 significantly increased in volume in approximately March 2022, at the same time that cash deposits began to dissipate.

---

[3]    Crypto Exchanges 1 and 3 appear to have also been used for this purpose, but on a more limited basis.  Further, of the approximately 11 BTC currently frozen on Crypto Exchange 3, it appears that at least 10.4 BTC are the result of an internal transfer from Crypto Exchange 4.



Each user appears to have had two types of wallets that contained their purported EminiFX account balance denominated in dollars: (1) an e-wallet that was used for deposits, withdrawals, and the payment of EminiFX bonuses and returns, and (2) a trading wallet that contained the amount of a user's EminiFX account balance on which the weekly ROI of between 5.00% and 9.99% would be applied every Friday. A user could transfer a portion of her EminiFX account balance held in one wallet to the other wallet. Only balances that were in the trading wallet would receive the "ROI," which was the term used in the EminiFX internal "earnings" database to characterize these increases to users' account balances.[4] The weekly ROI appears to be as follows:

| Date | ROI | Hypothetical Growth of $10,000 |
|---|---|---|
| 22-Oct-2021 | 5.01% | $10,501.00 |
| 29-Oct-2021 | 5.01% | $11,027.10 |
| 05-Nov-2021 | 5.27% | $11,608.23 |
| 12-Nov-2021 | 5.75% | $12,275.70 |
| 19-Nov-2021 | 5.15% | $12,907.90 |
| 26-Nov-2021 | 6.85% | $13,792.09 |
| 03-Dec-2021 | 7.75% | $14,860.98 |
| 10-Dec-2021 | 7.77% | $16,015.68 |

---

[4]     Some of the accounting employees informed the Receiver that EminiFX management was concerned about potential money laundering on the system, from accounts that were created and funded but for which no money was placed into the trading wallet such that the ROI would be applied. The Receiver cannot say at this stage whether any such concerns were well founded or whether they would affect the administration of the estate.

| Date | ROI | Hypothetical Growth of $10,000 |
|---|---|---|
| 17-Dec-2021 | 8.75% | $17,417.05 |
| 24-Dec-2021 | 8.88% | $18,963.68 |
| 31-Dec-2021 | 9.97% | $20,854.36 |
| 07-Jan-2022 | 5.01% | $21,899.16 |
| 14-Jan-2022 | 5.15% | $23,026.97 |
| 21-Jan-2022 | 5.03% | $24,185.23 |
| 28-Jan-2022 | 6.73% | $25,812.90 |
| 04-Feb-2022 | 5.35% | $27,193.89 |
| 11-Feb-2022 | 9.86% | $29,875.21 |
| 18-Feb-2022 | 9.83% | $32,811.94 |
| 25-Feb-2022 | 9.94% | $36,073.45 |
| 04-Mar-2022 | 9.27% | $39,417.46 |
| 11-Mar-2022 | 9.99% | $43,355.26 |
| 18-Mar-2022 | 9.98% | $47,682.11 |
| 25-Mar-2022 | 9.94% | $52,421.71 |
| 01-Apr-2022 | 9.91% | $57,616.70 |
| 08-Apr-2022 | 9.97% | $63,361.08 |
| 15-Apr-2022 | 5.00% | $66,529.13 |
| 22-Apr-2022 | 5.05% | $69,888.85 |
| 29-Apr-2022 | 5.03% | $73,404.26 |
| 06-May-2022 | 5.17% | $77,199.26 |

A user who deposited $10,000 in cash on October 15, and simply elected to reinvest her EminiFX ROI into her trading wallet, would have seen an account balance of over $77,000 at the time the Receiver was appointed.[5]  At the time the Receiver was appointed, the total stated balances of all the trading wallets was approximately $512 million, which is substantially more than the total value of the estate's assets at that time (then around $170 million).

Each user had a sponsor in the system (except for Alexandre, whose sponsor was listed as "admin").  This created the multilevel marketing aspect of the EminiFX system, and the system also appeared to keep track of an overall value for each user's group – *i.e.*, the users whose sponsor was that user, and the users whose sponsor's sponsor was that user, and so forth down the

---

[5]    It would appear that a substantial number of users expected that the ROI that was applied to their trading wallets were funds that could be accessed at any time.  A petition on change.org signed by "the Members of EminiFX Inc" with nearly 14,000 signatures states: "Since September 20th 2021 when EMiniFx Inc. was founded, Mr. Eddie Alexandre has promised a return on investment (ROI) ranging from no less than 5% to no more than 9.99% weekly. As investors, we have experienced a steady weekly return. We also consent to have never received less than 5% return to no more than 9.99% weekly on our investment accounts from September 20th 2021 to May 11th 2022. *We have access to our capitals and these returns on investment at any time.*"  *See* https://www.change.org/p/eminifx-members-petition (last visited July 16, 2022) (emphasis added).

levels. Alexandre appears to have been at the top of this hierarchy for most if not all EminiFX users. Commissions appear to have been calculated based on a user's overall group value, and paid as credits created by the EminiFX system into a user's e-wallet, and not via cash or cryptocurrency through some other means.

Many users appear to never have withdrawn or redeemed funds, although some did in whole or in part. For users who had invested for less than 150 days, there was a 15% withdrawal fee, which the Receiver understands was applied to most withdrawals, given the short time during which EminiFX operated (only having been incorporated in September 2021). EminiFX users could request a withdrawal through the system, which could be approved for processing by the EminiFX accounting team. The Receiver understands from certain accounting team members, however, that the payment of all withdrawals had to be personally approved by Alexandre. It appears that withdrawals were generally processed from the same account at Crypto Exchange 4 into which users made deposits, with the first withdrawal occurring in November 2021. There were over 22,000 withdrawal transactions totaling nearly $35 million between November 2021 and May 2022, although the vast majority of withdrawals occurred from March to May. That data from Crypto Exchange 4 also suggests that withdrawals were submitted manually in batches, as the date and times of withdrawals are largely clustered. Data recently obtained from Crypto Exchanges 1 and 3 indicate that smaller numbers of withdrawals may have been processed similarly through those exchanges. The Receiver and his team have not discovered any evidence that withdrawals were processed via any other method.

E.    *Trading and Investing Activity*

The Receiver and his team have not discovered any trading activity that would support the ROI of 5.00% to 9.99% that was applied to EminiFX user account balances. EminiFX

touted its Robo Assisted Adviser Account ("RA3"), which Alexandre stated on an investor call in April 2022 was a "trade secret."  The Receiver and his team have not discovered any evidence of the existence of RA3 in any EminiFX file or anywhere in the code base.  None of the former employees to whom the Receiver spoke had any understanding of how the weekly return on investment ("ROI") of 5.00 to 9.99% was earned, or what RA3 was or how it worked.

The most significant commodities and securities trading appears to have occurred in Alexandre's personal brokerage account at Brokerage 1, which was funded in December 2021 and January 2022 with just over $9 million, almost exclusively in funds that are clearly traceable to EminiFX corporate accounts.  The trading losses in Brokerage 1 were consistent and significant, increasing each month until the account value had diminished to less than $2 million at the time the Receiver was appointed.  The Receiver has not seen any trading activity in Brokerage 1 that would support any positive returns, or the weekly ROI applied to customer accounts.

The other significant investing venture discovered by the Receiver was EminiFX's entry into the Suffolk and Nassau County residential foreclosure real estate market.  As set forth in more detail in Part VI.D *infra*, EminiFX entered into contracts to purchase 46 residential properties in foreclosure auctions, agreeing to pay a finder $10,000 per successful bid and placing $2,310,400 down in deposits.  EminiFX also purchased two properties not in foreclosure, placing $192,000 down in deposits.  The total purchase price of these 48 properties was $24,254,525.[6] None of those transactions closed prior to the appointment of the Receiver.  Pursuant to the plan concerning the foreclosure properties the Receiver laid out in his June 1 Preliminary Status Report and Request for Emergency Instructions [Dkt. 38], the Receiver obtained Broker Price Opinions

---

[6]      Alexandre, through a yet-to-be-formed LLC, also entered into a contract to purchase a separate property in Nassau County for $5.35 million, paying $535,000 down using funds in a personal account that are traceable to EminiFX funds.

("BPOs") for those properties.  The total value of the 46-property portfolio was $366,525 less than the purchase price, making it highly unlikely that this venture would have been sufficiently profitable to warrant the returns being applied to EminiFX user account balances.  Moreover, the transactions involved substantial risk, and the short time to close would have given EminiFX little opportunity to perform title investigations or to verify the potential existence of tenants or other occupants that could have delayed realization of the portfolio value through market sales.  The Receiver is in the process of unwinding this portfolio to the extent possible, as set forth in Part VI.D *infra*.

Further, although deposits made through Crypto Exchange 4 were generally denominated in the user's account in US dollars as if the BTC had been so converted, the actual deposit was held in BTC at Crypto Exchange 4.  The withdrawal transactions from Crypto Exchange 4 appear to be limited to redemptions by EminiFX users, with the exception of at least one internal transfer to Crypto Exchange 3 of 10.4 BTC.  Deposits into Crypto Exchange 4 far outpaced withdrawals from there.  As a result, thousands of BTC accumulated in Crypto Exchange 4 over time, exposing EminiFX to the price of BTC.  As the chart of the price of BTC in US Dollars from November 1, 2021 to May 13, 2022 (the date the account was frozen and placed into suspense by Crypto Exchange 4) below shows, the price of Bitcoin generally trended downward over time,



with a substantial amount of volatility.  In many of those weeks, a holder of BTC would have experienced negative returns, and therefore exposure to BTC does not appear to support the consistently positive returns EminiFX applied to its users' account balances.

## V.  WINDING DOWN EMINIFX AS AN OPERATING ENTITY

In the June 1 Preliminary Status Report and Request for Emergency Instructions (the "June 1 Report"), the Receiver stated that he would seek to wind down the operations of EminiFX in an orderly fashion based upon his findings to date [Dkt. 38].  The Receiver's investigation since then has confirmed the findings in the June 1 Report, which is that there is no investing or other business activity of EminiFX that would warrant the cost of continuing the company as an operating entity.  The Receiver and his team therefore spent the month of June focusing their efforts on winding down the operations of EminiFX, which is substantially complete.

**EminiFX Platform Shutdown**.  Once the Receiver was able to gain control of the eminifx.com website and safely secure all the data located therein, he and his team shut down the EminiFX platform.  The eminifx.com website is currently set up to the forward to the receivership website.  The receivership website cautions users on the home page: "The Receiver is not operating EminiFX as a trading platform of any kind. Please do NOT continue to use the EminiFX platform in any way or try to deposit any additional funds into EminiFX."  *See* Part VII, *infra*, for more information on communications with users and creditors.

**Termination of Employees**.  As stated in the June 1 Report, once the Receiver was able to obtain access to EminiFX's account at its payroll company, all employees were terminated from EminiFX.  The Receiver sought instruction from the Court, consistent with the obligations of New York Bus. Corp. Law § 1210, to pay the final payroll of the terminated employees, with

the exception of Alexandre and his wife, the Chief Financial Officer.  Payments to former employees (other than Alexandre and his wife) have been made, and all associated payroll taxes were paid via the payroll company.  All but three of the former employees have deposited the final paychecks; the Receiver is in communication with those three former employees to ensure they receive their final payroll.

**Vacating the Premises**.  When the Receiver secured the premises of the company on 34th Street in Manhattan, he discovered that EminiFX had recently expanded its license agreement (the "License Agreement") with 34th Street Suites LLC ("Jay Suites" or the "Licensor") on May 4, 2022.  The License Agreement required a $306,000 security deposit and included 41 individual units, which had been combined into over 30 separate offices.  Most of these offices had a substantial amount of computer equipment and other office property in them, and the Receiver and his team immediately secured the equipment containing data in a subset of offices, and engaged a locksmith to change the locks.  The Receiver and his team spent the next month and a half securing the substantial amount of data in EminiFX systems, as set forth above in Part III.

As the Receiver stated in his June 1 Report, his intention was to vacate the premises as soon as practicable, ideally by June 30.  The Receiver therefore requested authority from the Court to pay the June rent invoice of $106,144.68.  The Court granted that request [Dkt. 42], and the Receiver paid the invoice.  While the Receiver's forensics team was working to secure the data, the Receiver proceeded separately to try to dispose of the substantial amount of electronic and office equipment in the EminiFX offices in order to vacate the premises.  Such disposition presented several problems – most significantly, the bulky nature of the equipment demanded significant time and effort to remove it from the premises; storage costs would be substantial and

eat into any revenue from the disposition of the equipment; and the resale value of used electronics is generally very limited.

In order to maximize value of the office equipment liquidation, the Receiver solicited bids from three different potential buyers, all of whom had substantial experience with this type of situation and all of whom performed on-site due diligence.  One potential buyer informed the Receiver that any bid would not be economical, given the issues.  Another potential buyer submitted a bid for $5,000, expressing similar concerns.  A third potential buyer submitted a bid for $20,000 if he had time to slowly vacate the offices and sell the equipment, or $15,000 if the offices were to be vacated by June 30.  Included in such price were all moving and storage costs, which were expected to range from $25,000 to $40,000 for moving and $3,000 to $6,000 per month for storage.  Given that rent for the space was in excess of $100,000 per month, the Receiver agreed to the third bid with the June 30 date, on the condition that any proceeds over $75,000 would be divided equally between the Receiver and the buyer.  This structure allows the receivership estate to participate in any unexpected windfall that may occur as a result of the sale of the equipment.  The Receiver moved for approval of such sale under 28 U.S.C. § 2004 [Dkt. 61], and approval was granted [Dkt. 66].  The buyer divided the items into two categories – smaller more valuable items that could be stored easily and sold over time, and larger Category 1 items that were sold immediately in bulk to a service that also assisted in ensuring that the premises were vacated by June 30.  An inventory of the foregoing items is attached hereto as Exhibit 2.  The initial payment of $15,000 was received on July 13, and is being held in Alexandre Assets pursuant to an agreement between the Receiver and Alexandre's counsel.

Having fully vacated the premises by June 30, the Receiver was in a position to surrender possession to the Licensor fully at that time.  Earlier that month, the Receiver informed

27

the Licensor that, consistent with the June 1 Report, he expected to be fully out of the premises by June 30.  The Receiver also informed the Licensor that the $306,000 security deposit should be returned to the estate, without prejudice to any right Licensor may have to submit a claim in a claims process to be established at a later date, and that the Receiver expected Licensor to retain evidence of mitigation to submit with any such claim.  The Receiver and the Licensor discussed a negotiated resolution, but were ultimately unable to reach an agreement.  On June 30, as a result of the substantial efforts by the Receiver's team, the premises were vacated fully, and keys were surrendered to the Licensor.

Also on June 30, the Receiver informed the Licensor that he was rejecting formally the License Agreement and demanded return of the security deposit, as under New York General Obligation Law § 7-103, such security deposit remains the property of the tenant while it is being held in trust by the landlord.[7]  On July 14, the Licensor filed a letter requesting that it be allowed to keep the security deposit and file a claim for additional damages [Dkt. 69].  The Receiver is preparing a response, which is due on or before July 29.

**Termination of Minor Contracts**.  The Receiver has and continues to terminate minor contracts and services as part of the wind down of EminiFX operations, as such services are no longer required for administration of the estate.  To the extent that any such contracts are canceled, the Receiver is ensuring that counterparties are added to a list of non-investor potential claimants, such that they will be notified of the claims process in this case once it is established and approved by the Court.

---

[7]     *See, e.g., Samuels* v. *E.F. Drew & Co.*, 292 F. 734, 739 (2d Cir. 1923) (executory contracts presumed rejected by federal receiver, who must affirmative adopt); *Menke* v. *Willcox*, 275 F. 57, 58–59 (S.D.N.Y. 1921) (Learned Hand, J.) (federal receiver may perform part of a contract experimentally without being bound); *Jeffrey* v. *J.I.M. Mgmt. Co.*, 31 Misc. 3d 141(A), 929 N.Y.S.2d 200 (App. Term 2011) ("commingling of a security deposit with a landlord's personal funds is a conversion, which gives a tenant an immediate right of recovery"); *LeRoy* v. *Sayers*, 217 A.D.2d 63, 68 (N.Y. App. Div. 1995) (obligation not to commingle survives purported repudiation of lease).

## VI.    ASSET RECOVERY AND DISPOSITION

To date, approximately $60.5 million in funds, in two banks and one brokerage that were frozen by the CFTC, has been turned over to the receivership estate.  The Receiver has also recovered an additional $1.1 million from real estate and other recoveries, and has identified additional potential real estate recoveries to pursue, as set forth herein.  The CFTC also froze funds in three cryptocurrency accounts, which the Receiver is in the process of turning over to the estate. A fourth EminiFX cryptocurrency account, in Estonia, also contains a potentially substantial amount of cryptocurrency that the Receiver is currently working to obtain.  The Receiver is also working to recover and dispose of additional assets, and will continue to do so for any further assets that come to light as a result of his team's investigation.

### A.    *Alexandre Assets Procedure*

The SRO appointed the Receiver as receiver over EminiFX and assets in the name or under the control of Alexandre traceable to customer funds.  (SRO ¶ 30.)  However, as noted above, the day after the Receiver was appointed, Alexandre was charged criminally for similar conduct to that alleged in the Complaint and was arrested.  Whether an asset in the name or under the control of Alexandre is traceable to customer funds is and remains a question of fact. Nevertheless, the Receiver continues to have a duty, first under the SRO and now the Consent Order, to secure and administer those assets as part of the Receivership Estate.

In order to solve the practical difficulty of conducting a tracing hearing while a parallel criminal charge is pending, the Receiver devised a two-step process whereby he alone could request turnover of assets in the name or under the control of Alexandre traceable to customer funds (the "Alexandre Assets"), based on his good-faith belief that such assets were traceable to EminiFX customers.  (Consent Order ¶ 38.)  The Receiver agreed further to provide

29

Alexandre with the basis for such belief and has done so for the Alexandre Assets thus turned over to the Receiver.  The Receiver agreed to hold, and has held, these assets in a segregated account, which shall not be used to fund the administration of the receivership estate.  The remainder of the assets turned over to the Receiver are maintained in the general receivership estate and remain available for use in administration of the estate.

At a later date, the Receiver intends to negotiate in good faith with Alexandre concerning which of the Alexandre Assets should be turned over to the general receivership estate. Any agreed resolution will be submitted to the Court for approval, and any disputes over certain assets will be the subject of further proceedings before the Court.  If and when any of the Alexandre Assets are released to the general receivership estate, they will be available for use in the administration of the estate and for distribution to claimants.  At present, the Alexandre Assets total just over $9 million.

B.  *Bank and Investment Account Turnovers*

Upon entry of the SRO, the CFTC immediately froze a number of accounts in the name of EminiFX, and those of Alexandre that appeared to contain customer funds.  The bulk of the assets denominated in US dollars were located at two banks (Bank 1 and Bank 2) and one brokerage (Brokerage 1).[8]  As stated in the June 1 Report, the Receiver immediately liquidated the risky holdings at Brokerage 1, pursuant to Paragraph 31(d) of the SRO, in order to preserve the value for the estate.  The account at Brokerage 1 and two of the eight accounts in Bank 1 were in the name of Alexandre, and the Receiver therefore provided Alexandre with his good-faith belief that the funds were traceable to EminiFX customers, before depositing the funds into the

---

[8]  The Receiver recently obtained records for Bank 3, in which Alexandre had an account with a balance less than $1,000. The Receiver expects to resolve that account shortly.

Alexandre Assets account created by the Receiver.  The total amount of funds turned over from frozen accounts exceeds $60 million, as follows:

| Institution | Amount | Date |
|---|---|---|
| **General Receivership Estate** | | |
| Bank 1 – Acct x2914 | $35,783,299.59 | 6/1/2022 |
| Bank 1 – Acct x2922 | $736,526.66 | 6/1/2022 |
| Bank 1 – Acct x8473 | $100,000.00 | 6/1/2022 |
| Bank 1 – Acct x8598 | $100,000.00 | 6/1/2022 |
| Bank 1 – Acct x8697 | $672,925.00 | 6/1/2022 |
| Bank 1 – Acct x9920 | $101,174.67 | 6/1/2022 |
| Bank 2 – Acct x3746 | $14,542,354.94 | 6/28/2022 |
| Bank 2 – Acct x3762 | $40,797.60 | 6/28/2022 |
| **Total Recoveries** | **$52,077,078.46** | |
| **Alexandre Assets** | | |
| Bank 1 – Acct x5365 | $6,615,449.38 | 6/21/2022 |
| Bank 1 – Acct x2539 | $100,643.05 | 6/21/2022 |
| Brokerage 1 – Acct x1114 | $1,752,940.40 | 7/6/2022 |
| **Total Recoveries** | **$8,469,036.83** | |
| **Total Bank and Brokerage Turnovers** | **$60,546,115.29** | |

The Receiver will report on further turnover of accounts if any are discovered, and is continuing to investigate all possible accounts containing receivership assets.

C.   *Cryptocurrency Account Turnovers*

Upon entry of the SRO, as well as freezing the above accounts, the CFTC also froze a number of accounts containing cryptocurrency, the vast majority of which is denominated as Bitcoin (BTC).  Since the preliminary status report was filed, the Receiver and his team have learned that the amount in Crypto Exchange 4, which remains frozen, is substantial:

| Institution | Amount Frozen | Est. USD Value (July 20) |
|---|---|---|
| Crypto Exchange 1 | BTC 10.76 | $250,000 |
| Crypto Exchange 2 | BTC 0.06 ETH 1.85 | $5,000 |
| Crypto Exchange 3 | BTC 10.98 *plus others* | $285,000 |
| Crypto Exchange 4 | BTC 3,658.34 | $86,460,000 |
| **Total Cryptocurrency** | **BTC 3,680.14** *plus others* | **$87,000,000** |

31

Crypto Exchange 4 is located in Estonia, and the account there has been frozen by the Estonian Financial Intelligence Unit.  The Receiver is in the process of engaging counsel in Estonia to assist the receivership estate with obtaining the cryptocurrency frozen there, to the extent possible.  *There is no guarantee that all or part of the cryptocurrency held in Estonia will be repatriated to the United States and turned over to the Receiver.*  Nevertheless, the Receiver and his team will continue their efforts to recover as much of the cryptocurrency as possible.

Given the substantial amount of potential cryptocurrency assets that could be turned over to the estate, the Receiver and his team are preparing to open an institutional account at a large cryptocurrency exchange that is licensed by the New York State Department of Financial Services.  Once the size of the cryptocurrency portfolio actually under the estate's control is known, the Receiver and his team intend to devise a specific plan for the administration of the estate's cryptocurrency holdings and to submit that plan for approval by this Court.

D.   *Long Island Real Estate Portfolio*

In the weeks before the Receiver was appointed, EminiFX entered into 48 separate contracts to purchase various properties in Long Island, for a total purchase price of $24,254,525 with $2,502,400 paid in deposits.  Of those, two were purchased via regular real estate contract ($1,920,000 purchase price, $192,000 paid in deposits), and 46 were purchased via foreclosure auctions in Suffolk County ($22,334,525 purchase price, $2,310,400 paid in deposits) (the "Foreclosure Properties").  On June 1, upon the Receiver's application for emergency instructions, a procedure was set up whereby the Receiver has the option to accept the return of the deposit in all cases, or otherwise determine if a property had significant enough possible upside to warrant a different course of action [Dkt. 42].  The Receiver has already executed termination agreements

for the two properties purchased via regular real estate contract, and the estate has recovered the associated deposits.

For the Foreclosure Properties, the Receiver and his team have been working to unwind the transactions and recover as much as possible for the Receivership Estate.  In a foreclosure sale in Suffolk or Nassau County, the lender of the underlying mortgage brings an action against the defaulting borrower in Supreme Court, and obtains a judgment of foreclosure. The property is then sold under the supervision of a court-appointed referee pursuant to Terms of Sale approved by the Court.  After the supervised auction, the purchaser (in this case, EminiFX) enters into a Memorandum of Sale agreeing to be bound by the Terms of Sale, pursuant to which a deposit (in most cases, approximately 10% of the winning bid, or purchase price) is delivered to the referee.  Closing is scheduled in the Terms of Sale, typically on a shortened time frame with a time is of the essence clause included.  At the time the Receiver was appointed, the Terms of Sale had been executed and the deposits paid, but EminiFX had not yet closed on any of the properties. EminiFX had used a finder, Bonaventura Realty Group ("Bonaventura"), which charged $10,000 for each successful bid.  The deposits were also all paid through Bonaventura; the Receiver has discovered that $2,519,000 in payments were made by EminiFX to Bonaventura, the majority of which was used for deposits and the remainder collected as fees.

Once the scope of portfolio and EminiFX's prior actions became clear, the Receiver obtained the Terms of Sale from Bonaventura and discovered that closing dates on many of the properties were imminent.  The Receiver immediately engaged counsel on Long Island, Forchelli Deegan Terrara LLP ("FDT"), with experience in real estate and bankruptcy matters, to make sure that all referees were served with the SRO in effect at the time, and to delay the closing dates and freeze the deposits.  The Receiver also obtained price estimates on Zillow for each of the

Foreclosure Properties in an effort to assess the potential value of the portfolio, and on June 1

submitted to this Court a plan for resolution of the Foreclosure Properties [Dkt. 38].  That plan

called for the Receiver to obtain a Broker Price Opinion ("BPO") for a more accurate estimation

of potential price than Zillow, to seek cancellation of the contracts and return of the deposit for

properties where the BPO was less than 130% of the purchase price, and to evaluate further options

where the BPO exceeded 130% of the purchase price.  The Court approved that plan on June 1

[Dkt. 42].

Pursuant to that plan, the Receiver obtained a BPO from a broker at a Long Island

brokerage with over 1,500 agents.  Exactly half of the BPOs (23) were above the purchase price,

and the other half were equal to or below the purchase price, and the total BPO value was $366,525

less than the purchase price for those properties.  The Receiver further analyzed the portfolio by

discounting the BPOs by 7%, representing a simple re-sale at the BPO less commission and costs;

and by 15%, representing additional market and property risk, which yielded the following results:

| Estimated Average Price | Estimated Proceeds | Purchase Price | Difference | Properties Over Purchase Price |
|---|---|---|---|---|
| 100% of BPO | $21,968,000 | $22,334,525 | ($366,525) | 23 |
| 93% of BPO | $20,430,240 | $22,334,525 | ($1,904,285) | 17 |
| 85% of BPO | $18,672,800 | $22,334,525 | ($3,661,725) | 7 |

The seven properties over the purchase price even if 85% of the BPO represented those with a

potential substantial premium.  The premiums – the excess of the BPO over the EminiFX purchase

price – for those seven properties ranged from 25% to 46%.  The Receiver, in consultation with

his financial adviser, decided to test the market by instructing the broker who performed the BPO

to market those seven properties to the more than 1,500 agents at her Long Island brokerage, to

see if there was any interest.  No true market developed to acquire all or some of these marketed

properties, likely in part due to potential concerns about title and the residential homes' occupancy

status.  As a result, the Receiver does not believe it would be prudent at this time to use receivership funds to close on any of the properties.

The Receiver is therefore seeking the return of the contract deposit and cancellation of the contracts as set forth in the June 1 order.  In general, the termination agreement is executed by the lender (as seller) and the Receiver (as purchaser).  Some lenders are also requesting that, in lieu of a termination agreement, the Receiver execute an assignment of the bid back to the lender in exchange for the return of the deposit, which from the Receiver's perspective is equivalent.  At that point, the referee may turn over the deposit to the Receiver.  A majority of referees have, however, requested that the court overseeing the foreclosure sale enter an order approving the turnover of the deposit to the Receiver, which can add additional time before the deposit is returned to the estate.

The Receiver has thus far executed termination agreements with respect to 22 of the Long Island properties, including the two not in foreclosure for which no further action from a referee or a court was necessary.  The deposits on those 22 properties total $1,173,200.  Eight of those have been completed, and the Receiver has received the associated deposits.  Of the remaining 14 properties, stipulations with respect to eight have been filed with the Suffolk County Supreme Court and the parties are awaiting court order,[9] and six are awaiting further confirmation from the referee on whether a stipulation is necessary.

For an additional twenty properties with deposits totaling $948,500, the Receiver has agreed in principle with the lender for a termination of the agreement and a return of the

---

[9]    For one of those properties, the Suffolk County Supreme Court had ordered, upon an Order to Show Cause request made by the Receiver, the return of the $57,000 deposit to FDT's IOLA account, after which the lender agreed to the termination, although the referee has not yet agreed to the release of the deposit from the IOLA account to the Receiver.  The Receiver directed FDT to seek further order of the Court directing that the deposit amount may be transferred from the IOLA account to the receivership estate.

deposit.  Those cases remain subject to negotiation of appropriate documentation of settlement. The Receiver is also awaiting final signature on two properties, and for the other eighteen properties is awaiting documentation from the lenders after each determines whether it wants to proceed via termination agreement or assignment of bid.  For four properties with deposits totaling $290,700, the Receiver is in active negotiations with the lenders and will continue to work toward resolution.

Finally, for two properties, the deposit amounts were already returned to Bonaventura by the referees, in an amount of $90,000.  The Receiver understands that Bonaventura claims to be owed additional funds as fees from EminiFX even after collection of the $90,000. The Receiver plans to address those $90,000 in deposits as part of a larger evaluation of the Bonaventura issue, and not pursuant to the process set forth in the June 1 order.  The current status of the Receiver's efforts to resolve the Long Island real estate portfolio is summarized as follows, and a complete list is attached as Exhibit 3:

| Status | No. | Deposit Amount | Agreed Recovery | Amount Received |
|---|---|---|---|---|
| **Funds Received** | **8** | **$534,000** | **$534,000** | **$534,000** |
| **Agreement Signed** | **14** | **$639,200** | **$639,200** | **$0** |
| Awaiting Court Order | 8 | $423,000 | $423,000 | $0 |
| Awaiting Referee | 6 | $216,200 | $216,200 | $0 |
| **Agreement in Principle** | **20** | **$948,500** | **$948,500** | **$0** |
| Awaiting Final Signature | 2 | $80,000 | $80,000 | $0 |
| Awaiting Documentation | 18 | $868,500 | $868,500 | $0 |
| **Negotiation in Process** | **4** | **$290,700** | **$0** | **$0** |
| **Returned to Bonaventura** | **2** | **$90,000** | **$0** | **$0** |
| **Grand Total** | **48** | **$2,502,400** | **$2,121,700** | **$534,000** |

The Receiver and his team intend to continue their efforts to resolve this portfolio and will provide the Court with an update as to their progress in the next status report.

E.   *Manhasset Deposit*

On June 22, a $535,000 deposit (the "Manhasset Deposit") on a real estate property in Manhasset, Nassau County (the "Manhasset Property") was turned over to the Receiver, to be administered in the segregated Alexandre Assets account.   Soon before the creation of the receivership, Alexandre entered into a contract for the purchase of the Manhasset Property, and made the Manhasset Deposit.   That transaction did not close before the Receiver was appointed. After a lengthy negotiation followed by extensive briefing before the Court, the Court ordered the sellers to turn over the Manhasset Deposit to the Receiver [Dkt. 60].   Such turnover was without prejudice to the sellers' right to file a claim in the receivership, and subject to the Receiver's right and obligation to analyze and resolve such claim, all pursuant to the claims process that will later be established by the Court.

The Receiver will continue to hold the Manhasset Deposit in the segregated Alexandre Assets account pursuant to Paragraph 38 of the Consent Order.   If the sellers decide to file a claim pursuant to a court-approved claims process, the Receiver will in good faith assess any such claim based on the totality of the facts and circumstances.

F.   *Additional Asset Recovery and Disposition*

As set forth above, the Receiver disposed of the office property for (1) a $15,000 cash payment from Auction Advisers, which is also being held in the Alexandre Assets segregated account pending further discussion with Alexandre, (2) at least $30,000 in cost savings for moving and storage (if not more), and (3) half the sale proceeds over $75,000.   The Receiver also located a contract for parking near the premises of EminiFX, which had a substantial amount prepaid, and has recovered $3,300 from the garage.   Further, the Receiver has also discovered a number of vehicles that were purchased or leased by EminiFX, including one vehicle for which the loan

payoff was traceable to customer funds.  The Receiver will include in the upcoming procedures application a request for specific authority for the disposition of the vehicles.

## VII.    COMMUNICATIONS WITH EMINIFX USERS AND CREDITORS

The Receiver and his team have begun to develop a process to ensure that information about the receivership can be provided in a cost-effective and efficient manner to tens of thousands of EminiFX users, potential creditors of the receivership, and other interested parties. Soon after his appointment, the Receiver launched a website and an email box using his law firm's domain.  The Receiver and his team received thousands of emails while attempting to gain access to the EminiFX system.  Once the Receiver secured the user database from EminiFX containing over 62,000 unique email addresses, he engaged Stretto, Inc. ("Stretto") as a claims noticing agent to handle investor and claimant relations and communications.  The Receiver and his team then began the process of transferring the website and email box to Stretto to manage.

Going forward, to ensure that all interested parties are kept appropriately informed while allowing the costs to scale to the size of the EminiFX user base, the Receiver envisions communications with EminiFX users will occur in two ways.  First, the Receiver and his team at Stretto have created a website that will be the primary source of information for interested parties.[10] **Any interested party seeking information concerning the receivership is encouraged to review the website in the first instance.**  The homepage of the website contains the status reports (including this one), key filings and other information about this case.  The website also contains a "Civil Docket" section, so that all ECF filings in this case are available to all interested parties without the need for any such party to pay for filings using PACER or ECF.  The Receiver will aim to have all docket items posted by the next business day, and any interested party can subscribe

---

[10]       *See* http://www.eminifxreceivership.com.

for docket item email updates by clicking the "Subscribe" button in the "Civil Docket" section. Under the "Frequently Asked Questions" section, the Receiver and his team endeavor to provide answers to common user questions so that answers are available to all interested parties, and the Receiver and his team will update that over time.  Finally, the website contains a section for users or interested parties to update their contact information, especially the email address.  Given that a substantial number of EminiFX users appear to be French speakers, the Receiver is providing the website in both English and French.

The second type of communication will be notices from the Receiver sent via email to (1) the 62,000 users from the database (a working email address appears to have been required to open an EminiFX account), (2) any email address that sent an email to the receivership's initial email box, (3) all non-investor potential creditors known to the Receiver, and (4) any other interested party who submits an email address on the website (the "Email Distribution List"). Although this case is not a class action subject to Rule 23 procedures, the Receiver believes that such practices and procedures can be instructive given the volume of potential claimants here.  The Receiver has prepared a draft initial notice of receivership to send to the Email Distribution List and is submitting that draft notice for approval by the Court via application to be filed shortly after this Initial Status Report.  The Receiver also proposes to translate that notice into French.

Future notices to potential claimants to be sent in this manner, such as a notice for instructions on how to submit a claim, will also be submitted to the Court in advance for approval. Given that an email address appears to have been required to open an EminiFX account, the Receiver believes that it is reasonable to require that all interested parties provide an email address in order to receive notices in this matter.  The Receiver expects to manage communications and

claims in as paperless a manner as possible, in order conserve costs and maximize the funds available for distribution at a later date.

Stretto has also set up an email address (EminiFXInquiries@Stretto.com) and a phone number (855-228-3721) to handle individual user communications.  Due to the enormous volume of questions, however, a response is not guaranteed if such information can be found on the website, and users are encouraged to review that website before sending any email.  The Receiver and other employees of his law firm will not, as a general rule, respond directly to inquiries from individual EminiFX users, given the need to ensure that communications with users remain as uniform and as cost-effective as possible.

## VIII.   RECEIVERSHIP OPERATIONS

In order to administer the estate, the Receiver has taken a number of steps to ensure that the assets in the custody of the Receiver are protected and that the Receiver has sufficient support from professionals to administer the estate.  The primary types of assets the Receiver expects to hold in the estate are cash denominated in US dollars and cryptocurrency denominated in Bitcoin.  To hold US dollars, the Receiver has worked with Stretto to ensure that funds are held at a bank with over $5 billion in deposits that has substantial experience in federal receivership and a claims distribution matters.

As set forth in his Letter Application to Confirm Employment of Professionals [Dkt. 46], the Receiver has engaged a number of professional firms to assist him with the administration of the estate.  The SRO empowered the Receiver to engage additional members of his law firm to support him, and he has done so.  To assist with securing and analyzing the immense amount of data located on the servers and computers of EminiFX, and to provide the Receiver with financial advice and claims analysis, the Receiver has engaged J.S. Held, LLC.  To assist with

40

unwinding the Long Island real estate portfolio, and with other additional matters, the Receiver has engaged Forchelli Deegan Terrara LLP as additional counsel.  To assist the Receiver with claims administration and communications with EminiFX users, the Receiver has engaged Stretto, Inc.  Finally, to provide the Receiver with tax advice and file the necessary tax forms, the Receiver has engaged Crowe LLP.  All of these engagements were approved by the Court, and all professional fee requests will be subject to review by the CFTC consistent with the CFTC Billing Instructions for Receivers in Civil Actions [Dkt. 9, at 23-32], and approval by the Court after *in camera* submission of time entries [Dkt. 47].  The Receiver also expects to engage Estonian counsel and submit such engagement letter for review by the Court in the upcoming procedures application to be filed shortly after this Initial Status Report. The Receiver will continue to endeavor to ensure that the costs of administration remain reasonable.

## IX.     RECOMMENDATIONS AND NEXT STEPS

As set forth above, the Receiver's initial actions over the last two months were taken to preserve the status quo, to unwind the Long Island real estate portfolio given the urgency of those contracts, and to begin to obtain an accurate picture of the various transactions and financial condition of EminiFX.  The Receiver's analysis of the financial condition of EminiFX, especially an understanding of each individual user's investment of cash or cryptocurrency in EminiFX and redemption of cash or cryptocurrency from EminiFX, should be substantially complete by the end of the year.  The Receiver notes that progress may be made on many of the following next steps even if a portion of the case is stayed at the request of the USAO.

A.     *Application for Approval of Certain Procedures*

Shortly after the filing of this Initial Status Report, the Receiver intends to file a short application for approval of a number of items related to the administration of the estate.

Those items include (1) approval of the form of initial notice to be sent to investors; (2) a request for authority to administer and resolve certain assets and liabilities under a certain threshold, including settling claims and administering assets under $50,000, adopting executory contracts under $25,000, and paying expenses incurred in the ordinary course of the receivership under $10,000 (but not to exceed $25,000 per quarter total); (3) approval of certain actions in aid of securing the estate's cryptocurrency, including paying custodial fees and engagement of counsel in Estonia; and (4) a request for authority to dispose of certain vehicles in accordance with 28 U.S.C. § 2004.  For this application, and future applications and motions generally, the Receiver intends to coordinate with the CFTC and counsel for Alexandre in advance to determine if there is any opposition to such request, and to so state in the body of such request.

B.    *Complete Forensic Analysis*

The Receiver and his forensics team have begun to analyze the immense amount of data available in the EminiFX database, as well as the financial and transaction records obtained by the Receiver in connection with his investigation.   The primary goal of this analysis is to generate a reliable list for each EminiFX user containing the cash and cryptocurrency deposits into the account, the cash and cryptocurrency redemptions from an account, and any internal transfers between EminiFX accounts.  That analysis will be critical for evaluating the potential claims of each of the tens of thousands of EminiFX users.

The Receiver plans to use as much of the internal EminiFX database as possible, although the Receiver notes that even generating the foregoing list solely from the EminiFX database is not possible.  In order to validate the data recovered from the EminiFX database, the Receiver intends to use both the EminiFX bank account and cryptocurrency exchange account records in his possession, as well as public blockchain data for cryptocurrency transactions.  Such

validation may occur on an auditing or sampling basis, so that the cost of doing any such validation can scale appropriately given the tens of thousands of users.  Once this analysis is complete, the Receiver will use that data to determine a potential claims process and will submit such process for approval by this Court.

      C.    *Recovery and Administration of Cryptocurrency Holdings*

      In the near term, the Receiver plans to focus efforts on recovering the cryptocurrency holdings from Estonia, and in establishing the necessary accounts to hold cryptocurrency safely during the administration of the estate.  The Receiver reiterates that there is substantial uncertainty as to the timing and amount of any turnover of the cryptocurrency that is currently frozen at Crypto Exchange 4 in Estonia.  In the interim, the Receiver intends to turn over the cryptocurrency held in the other frozen cryptocurrency accounts in short order, to maintain until the resolution of the attempted turnover of the Crypto Exchange 4 account.

      Once the Receiver is in possession of all the cryptocurrency that he believes is likely to be turned over, the Receiver intends to formulate a plan for the disposition of the cryptocurrency.  Considerations relevant to such a plan may include, but are not limited to (a) general investor expectations, including known conversions to cryptocurrency immediately preceding deposits; (b) the extent to which EminiFX deposits and account balances were maintained in US dollars alone; (c) known conversions to cash immediately following redemptions; (d) the total amount of Bitcoin in the estate; (e) the need for a managed sale of the cryptocurrency; (f) the added cost of administering claims in both US dollars and Bitcoin as opposed to just US dollars; and (g) other relevant factors discovered as the Receiver continues his investigation.  Any plan formulated by the Receiver will be in consultation with his financial advisors, and will be submitted to the Court for approval.

D.    *Motion for Approval of Claims Process*

After the Receiver completes his forensic analysis, he intends to formulate a claims procedure, both for the tens of thousands of potential claims by EminiFX users, as well as what the Receiver expects will be a limited number of claims from non-investors.  Depending on the volume, the Receiver expects to make individual determinations with respect to each of the claims submitted by non-investors.  The Receiver further expects to include an objection procedure for non-investor claims that will provide them with a notice and opportunity to be heard.

For claims by EminiFX users, the Receiver will determine whether to propose valuing the claims solely in US dollars, or valuing them in both US dollars and cryptocurrency. The Receiver will also analyze any intra-system transfers and propose a method for how such transfers should be treated.  As a general rule, the Receiver expects each account to be associated with a single claim.  The Receiver will, however, evaluate whether there are any sets of multiple accounts that should be consolidated into a single claim, based on a number of factors including the social security numbers, email addresses, names, phone numbers, and physical addresses associated with the accounts.  Depending on the volume of potential claims with multiple accounts, the Receiver will propose a process for how to process those claims, with an expectation that there will be some mechanism for a claimant to respond to any consolidation.  For investor claims, the Receiver expects to include in his proposal both a standard for disallowance of any claim and a cost-effective and workable general objection procedure.  Any proposed claims process will be the subject to approval by this Court.

E.    *Development of Distribution Plan*

As explained in his June 1 Report, once the claims process is complete, the Receiver intends to develop a distribution plan for court approval, accounting for all relevant issues that

arose during the claims approval process. The Receiver intends to propose a prudent initial distribution as soon as practicable following the Court's approval of a distribution plan. The Receiver further cautions EminiFX users—especially those who have inquired about refunds— that no receivership funds are intended to be distributed to EminiFX users outside the claims and distribution process approved by the Court.

F.    *Evaluation of Potential Litigation Claims*

As part of the administration of the estate, the Receiver intends to evaluate the possibility of litigation claims against third parties for which the estate has standing to pursue under applicable law. Given how recently EminiFX was created, any proposed stay by the USAO is unlikely to affect any statute of limitations or repose that might be available to any potential defendant, at least in the near term. Moreover, the result of the Criminal Action may affect the Receiver's evaluation of any such third party claims. The Receiver may seek further relief from the Court at the appropriate time if necessary to preserve the Receiver's position with respect to any potential litigation against third parties.

**X.    CONCLUSION**

The Receiver will provide a further report within approximately the next 90 days, or at such other time as the Court may direct. The Receiver remains available to provide any further information or advice that the Court may require.

Dated: New York, NY
        July 20, 2022

                                Respectfully Submitted,

                                By: _____
                                        David A. Castleman
                                        *Receiver*

# EXHIBIT 1

**Receivership Estate of EminiFX and Alexandre (22 Civ. 3822): General Ledger**

| Category | Type | Account | Amount (USD) | Date | Balance (USD) |
|----------|------|---------|--------------|------|---------------|
| Turnover | Bank 1 (Frozen) | General Receivership | $35,783,299.59 | 6/1/2022 | $35,783,299.59 |
| Turnover | Bank 1 (Frozen) | General Receivership | $736,526.66 | 6/1/2022 | $36,519,826.25 |
| Turnover | Bank 1 (Frozen) | General Receivership | $100,000.00 | 6/1/2022 | $36,619,826.25 |
| Turnover | Bank 1 (Frozen) | General Receivership | $100,000.00 | 6/1/2022 | $36,719,826.25 |
| Turnover | Bank 1 (Frozen) | General Receivership | $672,925.00 | 6/1/2022 | $37,392,751.25 |
| Turnover | Bank 1 (Frozen) | General Receivership | $101,174.67 | 6/1/2022 | $37,493,925.92 |
| Expenses | Wind Down [Dkt 42] | General Receivership | ($106,144.68) | 6/2/2022 | $37,387,781.24 |
| Recovery | RE Deposit | General Receivership | $37,000.00 | 6/9/2022 | $37,424,781.24 |
| Interest | Interest | General Receivership | $5,739.24 | 6/16/2022 | $37,430,520.48 |
| Expenses | Wind Down [Dkt 42] | General Receivership | ($181,841.45) | 6/17/2022 | $37,248,679.03 |
| Reserve | Wind Down [Dkt 42] | Alexandre (Payroll) | $54,556.92 | 6/17/2022 | $37,303,235.95 |
| Reserve | Wind Down [Dkt 42] | Dieuveuil (Payroll) | $22,152.03 | 6/17/2022 | $37,325,387.98 |
| Turnover | Bank 1 (Frozen) | Alexandre Assets | $6,615,449.38 | 6/21/2022 | $43,940,837.36 |
| Turnover | Bank 1 (Frozen) | Alexandre Assets | $100,643.05 | 6/21/2022 | $44,041,480.41 |
| Recovery | RE Deposit | General Receivership | $155,000.00 | 6/22/2022 | $44,196,480.41 |
| Turnover | RE Deposit | Alexandre Assets | $535,000.00 | 6/22/2022 | $44,731,480.41 |
| Expenses | Professional [Dkt 47] | General Receivership | ($25,000.00) | 6/23/2022 | $44,706,480.41 |
| Turnover | Bank 2 (Frozen) | General Receivership | $14,542,354.94 | 6/28/2022 | $59,248,835.35 |
| Turnover | Bank 2 (Frozen) | General Receivership | $40,797.60 | 6/28/2022 | $59,289,632.95 |
| Recovery | RE Deposit | General Receivership | $27,000.00 | 6/28/2022 | $59,316,632.95 |
| Recovery | Misc Deposit | General Receivership | $3,300.00 | 6/28/2022 | $59,319,932.95 |
| Interest | Interest | General Receivership | $5,789.93 | 6/30/2022 | $59,325,722.88 |
| Turnover | Broker 1 (Frozen) | Alexandre Assets | $1,752,944.40 | 7/6/2022 | $61,078,667.28 |
| Recovery | RE Deposit | General Receivership | $30,000.00 | 7/8/2022 | $61,108,667.28 |
| Recovery | Sale of Property | Alexandre Assets | $15,000.00 | 7/13/2022 | $61,123,667.28 |
| Recovery | RE Deposit | General Receivership | $45,000.00 | 7/13/2022 | $61,168,667.28 |
| Recovery | RE Deposit | General Receivership | $110,000.00 | 7/14/2022 | $61,278,667.28 |
| Recovery | RE Deposit | General Receivership | $50,000.00 | 7/15/2022 | $61,328,667.28 |
| Recovery | RE Deposit | General Receivership | $80,000.00 | 7/15/2022 | $61,408,667.28 |

*\* Detailed Descriptions Omitted for Public Filing*

# EXHIBIT 2

7/7/2022
16:29:27

Case 1:22-cv-03822-VEC    Document 71    Filed 07/20/22    Page 52 of 61

AuctionAdvisors
Remaining Auction Lots
128 - EminiFX

Page: 1
V9-13-Clerking-31

| Lot# | Description | Quantity |
|------|-------------|----------|
| 1 | Blackmagic URSA Broadcast G2<br>Box includes:<br>Blackmagic URSA Broadcast G2 Camera<br>Power Supply<br>Handle<br>Lens Mount<br>Bracket | 3 |
| 2 | Blackmagic URSA Studio Viewfinder | 3 |
| 3 | Fujinon TV Lens: XA20s x 8.5BERM-K3<br>FujiFilm Corporation | 3 |
| 4 | Panasonic 3MOS Full HD<br>Model # AG-AC90P<br><br>Includes:<br>Battery<br>Battery Charger w/ cord | 1 |
| 5 | Panasonic P2HD<br>Model: AG-HPX170P<br><br>Includes:<br>Battery | 1 |
| 6 | Optics HD PTZ Broadcast Camera<br>Model: PT30X-NDI-GY<br>Includes:<br>Remote w/ batteries<br>Video Cord<br><br>ADVISE: This units power cord is missing. | 1 |
| 7 | Optics HD PTZ Broadcast Camera (NIB)<br>Model: PT30X-NDI-GY<br>Includes:<br>Remote w/ batteries<br>Video Cord<br>Power Supply | 1 |
| 8 | ZowieTek NDI \| HX<br>Model: 90493-980<br><br>CAMERA ONLY | 1 |
| 9 | AViPAS HDMI PTZ Camera with PoE<br>Model: AV-1281W<br>Power cord included<br>No box | 1 |
| 10 | ATEM Camera Control Panel<br>Model: 9408565 | 1 |
| 11 | ATEM Television Studio Pro 4k<br>Model: 9447227 | 1 |

| Lot# | Description | Quantity |
|------|-------------|----------|
| 12 | Optics 4th Gen IP or Serial Controller (NIB) | 1 |
| 13 | ikan PT-Elite-Pro-RC (NIB)<br>Elite Universal Large Tablet, and iPad Pro Teleprompter w/ Elite Remote | 1 |
| 14 | Elvid STV-280-4KHDR<br>Elvid StudioVision 4K HDMI Monitor with HDR | 1 |
| 15 | URSA Mini Recorder  (NIB) | 1 |
| 16 | URSA Mini Recorder | 1 |
| 17 | Blackmagic URSA VLock Battery Plate (NIB) | 2 |
| 18 | #Core-SumoV (NIB)<br>Double V-Mount kit w/ coiled power tap to XLR 4-pin for Atomos Sumo | 1 |
| 19 | Blackmagic Micro Converter (NIB)<br>Micro Converter from HDMI to SDI 3G | 6 |
| 20 | Blackmagic Micro Converter<br>Micro Converter SDI to HDMI 3G<br><br>No box<br>Power Cord included | 2 |
| 21 | Hollyland MARS 400S<br>400ft HDMI + SDI Wireless Transmission System | 3 |
| 22 | Hollyland MARS 400 wireless transmitters<br>Includes two transmitters and power supply | 1 |
| 23 | Hollyland MARS 400S Pro<br>400ft HDMI + SDI Wireless Transmission System<br>Includes:<br>Power Supply<br>Antennas | 1 |
| 24 | Hollyland Mars 400S Pro<br>400 ft HDMI + SDI Wireless Transmission System<br>Includes Antennas<br><br>DOES NOT INCLUDE POWER SUPPLY | 1 |
| 25 | Hollyland MARS 400S Pro (NIB) | 1 |
| 26 | Cannon EOS 70D Camera w/ EW-83H Lens<br>Includes flash attachment in carrying case. | 1 |
| 27 | Manfrotto Tripod with 509HD Head<br>Includes carrying cases | 3 |
| 28 | Manfrotto 546B Tripod w/ MVH502A head | 1 |
| 29 | Coman DV1000 Video Tripod<br>Carrying case included | 1 |
| 30 | Panasonic AG-VBR59 Battery Pack (NIB) | 4 |

| Lot# | Description | Quantity |
|------|-------------|----------|
| 31 | Watson Li-ion Battery Pack (NIB) | 4 |
| 32 | Watson Battery Charger w/ 3 Batteries<br>Li-ion batteries | 1 |
| 33 | IndiPro Li-ion Rechargeable Batteries Kit (NIB)<br>SKU# 2PSKTDC | 2 |
| 34 | IndiPro Li-ion Rechargeable Batteries Kit | 1 |
| 35 | IndiPro Micro Series 270Wh Li-ion Battery<br>V-Mount | 2 |
| 45 | Porta Brace Bag | 3 |
| 100 | 27" Nitro XZ2 Gaming Monitor - XZ272U (NIB) | 1 |
| 101 | Dell 24 Monitor - SE2422H (NIB) | 2 |
| 102 | ASUS VP249QGR Gaming Monitor – 23.8 inch (NIB) | 2 |
| 103 | ASUS VP248QG Gaming Monitor – 24 inch (NIB) | 4 |
| 104 | Dell Monitor VP278 QG | 1 |
| 105 | Samsung Curved Monitors<br>One cracked bezel | 2 |
| 106 | Wise Portable SSD 2TB Gen 2 (NIB) | 1 |
| 107 | Inland Professional 1TB SSD (NIB)<br>3D NAND SATA III 6Gb/s 2.5" 7mm Internal Solid State Drive (1T) | 2 |
| 108 | SanDisk Ultra 4 TB Solid State Drive (NIB)<br>-SATA (SATA/600) | 1 |
| 109 | SanDisk Extreme PRO 512GB CFast 2.0 card (NIB) | 1 |
| 110 | SanDisk Professional G-DRIVE (NIB)<br>ArmorLock SDPS41A-004T-GBANB 4 TB Portable Rugged Solid State Drive - M.2<br>External | 1 |
| 111 | Iogear USB-C Ultra-Slim Dual Display Docking<br>Station with Power Delivery GUD3C02. 3 NIB, 1 loose. | 4 |
| 112 | IOGEAR GCS1104 4-Port USB DVI KVMP Switch (NIB)<br>W/Audio and Cables | 1 |
| 113 | HDBaseT HDMI Extender IOGEAR GVE330 | 1 |
| 114 | VANTEC M.2 NVME SSD TO USB 3.1 GEN 2 TYPE C<br>ENCLOSURE | 2 |
| 115 | Sabrent 2.5 SD & SATA Hard Drive to Desktop<br>3.5" Bay Converter (NIB) | 6 |
| 116 | Vantec UGT-M2PC300R Dual M.2 SSD RAID PCIe X4<br>Host Card (NIB) | 2 |
| 117 | ProGrade Digital Dual-Slot UHS-II SDXC USB 3.1 | 1 |

7/7/2022
16:29:27

Case 1:22-cv-03822-VEC    Document 71    Filed 07/20/22    Page 55 of 61

Auction Advisors
Remaining Auction Lots
128 - EminiFX

Page: 4
V9.13-Clerking-31

| Lot# | Description | Quantity |
|------|-------------|----------|
|  | Gen 2 Card Reader (NIB) |  |
| 118 | Aruba APIN0505 Wireless Access Point (NIB) | 1 |
| 119 | Stream Deck XL | 1 |
| 120 | Core i9 PC<br>No HDD | 1 |
| 121 | HP Z640 PC | 2 |
| 122 | Mophie 4-in-1 Wireless Charging Mat | 1 |
| 123 | KOOTION 32GB USB Flash Drive 32 gb Flash Drive 1<br>10 Pack Thumb Drive Memory Stick Pen Drive Keychain Design Black | 2 |
| 124 | Powered USB Hub 3.0, Atolla 7-Port USB Data Hub | 2 |
| 125 | OtterBox Defender Case for iPhone 12/13 Pro Max | 2 |
| 126 | LG USB Fast Chargers | 3 |
| 127 | SanDisk 16gb Flash Memory Cards | 2 |
| 128 | NZXT Kraken Z73 360mm - Liquid Cooler (NIB) | 2 |
| 129 | HP ProDesk 600 PC | 3 |
| 130 | HP ProDesk 400 PC | 2 |
| 131 | Hitachi 2.0 TB Hard Disks | 28 |
| 132 | Core V71 Full Tower Case (NIB) | 2 |
| 133 | Apple Mini DisplayPort DVI Adapter (NIB) | 4 |
| 134 | Apple Thunderbolt to Gigabit Ethernet Adapter (NIB) | 6 |
| 135 | Apple Compatible iPhone Charger | 3 |
| 136 | Apple Mini DisplayPort to DVI Adapter (NIB) | 29 |
| 137 | Apple TV 4K 64GB Model A2169 | 1 |
| 138 | Lenovo Yoga 9 14ITL5 14" 4K UHD Touch i7-1185G7<br>3GHz 16GB 512GB (NIB) | 2 |
| 139 | LG UHD 43" TV 43UP70 (NIB) | 2 |
| 140 | Core V71 w/video card and cpu | 1 |
| 200 | Scarlett 4i4 USB Audio Interface (NIB) | 1 |
| 201 | Creative Labs Sound Blaster AE-7 (NIB) | 2 |
| 202 | Sennheiser EW 112P G4<br>Sennheiser EW 112P G4 Camera-Mount Wireless Omni Lavalier Microphone System | 2 |
| 203 | Sennheiser EW 500 BOOM G4 | 2 |

7/7/2022
16:29:27

Auction Advisors

Case 1:22-cv-03822-VEC   Document 71   Filed 07/20/22   Page 56 of 61

Page: 5
v9-13-Clerking-31

Remaining Auction Lots
128 - EminiFX

| Lot# | Description | Quantity |
|------|-------------|----------|
| | Sennheiser EW 500 BOOM G4 Camera-Mount Wireless Plug-On Microphone System with No Mic | |
| 204 | Sennheiser MD 42 ENG Handheld Microphone | 2 |
| 205 | Shure PSM 300 Twin-Pack Pro Wireless In-Ear Monitor Kit | 1 |
| 206 | Shure PSM 300 Twin-Pack Pro Wireless In-Ear No box | 1 |
| 207 | Shure ULXD4Q Quad-Channel Digital Wireless Receiver, no box | 1 |
| 208 | Shure ULXD1 Digital Wireless Bodypack T Transmitter with TA4M | 4 |
| 209 | Shure TwinPlex TL47B/O-MTQG Omnidirectional Lavalier Microphone with TA4F Connector - Black | 4 |
| 210 | PreSonus Studio 1824c USB-C Audio Interface | 1 |
| 211 | Audio-Technica ATH-M50x Headphones | 1 |
| 212 | Audio-Technica ATH-M20x Headphones No box | 1 |
| 213 | Yamaha HS5 5 inch Powered Studio Monitor Pair - | 1 |
| 215 | JamStands Monitor Stands | 1 |
| 216 | QSC TouchMix-30 Pro 32-channel Touchscreen Digital Mixer. 1 NIB, 1 no bag | 3 |
| 217 | ADJ Pow-R Bar Rack USB | 1 |
| 218 | SoundTown Road Rack Case w/tables | 1 |
| 219 | Furman M-8Dx 15 Amp AC Power Conditioner | 1 |
| 300 | Nanlite PavoTube 30C 4' RGBW LED (NIB) w/Internal Battery 4-Light Kit | 1 |
| 301 | GVM-1500D 75W Powerful Bi-color and RGB Video Light 3-Light-Kit | 3 |
| 302 | Genaray SSL-836 Soft Strip Daylight LED Light (8" x 36") one damaged | 1 |
| 303 | Godox UL150 Silent LED Video Light (NIB) | 1 |
| 304 | Godox UL150 Silent LED Video Light w ULC150 power supply /battery and soft box (CS-65D). No box. | 1 |
| 305 | Genaray SSL-MINI-B Soft Strip Bi-Color LED Light (4 x 17") (NIB) | 1 |
| 306 | GVM Soft Light Panel | 3 |
| 307 | GVM 1500D RGB LED Video Light | 1 |

7/7/2022
16:29:27

Case 1:22-cv-03822-VEC   Document 71   Filed 07/20/22   Page 57 of 61

AuctionAdvisors
Remaining Auction Lots
128 - EminiFX

Page: 6
V9-13-Clerking-31

| Lot# | Description | Quantity |
|------|-------------|----------|
| 308 | GVM Battery Kit (NIB) | 3 |
| 309 | Godox ULC150 Charger | 2 |
| 310 | GVM Tripod | 1 |
| 400 | Power Tools | 1 |
| 401 | Hand Tools (NIB) | 1 |
| 402 | Hand Tools | 1 |
| 403 | Ridgid Carrying Case System<br>Includes base and 2 stacks on top. | 1 |
| 500 | Brother P-touch label maker | 1 |
| 502 | Acoustic Panels | 2 |
| 503 | Frigidaire Portable Air Conditioner | 1 |
| 504 | 6 Outlet Power Strip | 2 |
| 505 | Pyle Pro Protective Cable & Wire Concealment<br>RampTrack with Flip-Open Top Cover | 2 |
| 507 | Levin Bluetooth Headset LE-HS010 Superior | 3 |
| 508 | M4010 Studio Elite 4000 Series XLR Male to XLR<br>Female Microphone Cable 10ft | 10 |
| 509 | M4025 Studio Elite 4000 Series XLR Male to XLR<br>Female Microphone Cable with Neutrik Connectors (Black, 25') | 4 |
| 510 | Pearstone 25' SDI Video Cable - BNC to BNC | 3 |
| 511 | Pearstone 15' SDI Video Cable - BNC to BNC | 3 |
| 512 | Pearstone 6' SDI Video Cable - BNC to BNC | 3 |
| 513 | Pearstone PM Series 1/4" TRS Male to XLR Female<br>Professional Interconnect Cable (6') | 12 |
| 514 | Canare Star Quad L-4E6S Microphone Cable (50',<br>Black) | 4 |
| 515 | Lot of Various A/V Cables | 20 |

**EminiFX Inventory Category 1**

| | |
|---|---|
| 43" 4k UHD LG 70 Series 4K HDR Smart LED TV - 43UP7000PUA | 21 |
| LG 55" UHD 70 Series 4K HDR Smart LED TV - 55UP7000PUA | 3 |
| E50k12nkdybennu   50"  Insignia  7/2021 | 2 |
| ASUS VP248 QG  24" Monitor | 118 |
| ASUS VP278 27" Monitor    October 2021 date code | 36 |
| NEC 23" EA231WMI & a few 245wmi Older units | 60 |
| APC BR1500MS2 Battery Backups Refurbished | 84 |
| Dual and Quad Monitor Arms  (some with USB ports) | 82 |
| Used Keyboards and Mice | 118 |
| Pro Desk - i5 7th Gen | 43 |
| Z6 xeon Bare,    No graphix, cards, hardrive | 8 |
| Elite Workstation - i7 8th gen | 6 |
| Z840 XEON desktop | 7 |
| Z640 desktops | 26 |
| Money Counter Carnation (Smaller one) | 1 |
| Money Counter Carnation cr25000 | 1 |
| L86EC 86" Flat Panel WhiteBoard Smart Board | 2 |
| 68" Flat Panel WhiteBoard NEW IN BOX | 1 |
| TVMount/ dual mount setups NIB | 9 |
| Inland Keyboards New in Box  8083 Room | 10 |
| Logitech Keyboards New in box. 8083 Room | 9 |
| C Stands Room 8083 | 6 |
| HP Colored Toner | 6 |
| Various HP Printers | 6 |
| TK-Hs003 headsets | 18 |
| Office Art, Abstract, Modern | 14 |
| Portable Heaters | 1 |
| Power Strip | 2 |
| CASIO spool CALCULATOR | 2 |
| 5GALLON BEVERAGE DISPENSER | 3 |
| Manfrotto Sheets? Backdrop? | 1 |
| Manfrotto tripod | 1 |
| Mounts, accessories | 7 |
| Executive Desk | 1 |
| Wine Cooler | 1 |
| Fixed chairs | 2 |
| Rolling Chairs | 2 |
| Boxes of Short Cat6 wire | 4 |
| Boxes of mixed cables from rooms | 5 |
| Document Shredder | 4 |
| Light strip bars | 2 |

# EXHIBIT 3

**Receivership Estate of EminiFX and Alexandre (22 Civ. 3822):  Resolution of Real Property Portfolio**

| Number | Deposit Amount | Purchase Price | Agreed Recovery | Amount Received | Status | Next Step |
|---|---|---|---|---|---|---|
| 1 | $ 32,000.00 | $ 320,000.00 | $ 32,000.00 | $ - | Agreement Signed | Awaiting Court Order |
| 2 | $ 50,000.00 | $ 450,000.00 | $ 50,000.00 | $ - | Agreement in Principle | Awaiting Final Signature |
| 3 | $ 49,000.00 | $ 499,000.00 | $ 49,000.00 | $ - | Agreement Signed | Awaiting Court Order |
| 4 | $ 27,000.00 | $ 264,000.00 | $ 27,000.00 | $ 27,000.00 | Agreement Complete | Funds Received |
| 5 | $ 65,000.00 | $ 650,000.00 | $ 65,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 6 | $ 50,000.00 | $ 480,000.00 | $ 50,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 7 | $ 26,000.00 | $ 255,000.00 | $ 26,000.00 | $ - | Agreement Signed | Awaiting Referee |
| 8 | $ 46,000.00 | $ 460,000.00 | $ 46,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 9 | $ 50,000.00 | $ 430,000.00 | $ 50,000.00 | $ 50,000.00 | Agreement Complete | Funds Received |
| 10 | $ 42,000.00 | $ 405,000.00 | $ 42,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 11 | $ 42,000.00 | $ 415,000.00 | $ 42,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 12 | $ 35,000.00 | $ 336,000.00 | $ - | $ - | Negotiation in Process | Awaiting Lender |
| 13 | $ 35,000.00 | $ 330,000.00 | $ 35,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 14 | $ 30,000.00 | $ 287,000.00 | $ 30,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 15 | $ 40,000.00 | $ 391,501.00 | $ 40,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 16 | $ 55,000.00 | $ 525,001.00 | $ 55,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 17 | $ 30,000.00 | $ 290,000.00 | $ 30,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 18 | $ 55,000.00 | $ 533,000.00 | $ 55,000.00 | $ - | Agreement Signed | Awaiting Court Order |
| 19 | $ 30,000.00 | $ 300,000.00 | $ 30,000.00 | $ - | Agreement in Principle | Awaiting Final Signature |
| 20 | $ 40,000.00 | $ 369,001.00 | $ - | $ - | Returned to Bonaventura | Separate Negotiation |
| 21 | $ 80,000.00 | $ 800,000.00 | $ 80,000.00 | $ 80,000.00 | Agreement Complete | Funds Received |
| 22 | $ 35,000.00 | $ 320,000.00 | $ 35,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 23 | $ 55,000.00 | $ 550,000.00 | $ 55,000.00 | $ - | Agreement Signed | Awaiting Court Order |
| 24 | $ 30,000.00 | $ 300,000.00 | $ 30,000.00 | $ 30,000.00 | Agreement Complete | Funds Received |
| 25 | $ 52,000.00 | $ 510,000.00 | $ 52,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 26 | $ 45,000.00 | $ 360,001.00 | $ 45,000.00 | $ - | Agreement Signed | Awaiting Referee |
| 27 | $ 45,000.00 | $ 436,000.00 | $ 45,000.00 | $ - | Agreement Signed | Awaiting Court Order |
| 28 | $ 50,000.00 | $ 447,000.00 | $ 50,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 29 | $ 40,000.00 | $ 400,000.00 | $ 40,000.00 | $ - | Agreement Signed | Awaiting Referee |
| 30 | $ 41,200.00 | $ 412,000.00 | $ 41,200.00 | $ - | Agreement Signed | Awaiting Referee |
| 31 | $ 70,000.00 | $ 660,000.00 | $ 70,000.00 | $ - | Agreement Signed | Awaiting Court Order |
| 32 | $ 34,000.00 | $ 331,000.00 | $ 34,000.00 | $ - | Agreement Signed | Awaiting Referee |
| 33 | $ 40,000.00 | $ 377,000.00 | $ 40,000.00 | $ - | Agreement in Principle | Awaiting Documentation |

*Addresses omitted for public filing*

**Receivership Estate of EminiFX and Alexandre (22 Civ. 3822):  Resolution of Real Property Portfolio**

| Number | Deposit Amount | Purchase Price | Agreed Recovery | Amount Received | Status | Next Step |
|---|---|---|---|---|---|---|
| 34 | $ 57,000.00 | $ 566,000.00 | $ 57,000.00 | $ - | Agreement Signed | Awaiting Court Order |
| 35 | $ 60,000.00 | $ 509,000.00 | $ 60,000.00 | $ - | Agreement Signed | Awaiting Court Order |
| 36 | $ 49,000.00 | $ 486,000.00 | $ 49,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 37 | $ 32,000.00 | $ 310,000.00 | $ 32,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 38 | $ 110,000.00 | $ 1,080,000.00 | $ 110,000.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 39 | $ 172,700.00 | $ 1,726,021.30 | $ - | $ - | Negotiation in Process | Awaiting Lender |
| 40 | $ 50,000.00 | $ 480,000.00 | $ - | $ - | Negotiation in Process | Awaiting Lender |
| 41 | $ 65,500.00 | $ 655,000.00 | $ 65,500.00 | $ - | Agreement in Principle | Awaiting Documentation |
| 42 | $ 30,000.00 | $ 290,000.00 | $ 30,000.00 | $ - | Agreement Signed | Awaiting Referee |
| 43 | $ 45,000.00 | $ 440,000.00 | $ 45,000.00 | $ 45,000.00 | Agreement Complete | Funds Received |
| 44 | $ 110,000.00 | $ 1,075,000.00 | $ 110,000.00 | $ 110,000.00 | Agreement Complete | Funds Received |
| 45 | $ 33,000.00 | $ 325,000.00 | $ - | $ - | Negotiation in Process | Awaiting Lender |
| 46 | $ 50,000.00 | $ 500,000.00 | $ - | $ - | Returned to Bonaventura | Separate Negotiation |
| 47 | $ 37,000.00 | $ 370,000.00 | $ 37,000.00 | $ 37,000.00 | Agreement Complete | Funds Received |
| 48 | $ 155,000.00 | $ 1,550,000.00 | $ 155,000.00 | $ 155,000.00 | Agreement Complete | Funds Received |
| TOTALS | $ 2,502,400.00 | $ 24,254,525.30 | $ 2,121,700.00 | $ 534,000.00 | | |