**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

COMMODITY FUTURES TRADING COMMISSION,

Plaintiff,

-against-

EDDY ALEXANDRE and
EMINIFX, INC.,

Defendants.

22 Civ. 3822 (VEC)

**MEMORANDUM OF LAW IN SUPPORT OF THE RECEIVER'S MOTION
FOR ENTRY OF AN ORDER APPROVING (I) THE RECEIVER'S
DISTRIBUTION PLAN; (II) THE DETERMINATION OF ALLOWED
USER CLAIMS; (III) NOTICE OF DISTRIBUTION PLAN; AND
(IV) AUTHORITY TO PURSUE CAUSES OF ACTION**

OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
(212) 661-9100

*Attorneys for David A. Castleman, as Receiver*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ------------------------------------------------------------------- 1

BACKGROUND ----------------------------------------------------------------------------------- 5

   I.   EminiFX's Pre-Receivership Operations ------------------------------------------------ 5

      A.   EminiFX Overview ------------------------------------------------------------------ 5

      B.   Deposits and Withdrawals ---------------------------------------------------------- 5

      C.   ROI and Bonuses Accrued to Users ----------------------------------------------- 7

      D.   Performance of Investments and Holdings ---------------------------------------- 8

   II.  Enforcement Actions Shut Down EminiFX in May 2022 ------------------------------- 9

      A.   The CFTC Enforcement Action ---------------------------------------------------- 9

      B.   The Appointment of the Receiver--------------------------------------------------- 9

      C.   Parallel Criminal Action------------------------------------------------------------10

  III.  The Receiver's Recovery and Liquidation of Assets -------------------------------------11

  IV.  The EminiFX User Claims and Non-User Claims Process ------------------------------12

      A.   The EminiFX User Claims------------------------------------------------------------13

      B.   The Non-User Claims----------------------------------------------------------------14

SUMMARY OF DISTRIBUTION PLAN, CLAIMS PROCESS, AND NET WINNER
PROCEDURES---------------------------------------------------------------------------------------14

   I.   Distribution Plan Overview -----------------------------------------------------------------14

      A.   The Distribution Plan's Classification and Treatment of Claims-----------------------14

      B.   Rising Tide Method for EminiFX User Refunds ----------------------------------------17

      C.   Comparison with Other Distribution Methods -----------------------------------------19

      D.   Additional Plan Provisions-----------------------------------------------------------------20

II.   The Receiver Will Continue To Administer The EminiFX Claims Process To Determine Which Claims Are Entitled To A Distribution--------------------------------------------------------------21

    A.   Non-User Claims ------------------------------------------------------------------------------21

    B.   Verified User Transactions--------------------------------------------------------------------23

    C.   Additional Procedures Governing the Resolution of Disputed Transactions ----------23

    D.   Net Winner Procedures and Other Affirmative Litigation -------------------------------26

   III.  Proposed Notice Procedures-------------------------------------------------------------------------27

ARGUMENT ---------------------------------------------------------------------------------------------------28

   I.   STANDARD OF REVIEW -----------------------------------------------------------------------28

   II.   THE CALCULATION AND DISTRIBUTION OF USER CLAIMS UNDER THE DISTRIBUTION PLAN IS EQUITABLE ----------------------------------------------------------29

    A.   EminiFX's Operations Contain the Indicia of a Ponzi Scheme-------------------------30

    B.   Rising Tide is Appropriate Where Distributions are Based on  Refunds of Deposits in a Ponzi Scheme --------------------------------------------------------------------------------32

    C.   The Distribution Plan Properly Excludes ROI, Bonuses, and Internal Transfers -----35

   III.  THE DISTRIBUTION PLAN PROPERLY PRIORITIZES CLAIMS ----------------------37

    A.   The Distribution Plan Properly Treats User and Investor Claims *Pari Passu*---------37

    B.   The Distribution Plan Properly Maintains the Priority of any Tax Claims ------------39

    C.   The Distribution Plan's Subordination Procedures are Proper----------------------------40

   IV.  THE COURT SHOULD AUTHORIZE THE RECEIVER'S PROCEDURE FOR PRE-LITIGATION SETTLEMENTS WITH NET WINNERS -----------------------------------------41

   V.   THE DISTRIBUTION PLAN AFFORDS CLAIMANTS THE REQUISITE NOTICE AND OPPORTUNITY TO BE HEARD ----------------------------------------------------------43

CONCLUSION-------------------------------------------------------------------------------------------------44

# TABLE OF AUTHORITIES

### CASES

*Bear, Stearns Sec. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.),*
    397 B.R. 1 (S.D.N.Y. 2007) -------------------------------------------------------------------------30

*C.F.T.C. v. Equity Fin. Grp., Inc.,*
    2005 WL 2143975 (D.N.J. Sept. 2, 2005) ---------------------------------------------------------35

*C.F.T.C. v. Equity Fin. Grp., LLC,*
    2005 WL 2864783 (D.N.J. Oct. 26, 2005)----------------------------------------------------------35

*C.F.T.C. v. Lake Shore Asset Mgmt. Ltd.,*
    2010 WL 960362 (N.D. Ill. Mar. 15, 2010) ------------------------------------------------- 34, 36

*C.F.T.C. v. Rolando,*
    589 F. Supp. 2d 159 (D. Conn. 2008) ------------------------------------------------------------28

*C.F.T.C. v. Rust Rare Coin, Inc.,*
    2020 WL 4904165 (D. Utah Aug. 20, 2020) ----------------------------------------------------38

*CCWB Asset Invs., LLC v. Milligan,*
    --- F.4th ----, No. 22-2256, 2024 WL 3658780 (4th Cir. Aug. 6, 2024)------------------29, 33, 37

*Cunningham v. Brown,*
    265 U.S. 1 (1924)--------------------------------------------------------------------------------32

*Diana Melton Tr. v. Picard (In re Bernard L. Madoff Inv. Sec., LLC),*
    2016 WL 183492 (S.D.N.Y. Jan. 14, 2016) ------------------------------------------------------37

*Eberhard v. Marcu,*
    530 F.3d 122 (2d Cir. 2008) -----------------------------------------------------------------------28

*Gordon v. Dadante,*
    2010 WL 4137289 (N.D. Ohio Oct. 14, 2010)---------------------------------------------------36

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP),*
    WL 47774 (Bankr. S.D.N.Y. Jan. 3, 2014)-------------------------------------------------------30

*Gowan v. The Patriot Grp. LLC (In re Dreier LLP),*
    2011 WL 2412581 (Bankr. S.D.N.Y. June 16, 2011)------------------------------------------42

*Johnson v. Neilson (In re Slatkin),*
    525 F.3d 805 (9th Cir. 2008) ---------------------------------------------------------------------42

*Moran v. Goldfarb,*
    2012 WL 2930210 (S.D.N.Y. July 16, 2012) ---------------------------------------------- 41, 42

*Pergament v. Torac Realty, LLC (In re Diamond Fin. Co., Inc.)*,
    658 B.R. 748 (Bankr. E.D.N.Y. 2024) ------------------------------------------------------30

*Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*,
    12 F.4th 171 (2d Cir. 2021) ------------------------------------------------------------3, 41

*S.E.C. v. Amerindo Inv. Advisors Inc.*,
    WL 10821985 (S.D.N.Y. May 20, 2016) ------------------------------------------ 28, 29

*S.E.C. v. Byers*,
    637 F. Supp. 2d 166 (S.D.N.Y. 2009)------------------------------------------34, 40, 43

*S.E.C. v. Callahan*,
    193 F. Supp. 3d 177 (E.D.N.Y. 2016)------------------------------------------ passim

*S.E.C. v. Credit Bancorp, Ltd.*,
    290 F. Supp. 2d 418 (S.D.N.Y. 2003) ------------------------------------------------39

*S.E.C. v. Credit Bancorp, Ltd.*,
    290 F.3d 80 (2d Cir. 2002)------------------------------------------------19, 28, 32

*S.E.C. v. Credit Bancorp., Ltd.*,
    297 F.3d 127 (2d Cir. 2002) ------------------------------------------------------39

*S.E.C. v. Enter. Tr. Co.*,
    2008 WL 4534154 (N.D. Ill. Oct. 7, 2008)------------------------------------------28

*S.E.C. v. Fischbach Corp.*,
    133 F.3d 170 (2d Cir. 1997) ------------------------------------------------------28

*S.E.C. v. Hardy*,
    803 F.2d 1034 (9th Cir. 1986)------------------------------------------------------28

*S.E.C. v. Huber*,
    702 F.3d 903 (7th Cir. 2012) ------------------------------------------------17, 33, 34

*S.E.C. v. Malek*,
    397 F. App'x 711 (2d Cir. 2010)------------------------------------------------------33

*S.E.C. v. Nationwide Automated Sys. Inc.*,
    2015 WL 13710945 (C.D. Cal. Apr. 21, 2015) --------------------------------------42

*S.E.C. v. TCA Fund Mgmt. Grp. Corp.*,
    2022 WL 17816956 (S.D. Fla. Dec. 2, 2022) --------------------------------------38

*S.E.C. v. Varacchi*,
    2021 WL 10361074 (D. Conn. July 30, 2021) ----------------------------------- 17, 28

*S.E.C. v. Wang*,
  944 F.2d 80 (2d Cir. 1991)--------------------------------------------------------------28

*S.E.C. v. Wealth Mgmt. LLC*,
  628 F.3d 323 (7th Cir. 2010) --------------------------------------------------29

*S.I.P.C. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*,
  531 B.R. 439 (Bankr. S.D.N.Y. 2015) -----------------------------------------31

*Smith v. Suarez (In re IFS Fin. Corp.)*,
  417 B.R. 419 (Bankr. S.D. Tex. 2009)------------------------------------------36

*United States v. Alexandre*,
  No. 22 Cr. 326 (JPC) (S.D.N.Y. May 11, 2022)-----------------------------11

S<span style="font-variant:small-caps">TATUTES</span>

31 U.S.C. § 3713 ---------------------------------------------------------------------39

N.Y. Debt. & Cred. Law § 278-------------------------------------------------------41

Pursuant to this Court's *Consent Order for Preliminary Injunction* ("**Consent Order**") [Dkt. 56],[1] David A. Castleman, the Court-appointed receiver (the "**Receiver**") over Defendant EminiFX, Inc. ("**EminiFX**") and certain assets of Defendant Eddy Alexandre ("**Alexandre**"), through his counsel, respectfully submits this memorandum of law in support of his motion (the "**Motion**"), for entry of an Order, in substantially the form annexed hereto (the "**Proposed Order**"), approving (i) the Receiver's proposed distribution plan (the "**Distribution Plan**");[2] (ii) the determination of allowed User claims; (iii) notice of distribution plan; and (iv) authority to pursue causes of action.

## PRELIMINARY STATEMENT

Commencing in late 2021 and continuing for the next eight months, EminiFX operated as a Ponzi scheme, receiving over $260 million in contributions from a single class of investors (*i.e.*, EminiFX Users) into a pool of commingled funds, paying those investors between 5.00% and 9.99% in returns each and every week (the "**ROI**") (equivalent to 11x to 140x annually), and using that pool of commingled funds to satisfy over $30 million in investor withdrawals. Since the Receiver's appointment, he has secured and liquidated over $150 million in EminiFX assets, all of which were funded solely by investor contributions. The Receiver has also worked to verify as many actual investor deposits and withdrawals as possible given the poor state of EminiFX records. In this Motion, the Receiver proposes the Distribution Plan, which he respectfully submits is fair and equitable under the circumstances, and which sets forth how the Receiver intends to distribute the recovered funds to investors who made contributions to EminiFX and to satisfy any other liabilities of the Receivership. That EminiFX's operations were consistent with the key

---

[1] References to "[Dkt. _]" are to docket entries in the above-captioned action unless otherwise specified.

[2] A copy of the Distribution Plan is annexed as Exhibit 1 to the affidavit of David Castleman, as Receiver, in support of the Motion, submitted contemporaneously herewith. Defined terms used but not defined herein shall have the meaning ascribed in the Distribution Plan.

features of a Ponzi scheme is central to the Distribution Plan, as that informs the Receiver's treatment of investor claims, the method of distribution, and his request to pursue certain affirmative claims.[3]

Specifically, the Receiver is seeking to define allowed investor claims based only upon each investor's actual deposits into, and withdrawals from, EminiFX. The Receiver is seeking to exclude (i) the ROI, representing fictitious profits not related to any actual investing activity, (ii) recruitment and multilevel marketing bonuses, and (iii) internal transfers from the definition of an investor's claim. If the Receiver were to give credit for ROI and bonuses in an investor's claim, it would only further the EminiFX scheme by paying such ROI and bonuses (as a portion of a claim) to some investors using the deposits of other investors. While ROI, bonuses, and internal transfers appeared on the balances shown to EminiFX investors when they logged onto their online accounts, they do not represent actual funds into EminiFX and thus should not be included in investor claims.

The Receiver has determined that the most equitable approach for a *pro rata* distribution is the "rising tide" method ("**Rising Tide**"), which calculates claims based on pre-receivership deposits, and treats pre-receivership withdrawals as distributions on such claim. This treatment acknowledges that pre-receivership withdrawals were paid from the pool of commingled investor deposits—the same pool of funds that will be used by the Receiver to make distributions per the Distribution Plan. Under the Rising Tide method, the *pro rata* distribution percentage (as set in connection with each distribution contemplated under the Distribution Plan, the "**Rising Tide Percentage**") will be higher than such percentage under a "**Net Investment**" distribution method

---

[3] The Receiver is seeking only the relief requested in this Motion and is not seeking to prove or disprove the claims and defenses asserted by the CFTC or Alexandre in this case.

(where withdrawals are subtracted from deposits to determine a net claim) for the same number of dollars distributed. That difference is especially important to the vast majority of investors who had zero withdrawals, as those investors will receive higher distributions under Rising Tide than under a Net Investment method. Courts in the Second Circuit and around the country have generally recognized that Rising Tide is the proper method of distribution to investors when the underlying investment is a Ponzi scheme.

The Receiver also seeks in this Motion a request to pursue certain claims against individuals or entities that received transfers from EminiFX in excess of the value provided to EminiFX, and to offer settlements to those recipients on terms that presume their good faith. As the Second Circuit established in the *Madoff* case (a Ponzi scheme with similar attributes to EminiFX, although on a much longer time horizon with less extreme returns), all transfers out of a Ponzi scheme are presumed to be fraudulent, which greatly simplifies the analysis of whether such transfers may be recovered as voidable transactions. *See Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 181 (2d Cir. 2021). The Receiver therefore has a good faith basis to pursue claims against the recipients of such transfers, and to offer those recipients settlements.

The Distribution Plan also contains a number of additional elements that are necessary to effectuate its terms. Because distributions occur over time as the Rising Tide Percentage is periodically increased, the Receiver proposes to create a separate convenience class for those investors who deposited $1,000 or less, under which they will get a one-time distribution that is higher than the initial Rising Tide Percentage but may be lower than the Final Rising Tide percentage, to avoid as many distributions under $50 as possible. The Distribution Plan also recognizes the super-priority of tax claims under federal law. Finally, the Distribution Plan also

includes procedures that may affect a small number of investors, including, but not limited to, those governing subordination, liens on distributions, and deceased claimants.

Shortly after this proposed Distribution Plan is filed with the Court, the Receiver will publish the Distribution Plan on the Receivership website and email it to all EminiFX investors and certain other interested parties (by email or regular mail), so that they may provide feedback. The Receiver has set up a function on the User Portal (accessible to all investors) that will, for a limited time, allow EminiFX investors to provide feedback. The Receiver has made clear to investors that such feedback will be anonymous, and that the content of an investor's feedback will not impact his or her distribution. The Receiver will assemble that feedback and submit it to the Court on the same date that other response briefs to the Motion are due.

The Receiver cannot at this stage determine how much each investor is going to receive, both initially and over time, as the Rising Tide Percentage will be periodically increased under the Distribution Plan. However, most investors will receive a partial refund of their investments, and that refund will likely grow over time as the Receiver increases the Rising Tide Percentage. Investors who had substantial withdrawals may not receive a distribution, but equity and fairness are still preserved because the money they received when they made these withdrawals came from the same pot of commingled funds that will be used for distributions to other investors. Given that EminiFX was operated as a Ponzi scheme, and the size and circumstances of the deposits and withdrawals into EminiFX, the Receiver respectfully submits that the proposed treatment of claims and the proposed Distribution Plan are fair, reasonable, and in the best interest of the estate.

## BACKGROUND[4]

### I.    EminiFX's Pre-Receivership Operations

#### A.    EminiFX Overview

EminiFX was established as a "multi-level" investment club on or about September 2021, with a stated purpose of providing users of the EminiFX system ("**Users**")[5] "with an affordable solution that offers easy access to cryptocurrency and Forex trading." [Castleman Aff. ¶¶ 28, 36; Castleman Aff. Ex. 5 (Feb. 2022 Compensation Plan, at 2).]  Users could set up accounts through the site, and would purportedly earn ROI of between 5.00% and 9.99% per week (though, as discussed below, this ROI was not based on actual investment activity).  [Castleman Aff. ¶ 36.] Generally, Users were recruited to EminiFX by other Users, and were awarded commission bonuses based on a User's recruits, plus all their recruits, and so on down for each level.  [*Id.*]

#### B.    Deposits and Withdrawals

**User Deposits.**  Users would fund their EminiFX accounts using several methods.  Most commonly, Users would contribute US Dollars directly into one of EminiFX's primary bank accounts, maintained at TD Bank or Bank of America, where those funds were commingled with other User deposits.  [*Id.* ¶¶ 37-38.]  Bank of America froze EminiFX's account on or about March 14, 2022, at which time just over $27 million had been deposited there by EminiFX Users. [*Id.* ¶ 37.]  Around that time, just over $51 million had been deposited into the TD Bank account, including over $1 million deposited directly into Alexandre's personal TD Bank account.  [*Id.*]

---

[4] As explained herein, EminiFX did not maintain a general ledger of any kind, nor did it issue account statements to Users.  Although the Receiver was able to recover a substantial number of records from EminiFX and from certain third-parties (largely financial institutions where EminiFX maintained accounts), there were significant deficiencies in the maintenance of records.  The Receiver and his team undertook a detailed forensic investigation of EminiFX's pre-receivership financial condition, the result of which was the *Financial Condition Report of EminiFX, Inc.* ("**Financial Condition Report**") [Dkt. 199], filed May 16, 2023.

[5] The term "investor" is used interchangeably with the defined term "User" herein and in the Distribution Plan.

The second primary method was by sending funds to EminiFX via the offshore CoinPayments system, in which EminiFX maintained a sizeable account—over $180 million in contributions were made to CoinPayments by EminiFX Users. [*Id.* ¶ 41.] After the suspension of EminiFX's Bank of America account, CoinPayments became the most common method for User contributions. [*Id.*] As was true of EminiFX's bank accounts, deposits made through CoinPayments were also commingled. [*Id.* ¶ 42.] In addition to these contribution methods, EminiFX also maintained three separate CashApp accounts that received User deposits totaling $1.4 million. [*Id.* ¶ 43.] Starting especially in late March 2022, there was a substantial increase in funding of User accounts from deposits of cash (currency) at the physical office of EminiFX located on 34th Street in Manhattan. [*Id.* ¶ 40.]

**User Withdrawals**. Users were generally able to withdraw funds based on their total account value. [*Id.* ¶ 45.] Because that value included purported ROI and/or bonuses (discussed further below), a User could withdraw funds in excess of their total net contributions into the EminiFX system, and some did so. [*Id.*] The vast majority (98%) of these withdrawal transactions were completed via CoinPayments. [*Id.* ¶ 48.] By the time the Receiver was appointed, a total of at least $228 million in net contributions (contributions less withdrawals) had been made into the EminiFX system by Users. [*See* Castleman Aff. Ex. 9 (User Withdrawals and Net Contributions Chart).]

**Internal Transfers**. Users were also able to transfer funds to other Users though the EminiFX System. Similar to withdrawals, because a User's total account value included purported ROI and/or bonuses, a User could transfer funds in excess of their total net contributions into the EminiFX System. [Castleman Aff. ¶¶ 55-56.]

C.    ROI and Bonuses Accrued to Users

Beginning on October 22, 2021, Users' account balances would increase by a weekly ROI accrual, which was a fixed number between 5.00% and 9.99%, and purportedly represented a "share [in] profits . . . from prior week gains." [*Id.* ¶ 50; Castleman Aff. Ex. 5 (Feb. 2022 Compensation Plan, at 6).] Over time, the total amount of ROI in EminiFX's "earnings" table accrued each week, reaching a total amount accrued of over $262 million by the time of the Receiver's appointment in May 2022. [Castleman Aff. ¶ 50.]

In addition to ROI, several types of bonuses were also credited to Users based on the referral of additional Users to the platform, reflecting the multi-level nature of EminiFX. A User would be considered a "sponsor" of a User they referred (the "affiliate"), over time creating a complex "sponsor tree"—with Alexandre at the top. [*Id.* ¶ 53.] Bonuses were awarded for direct referral of new affiliates, indirect referrals by a sponsor's affiliates, and when affiliates earned ROI, among other scenarios. [*Id.* ¶ 53.] Ultimately, the total amount accrued to Users in referral bonuses was $56.6 million. [*Id.* ¶ 54.]

As a result of ROI and bonuses, Users' total stated account values, as reflected in the EminiFX system, far outpaced the results of EminiFX's actual, limited investments. While EminiFX incurred *net decreases*—exceeding $49 million—in the marked to market values of its accounts over the course of its operation, Users were still credited "ROI" and bonuses in excess of $319 million. [*Id.* ¶ 77.] If EminiFX was not shutdown when it was, by virtue of the fictious ROI and awarding of bonuses, this differential would have continued to grow exponentially, and the Receiver's models indicate that, at the 5.00% to 9.99% returns offered, the ROI paid through the date of this Motion would be in the hundreds of billions or even trillions of dollars. [*Id.* ¶ 78.]

D.    Performance of Investments and Holdings

The net decreases to the marked to market value of EminiFX's accounts are a result of several factors that, when taken cumulatively, evidence a complete disconnect between Users' purported earnings and EminiFX's actual investment activity. [Castleman Aff. Ex. 13 (Changes in Marked to Market Increases and Decreases of EminiFX Holdings).]

**Cryptocurrency Exposure.** Users contributions via CoinPayments were made in Bitcoin. While Users generally saw an equivalent increase in the US Dollar value of their User account when contributing with Bitcoin, no such conversion from Bitcoin to US Dollars actually occurred. [Castleman Aff. ¶ 67.] As a result, EminiFX's Bitcoin balance accumulated over time, increasing its exposure to Bitcoin's volatile market price. [*Id.* ¶ 68.] The price of Bitcoin decreased over 57% from November 10, 2021 to May 12, 2022, resulting in a cumulative $40 million decline in value of EminiFX's CoinPayments account by the time of the Receiver's appointment. [*Id.* ¶ 68.] EminiFX also invested small amounts in the cryptocurrency exchanges Kot4X and Gemini, both of which resulted in additional losses of approximately $550,000 in the aggregate. [*Id.* ¶ 70.]

**Interactive Brokers Investment.** Alexandre maintained an Interactive Brokers account in his own name, rather than in EminiFX's name, and made contributions to that account from his personal TD Bank account. [*Id.* ¶ 60.] Of the $9,040,000 transferred from the Alexandre TD Bank account to the Interactive Brokers account, at least $9,010,000 is directly traceable to EminiFX investor deposits. [*Id.*] By the time the Receiver liquidated the account (discussed further below), it had lost over $7.2 million—equivalent to about 80% of the total amount of EminiFX funds deposited into it. [*Id.* ¶ 62.]

**Real Estate Investments.** In the weeks before the Receiver was appointed, EminiFX entered into 48 separate contracts to purchase various properties in Long Island, for a total purchase price of $24.2 million, with 46 of those being at foreclosure auctions in Nassau and Suffolk County

("**Foreclosure Properties**").  [*Id.* ¶ 64.]  EminiFX paid deposits of just over $2.5 million in the aggregate for those properties.  [*Id.*]  None of these contracts had closed by the time the Receiver was appointed, and one had already been cancelled with the $50,000 deposit being returned to EminiFX on May 9, 2022.  [*Id.* ¶¶ 65-66.]

## II.    Enforcement Actions Shut Down EminiFX in May 2022

### A.    The CFTC Enforcement Action

On May 11, 2022, the Commodities Futures Trading Commission ("**CFTC**") filed a civil complaint (the "**Complaint**") against Alexandre and EminiFX (collectively, "**Defendants**") based on allegations arising from the operation of EminiFX.  Specifically, the complaint in the Criminal Action alleged that EminiFX was operated as a "Ponzi-like" scheme, by which Alexandre and others pooled funds from members of the general public and promised them ROI to provide the "false" impression that EminiFX was profitably trading their contributions.  Instead, the complaint alleges, Alexandre misappropriated over $14.7 million of investors' funds for his personal accounts, and racked up losses of $6 million.

Contemporaneously with the Complaint, the CFTC filed a motion for an *ex parte* statutory restraining order ("**SRO**").  [Dkt. 5-6, granted the same day at Dkt. 9.]  Among other things, the SRO froze certain of Defendants' assets, allowed the Commission access to certain of Defendants' records, and, as discussed further below, appointed the Receiver.  [Dkt. 9.]

### B.    The Appointment of the Receiver

Under the SRO entered on May 11, 2022, the Receiver was appointed with full powers of an equity receiver over EminiFX and over "all customer funds and property and other assets traceable to customers in the possession of or under the control of Eddy Alexandre."  [SRO ¶ 30, Dkt. 9.]  Paragraph 31 of the SRO further enumerated specific authority afforded the Receiver,

including, but not limited to, the assumption of "full control over the Receivership Defendants" and "exclusive custody, control, and possession of the Receivership Estate." [*Id.* ¶ 31.]

Two days before the expiration of the SRO, on June 15, 2022 the Court entered the Consent Order [Dkt. 56], which "shall remain in full force and effect until the final trial of this case, or until further order of this Court." [Consent Order ¶ 59.][6]  The Court also appointed the Receiver, who was previously appointed as Temporary Receiver under the SRO, with full powers of a federal equity receiver [*Id.* ¶ 37], as well as:

> all powers, authorities, rights and privileges heretofore possessed by the officers, directors, managers, managing members, and general and limited partners of the Defendants under applicable state and federal law, by the governing charters, by-laws, articles and/or agreements in addition to all powers and authority of a receiver at equity, and all powers conferred upon a receiver by the provisions of 28 U.S.C. §§ 754, 959 & 1692, and Fed R. Civ. P. 66; and all specific powers as set forth in Paragraph 31 of the SRO.

[*Id.* ¶ 37.]

The Court further granted the Receiver authority to demand turnover of assets in Alexandre's name based on a reasonable, good-faith belief that such assets are traceable to EminiFX customers, to be administered by the Receiver in a protected "Alexandre Assets" segregated account, until this Court could make a final determination as to whether such assets are traceable, or not, to EminiFX customers. [*Id.* ¶ 38.]

C.    Parallel Criminal Action

On May 11, 2022, the United States Attorney for the Southern District of New York ("**USAO**") filed a sealed criminal complaint against Alexandre on one count of Commodities Fraud and one count of Wire Fraud, both based on the same conduct alleged in the Complaint in

---

[6] On February 15, 2024, Alexandre's then-counsel filed a letter, stating Mr. Alexandre no longer agreed to the CFTC's proposed consent order, and requesting permission to withdraw as counsel [Dkt. 257].  The Court granted counsel's motion, and Alexandre has since proceeded *pro se* in this action [*see* Dkt. 261].

the civil action.  *See United States v. Alexandre*, No. 22 Cr. 326 (JPC), Complaint, Dkt. 1 (S.D.N.Y. filed May 11, 2022) (the "**Criminal Action**").  The FBI arrested Alexandre the following day, on May 12, 2022.  On February 10, 2023, Alexandre pled guilty to one count of Commodities Fraud and, as a part of the plea agreement, executed a Consent Preliminary Order of Forfeiture ("**Forfeiture Order**").  *United States v. Alexandre*, No. 22 Cr. 326 (JPC), Dkt. 74.  In connection with the Forfeiture Order, Alexandre agreed to forfeit $248,829,276 ("**Money Judgment**"), "representing the amount of proceeds traceable to the commission of the offence charged" [Forfeiture Order, at 2-3, 22-cr-00326, Dkt. 74].  The Forfeiture Order further states that "[a]ll assets distributed to the victims by the Receiver in the CFTC Action that were obtained from the Defendant and EminiFX shall be applied towards the satisfaction of the Money Judgment." [Forfeiture Order ¶ 11, 22-cr-00326, Dkt. 74.]  Alexandre surrendered to begin his term of incarceration on or about August 28, 2023.

## III.    The Receiver's Recovery and Liquidation of Assets

By the end of 2022, the Receiver had recovered nearly $61 million in cash[7] from frozen accounts and substantial amounts of cryptocurrency.  [Castleman Aff. ¶ 13.]  The Receiver liquidated the cryptocurrency in his possession between January and April 2023 in accordance with the Court-approved liquidation procedure [Dkt. 184], which brought net proceeds of over $90 million into the estate.  [Castleman Aff. ¶ 13.]  In addition to vehicles and office property liquidated, the net total of turned over assets, after liquidation, was just over $151 million.  [*Id.*]

---

[7] As noted above, a portion of the assets recovered were segregated in accordance with the Consent Order as "Alexandre Assets."  On May 9, 2024, the Court So Ordered a stipulation between the Receiver, the CFTC, and Alexandre [Dkt. 311].  As a result, $9,470,813.35 in Alexandre Assets was deemed traceable to EminiFX Users and turned over the general Receivership estate on that day [Dkt. 370 Ex. 1].  An additional $76,708.95 that was set aside as a payroll reserve was released by Order entered July 3, 2024 [Dkt. 354].

Following his appointment in 2022, the Receiver also pursued litigation related to EminiFX's nascent real estate investment portfolio, nearly all of which had been settled by 2023 [*Id.* ¶ 14], and the one remaining issue resolved in the claims process in 2024. These efforts yielded a net gain to the Receivership estate of $3.2 million. [*Id.*] The Receiver is continuing to evaluate several potential actions against third parties that may result in additional recoveries, including those against "Net Winners," as contemplated in the Distribution Plan and discussed further below. [*Id.* ¶ 16.]

The $153 million in cash under management is the primary source of funds expected to be available for distribution under the Distribution Plan, along with any additional recoveries received in connection with contemplated litigation. [*Id.* ¶¶ 15-16.] All of the assets expected to be distributed are directly or indirectly traceable to EminiFX User deposits, plus any interest earned thereon while under the Receiver's management.

## IV.    **The EminiFX User Claims and Non-User Claims Process**

As noted above, there were significant deficiencies in EminiFX's maintenance of records. There was no evidence uncovered of regularly issued User account statements, though the Receiver was able to recover an EminiFX MySQL database ("**Database**") that was used to maintain User account records. [*Id.* ¶¶ 23, 25.] Absent detailed records, to better determine the Users that may be entitled to an eventual distribution, and to establish bar dates and procedures to determine the identity of "**Non-Users**"—that is, individuals or entities who have a claim against EminiFX not based on their status as a User—and the amount of their Non-User Claims, on August 10, 2023, the Receiver filed a motion seeking the approval of procedures ("**Claims Procedures**") for the verification of User transactions, the establishment of bar dates for Non-Users to assert claims, and a review process for each. [*Id.* ¶¶ 11.] On August 29, 2023, the Court approved the

Claims Procedures [Dkt. 228] and the Receiver implemented the process by which User and Non-User Claims could be fixed for eventual distribution under the terms of a plan approved by this Court.

    A.    <u>The EminiFX User Claims</u>

Combining the various bank and cryptocurrency financial data with records from the Database allowed the Receiver and his team to construct a ledger ("**Ledger**") with sufficient reliability to assess the overall financial condition of EminiFX on a weekly basis to coincide with the ROI schedule and to ascertain contributions and withdrawals made to and from User accounts. [Castleman Aff. ¶ 9.]  Using the Ledger, the Receiver and his team developed a Portal, available to all Users, which displayed the actual cash and Bitcoin deposits and withdrawals associated with each User's EminiFX account.  [*Id.* ¶ 11].  The Claims Procedures provided an opportunity for Users to review the transactions attributed to their account based on the Ledger, and to provide additional information within prescribed parameters.  The deadline for verifying, disputing or adding transactions was February 26, 2024. While Users could continue to access the Portal, they were no longer able to verify, add and/or update transactions as of March 1, 2024 (the deadline plus a four-day grace period; set as the "Record Date" in the Distribution Plan).

By the close of the Portal, approximately 25,758 Users had submitted their transactions.[8] Of that total 5,618 EminiFX Users disputed 11,778 transactions identified by the Receiver, which is around 10% of the total EminiFX User transactions submitted by Users ("**Disputed Transactions**").  The Receiver has since directed his team to focus their forensic efforts on reviewing and addressing all Disputed Transactions.   The Receiver expects this process to

---

[8] That is, the User reviewed all of their transactions and have either verified or disputed transactions (including adding transactions) and then submitted such actions for review by the Receiver.

conclude this initial review around October 2024. [*Id.*]. As discussed further below, at that time, the Receiver expects to file a schedule of Disputed Transactions with the Court, which will begin the process of fixing any then-unresolved User transactions.

      B.     The Non-User Claims

As noted above, the Claims Procedures also provide an opportunity for Non-User Claimants to complete and serve a Proof of Claim. The general Non-User Claim bar date was October 30, 2023 and the governmental bar date was December 27, 2023. The Internal Revenue Service is not subject to the Claims Procedures; as discussed below, their claims are subject to separate treatment under the proposed Distribution Plan.

There were eight non-duplicative Proofs of Claim submitted by Non-Users in accordance with the Claims Procedures [*Id.* ¶ 91.] As of the date of this Motion, all but one of those Proofs of Claim has been resolved and satisfied. [*Id.*] The details of these settlements and the unresolved Non-User Claim, asserted by an insider and subject to the Receiver's ongoing investigation, are set forth in the Non-User Claims Report, filed at [Dkt. 369], and are summarized below.

**SUMMARY OF DISTRIBUTION PLAN, CLAIMS PROCESS,
AND NET WINNER PROCEDURES**

**I.**    **Distribution Plan Overview**

      A.     The Distribution Plan's Classification and Treatment of Claims

The Distribution Plan sets forth six classes and one sub-class of EminiFX Claims eligible to receive distributions, as follows:

| | |
|---|---|
| Class 1: | Administrative Claims |
| Class 2: | Tax Claims |
| Class 3: | User Claims |
| Class 3A: | User Convenience Class Claims |
| Class 4: | Other Claims |
| Class 5: | Subordinated Claims |
| Class 6: | Equity Interests |

14

Class 1, "Administrative Claims," consists of compensation claims by the Receiver and his retained professionals, as well as any other EminiFX Claims asserting an entitlement to priority payment in connection with the administration of the Receivership Assets or otherwise on the basis that it arises or is deemed to arise after the commencement of the CFTC Enforcement Action. Holders of Administrative Claims are entitled to receive the full amount of the Administrative Claim in cash from time to time as and when due pursuant to any applicable orders of this Court, except to the extent that such Holder agrees to less favorable treatment. [Plan, at 11.]

Class 2 consists of EminiFX Claims held by taxing authorities. [*Id.*] Holders of these "Tax Claims," to the extent allowed, are entitled to receive the full amount of such Allowed Tax Claim in cash from time to time as and when due pursuant to any applicable orders of this Court, except to the extent that such Holder agrees to less favorable treatment. At the time of any distribution, to the extent that the amount of the Tax Claims has not been determined or otherwise Allowed, the Receiver will establish a reserve—in an amount determined in his sole discretion after consultation with his advisors—to be a conservative estimate of potential tax liabilities of EminiFX and the EminiFX QSF.

Class 3 consists of all Users that have EminiFX Claims that are based on an alleged investment in the investment club operated by EminiFX, or "User Claims." [*Id.* at 6, 11.] The Allowed amount of a User Claim is based on the value of that User's verified deposits ("**Verified Deposit Amount**"), as determined in connection with the Receiver's ongoing review of User transactions under the Claims Procedures. User claims will *not* reflect ROI, bonuses, or internal transfers; as explained above, these were not reflective of the payment or transfer of actual funds. Additionally, to the extent deposits were made in BTC, for the purpose of calculating a User Claim amount, those values will be converted to US Dollars based on the closing price the day the

transaction was completed. Distributions based on Allowed User Claims will be based on the Rising Tide methodology. This distribution approach is explained further below, which will be a type of a *pro rata* distribution that will consist of an initial Rising Tide percentage and expected (but not guaranteed) increases and supplemental payments over time.

Class 3A, a subset of Class 3 User Claims, consists of all Users that have Allowed User Claims of $1,000 or less (*i.e.*, that deposited less than that sum into EminiFX). These Users will receive a single distribution consisting of a fixed percentage, to be set by the Receiver. That percentage will be higher than the initial Rising Tide percentage but will likely not be subject increases, in order to avoid the administrative burden of making very small payments.

Class 4, "Other Claims," will consist of Non-User Claims not treated in another class that are not treated in another class (*e.g.*, taxing authorities or Holders of Subordinated Claims). [*Id.* at 12.] The Distribution Plan proposes to give these Claimants *pari passu* treatment with Class 3 User Claims (*i.e.*, they will receive distributions at the same time and based on the same Rising Tide percentage). And like User Claims, which exclude false profits in the form of ROI and bonuses, the Distribution Plan provides that any sums based on consequential, indirect or lost profits, are to be treated as Subordinated Claims, under Class 5, which will receive a distribution, if at all, only after the satisfaction in full of prior classes.

Class 5, Subordinated Claims, will consist of any EminiFX Claim, or any portion thereof, that is (i) subordinated in accordance with a written agreement with the Receiver; (ii) any fine or penalty levied by the CFTC in connection with the CFTC Enforcement Action, unless the Court orders otherwise; or (iii) that contains consequential or indirect damages, or lost profits, or should otherwise be a subordinated in the interest of equity, as described in the Distribution Plan. [*Id.*] Subordinated Claims are not expected to receive a distribution, as they are not entitled to a

distribution until all other Claimants receive a distribution and it is not expected that other Claimants will be paid 100% of their Allowed Claims.

Class 6, Equity Claims, consist of the equity interests of Alexandre, which will not be entitled to any distribution and which will be extinguished upon the dissolution of EminiFX. [*Id.* at 13.]

B.    Rising Tide Method for EminiFX User Refunds

As noted above, the Distribution Plan entails calculating distributions to Users based on their Allowed User Claims in accordance with the Rising Tide method, which is a form of a *pro rata* distribution. Under the Rising Tide approach, "'withdrawals are considered part of the distribution received by an investor and so are subtracted from the amount of the receivership assets to which he would be entitled had there been no withdrawals.'" *S.E.C. v. Callahan*, 193 F. Supp. 3d 177, 198 (E.D.N.Y. 2016) (quoting *S.E.C. v. Huber*, 702 F.3d 903, 905 (7th Cir. 2012)); *see also S.E.C. v. Varacchi*, 2021 WL 10361074, at *13 (D. Conn. July 30, 2021). Here, distributions under a Rising Tide method would be made such that each eligible User would receive a cash distribution that, when added to the prior distributions received by that User, total an amount that equals a certain *pro rata* percentage—that is, the Rising Tide Percentage—of that User's total investment in EminiFX (ignoring any purported profits, interest, bonuses, transfers or other amounts shown in the EminiFX system other than actual money contributed to EminiFX by the investor). A distribution under the Rising Tide method can be calculated as follows:

*Distribution = (Verified User Deposit Amount <u>multiplied by</u> Rising Tide %) <u>minus</u> Verified User Withdrawal Amount <u>minus</u> Distributions by Receiver to Date*

By way of example, if the Rising Tide Percentage was fixed at 50%, and an investor previously received withdrawals and distributions equal to 28% of his or her investment in EminiFX, then such investor would receive a distribution from the Receiver equal to 22% of that

investor's investment in EminiFX.    Investors that previously received withdrawals and distributions equal to or greater than the then-applicable Rising Tide Percentage would not receive any distribution from the Receiver at that time.

The Receiver will set the initial Rising Tide Percentage in his sole discretion promptly after the later of (i) the conclusion of the investors' period to respond to the Receiver's initial schedule of Disputed transactions, and (ii) approval of a Distribution Plan by the Court.    When calculating such percentage, the Receiver expects to account for all available information—including the amounts of Disputed transactions in Class 3 and 4 and estimates of remaining Class 1 and Class 2 claims—and to reserve conservatively given that the Receiver expects to increase the Rising Tide Percentage from time to time as reserves are released.

Once set, the Receiver will post such initial Rising Tide Percentage on the Receivership website and shall file with the Court a notice identifying the applicable Rising Tide Percentage and a schedule showing the Verified Deposit Amounts and Verified Withdrawal Amounts for each Allowed User Claim, in advance of making such distribution.    Users' Verified Deposit Amounts and Verified Withdrawal Amounts will also be made available on the Receiver's website and on the User Portal.    [Plan, at 17].

The Receiver will set the User Convenience Class Distribution Percentage at the same time he sets the initial Rising Tide Percentage, and will follow a similar procedure as set forth above, posting the User Convenience Class Distribution Percentage on the website, filing schedules with the Court, and updating the User Portal with the Verified Deposit Amounts for affected Users. [*Id.*]

For subsequent distributions, when the Receiver determines it is prudent to increase the Rising Tide Percentage—using reasonable reserve estimates and seeking to minimize the costs of

distributions—the Receiver will follow a similar procedure, posting the revised Rising Tide Percentage on the website, filing updated schedules with the Court, and updating the User Portal [*Id.*]

  C. <u>Comparison with Other Distribution Methods</u>

   Because the User funds were commingled, and because the Receiver determined that EminiFX was operated as a Ponzi scheme, the Receiver proposes to distribute the recovered funds *pro rata*, rather than to attempt to trace any misappropriated funds to individual users.  The Second Circuit—and courts and Restatement generally—find that the "*pro rata* option as the more equitable distribution plan in Ponzi schemes because '[i]n such a scheme, whether at any given moment a particular customer's assets are traceable is "a result of the merely fortuitous fact that the defrauders spent the money of the other victims first.'"  *Callahan*, 193 F. Supp. 3d at 192 (quoting *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 89 (2d Cir. 2002)).

   The Rising Tide *pro rata* method used under the Distribution Plan was selected over another commonly used *pro rata* method of calculating distributions, the Net Investment method. Under this approach, Users' Claims would be fixed by subtracting their total withdrawals from their total deposits, and each would receive a percentage of that resulting amount.  In this case, however, the Receiver has determined that application of the Net Investment method would result in a less than equitable result, as Users who made pre-Receivership withdrawals stand to receive additional distributions at the expense of Users who made none.  [*See* Castleman Aff. ¶ 82-84.] The following hypothetical illustrates the point:

> Investor A invests $100,000 in a co-mingled account with other investors in a Ponzi scheme. Investor A then withdraws $20,000 before the scheme collapses, so his net loss is $80,000. Investor B invests $100,000 in the scheme and withdraws nothing, so his net loss is $100,000. Suppose that the receiver was able to recover $18,000 in assets from the defendant, which equals one tenth of the total loss of $180,000 by the two investors. Under the net loss method, each investor would receive a tenth of his loss, so A would receive $8,000 (1/10 of $80,000) and B would receive

$10,000 (1/10 of $100,000). However, technically because A already withdrew $20,000 from the scheme, the distribution of $8,000 permits him to recover a total of $28,000 or 35% of his total loss of $80,000, which is a far greater percentage of his loss than the 10% of his loss that Investor B will recover.

*Callahan*, 193 F. Supp. 3d at 198-99.

D.    Additional Plan Provisions

In addition to the classification and treatment of EminiFX Claims, the Distribution Plan also includes the following additional procedures and provisions:[9]

*Lien Resolution Procedures* [Plan, at 18-19]: The Receiver is authorized, without further Court order, to establish and publish procedures for third party lienholders to assert their rights to a distribution otherwise payable to Holders of Allowed EminiFX Claims.  The Receiver shall be permitted to withhold or pay distributions to those third parties, provided that the Receiver is given notice of such lien pursuant to the established procedures.

*Deceased Claimant Procedures* [*Id.* at 19]: The Receiver may publish a form and related procedures for beneficiaries of estates of Holders of User Claims that are deceased, which shall require valid evidence of death and a right to receive distributions on behalf of the deceased Holder's estate.  The Receiver shall be authorized to determine the validity of any such evidence in his discretion, subject to the right of any party to seek a ruling from this Court.

*Unclaimed Distributions* [*Id.*]: The Receiver is permitted to withhold distributions to Holders of Allowed Claims if a Holder fails to provide the Receiver with information necessary to facilitate those distributions.  If the Holder provides the requisite information, the Receiver will make all distributions then owing.  Otherwise, if the Receiver in his discretion determines that attempts to obtain the information have been exhausted prior to making the final distribution, the

---

[9] The procedures are outlined herein are provided for summary purposes only; to the extent of a discrepancy between the procedures in the Distribution Plan and the descriptions herein, the Distribution Plan controls.

Holder will be deemed to have forfeited the distributions, and they will become Receivership Assets available for distribution to other Holders of Allowed Claims.

*Injunction* [*Id.* at 23]: The Distribution Plan provides for an injunction against all persons or entities who have held, hold, or may hold EminiFX Claims from pursuing those Claims against the Receivership Assets, except to the extent set forth in the Distribution Plan.  The Receivership Preliminary Injunction Order will continue to remain in full force and effect through entry of an order closing the CFTC Enforcement Action, unless otherwise superseded by an Order of the Court.

*Interim and Final Distributions* [*Id.* at 16-18]: The Receiver is authorized to make distributions of Receivership Assets pursuant to and consistent with this Distribution Plan from time to time as determined by the Receiver in his sole discretion without further specific approval of the Court.  With respect to Class 3 User Claims, the Rising Tide Percentage will be fixed for the initial distribution and, to the extent it increases, will be published in advance of any additional distribution.

## II.    **The Receiver Will Continue To Administer The EminiFX Claims Process To Determine Which Claims Are Entitled To A Distribution**

The Receiver anticipates making distributions under the Plan as EminiFX Claims become Allowed in accordance with the Claims Procedures previously approved by the Court, as well as the supplemental Claims procedures set forth in the Distribution Plan.  This Section summarizes the status of the allowance process, and the procedures that would govern should the Distribution Plan be approved.

### A.    Non-User Claims

On August 2, 2024, the Receiver filed a Non-User Claims Report [Dkt. 369] in accordance with the Claims Procedures.  As outlined there and noted above, all but one of the eight unique

Non-User Claims has been resolved and satisfied. The following table sets forth these resolved Claims:

| Claimant[10] | Amount Asserted | Resolution Amount | Percentage | Authorization |
|---|---|---|---|---|
| A0002 | $700,048.25[11] | $160,500.00[12] | 23% | Dkt. 339 |
| A0003 | $5,094,562.39 | $251,555.37 | 5% | Dkt. 249 |
| A0004 | $220,288.08 | $90,376.06 | 41% | Dkt. 294 |
| A0005 | $17,458.03 | $5,000.00 | 28% | Dkt. 91[13] |
| A0006 | $81,098.00 | $10,000.00 | 12% | Dkt. 91 |
| A0007 | $17,324.30 | $5,000.00 | 29% | Dkt. 91 |
| A0008 | $5,003.50 | $1,375.00 | 27% | Dkt. 91 |
| **Total** | **$6,135,782.55** | **$522,431.43** | | |

The Receiver determined that the one remaining Non-User Claim, A0001, should be disallowed (the "**Disallowed Claim**"). The Disallowed Claim was originally asserted in the amount of $992,614.05, though the claimant later sought to adjust the amount of the Disallowed Claim to an amount in excess of $2 million. The Holder of the Disallowed Claim was given until September 27, 2024 to dispute the Receiver's determination with respect to the Claim.

---

[10]     Pursuant to the Claims Procedures, the Receiver assigned Claimants a unique identifier (each a "Non-User Identification Number").

[11]     After the initial filing of the Proof of Claim, Claimant A0002 sought to increase the claim amount under an alternative theory of liability to $1,015,048.25.

[12]     The $160,500 settlement was a return of the $535,000 the Claimants initially turned over to the Receiver subject to Claimants' right to make a claim against the Receivership, releasing the encumbrance on the remaining $374,500. [Dkt. 339].

[13]     The Supplemental Procedures Order entered on August 5, 2022 [Dkt. 91] authorized the Receiver to settle claims for under $50,000 where such settlement is in the best interest of the estate.

B.    Verified User Transactions

As outlined above, the Receiver's review of the Disputed Transactions is ongoing. The Receiver expects that the process of fixing User Claims will continue for the next several months. However, the Receiver expects to be able to make distributions to Users with Allowed User Claims before the conclusion of the process.

Consistent with the Claims Procedures, the Receiver anticipates filing a Schedule of Disputed Transactions (as defined in the Claims Procedures) with respect to unresolved, Disputed Transactions, in or around October 2024. Affected Users will have 45 days thereafter in which to object using the User Portal and the Receiver will continue to seek to reach a consensus with those investors who claimed to have deposited or withdrew actual funds from EminiFX.

Thereafter, for all disputes that remain, the Receiver will file with the Court a summary of the investor objections to the Schedule of Disputed Transactions and a statement in support of the Receiver's determination with respect thereto and may seek one or more orders of the Court resolving any disputes.

Though this process is anticipated to span several months, the vast majority of Users will have verified their claims and have no disputes as of the filing of the Schedule of Disputed Transactions in October 2024. Accordingly, the Receiver anticipates that initial distributions may commence for those Users (provided they are not insiders or otherwise subject to heightened scrutiny), prior to the full and final conclusion of the transaction review process pursuant to the Claims Procedures and this Distribution Plan.

C.    Additional Procedures Governing the Resolution of Disputed Transactions

In addition to the provisions already approved in the Claims Procedures, the Distribution Plan sets forth the following additional procedures that would govern the resolution of User Claims prior to distribution:

*Equitable Consolidation* [*Id.* at 14]: Up until the Review Hold Expiration Date, the Receiver may determine that certain User accounts should be deemed consolidated with one another for purposes of determining their Verified User Deposit Amount and the Verified User Withdrawal Amounts.[14]   In such a case, the Receiver will notify the affected Users in writing (which may be through the User Portal), and thereafter such affected Users' Claims shall not be Allowed or entitled to any distribution on account of such Claim unless and until the Receiver's determination is withdrawn in writing by the Receiver, resolved by agreement between the claimant(s) and the Receiver, or resolved by a Final Order of this Court.

*Review Holds* [*Id.* at 14-15]: The Receiver will be afforded the authority to place a temporary "review hold" with respect to any EminiFX Claim or the Holder thereof at any time up until the Review Hold Expiration Date (*i.e.*, the later of (i) June 30, 2025 or (ii) the date that is six months after the entry of an order of this Court approving the Distribution Plan), which shall prevent any EminiFX Claim identified in such temporary "review hold" from being Allowed.  Any "review hold" shall automatically expire on the Review Hold Expiration Date if not removed before such time, *unless* a Litigation Demand has been made, or a request for equitable subordination or consolidation.

*Litigation Demands* [*Id.* at 15]: The Receiver is provided the authority to assert a Litigation Demand with respect to any EminiFX Claim (regardless of whether a temporary "review hold" applied to such EminiFX Claim).  The assertion of a Litigation Demand will prevent any EminiFX Claim identified in such Litigation Demand and all EminiFX Claims of the Holder identified in such Litigation Demand from being Allowed at any time after notice of the Litigation Demand is

---

[14] An example of a situation in which the Receiver may determine to consolidate two accounts is where the principal owner of the account is the same (*e.g.*, a business account and a personal account or if the User opened up two separate accounts) and one of the relevant investor accounts is held by a Net Winner.  The foregoing is solely an example for illustrative purposes.  The Receiver may determine to designate accounts for consolidation in other situations as well.

provided to the relevant Holder, until such time that the Litigation Demand is withdrawn in writing by the Receiver, resolved by written agreement of the Receiver, or resolved by a Final Order of this Court.

*Subordination* [*Id.* at 15-16]: The Receiver may determine that certain User Claims or User Convenience Class Claims, under the applicable facts and circumstances, should be classified as Subordinated Claims.  The Receiver may, prior to the Review Hold Expiration Date, file one or more schedules of Subordinated Claims with the Court from time to time, and shall serve any affected Holder.  Any affected Holder shall have 45 days to submit an objection to the Receiver, in a manner specified by the Receiver upon service of the schedule of Subordinated Claims, or such Subordination classification shall become final.  For any Subordination classification not resolved consensually with the affected Holder, the Receiver shall submit such classification dispute to the Court for summary disposition in a manner consistent with Section 5 of the Claims Procedures.

*Office of Foreign Assets Control ("**OFAC**") Review* [*Id.* at 18]: The receiver is authorized under the Distribution Plan to take actions necessary to comply with applicable law, including, but not limited to, withholding distributions otherwise payable as a result of regulations promulgated by the OFAC of the U.S. Department of Treasury.

*Holdback of Disputed Transactions* [*Id.* at 9-10, 19]:  So long as one or more of a User's transactions remains a Disputed Transaction, or is otherwise subject to one of the procedures set forth above, no distribution will be made to the User.  If and when the User's Claim becomes Allowed, the User will be entitled to any catch-up distributions they otherwise would have been entitled to at the time.

D.    Net Winner Procedures and Other Affirmative Litigation

In addition to the foregoing procedures, the Distribution Plan also includes provisions applicable to the claims and causes of action held by EminiFX that are a part of the Receivership Assets (referred to in the Distribution Plan as "Causes of Action"). [Plan, at 20-21]. Specifically, the Plan expressly preserves the Receiver's right to commence litigation, settle, or otherwise resolve such Causes of Action, with such settlement authority—except in the case of Net Winners, discussed below—generally tracking the grant of authority contained in the Order re Supplemental Procedures. [Plan, at 20.]

There are multiple instances in which these procedures might affect Holders of EminiFX Claims—specifically, Net Winners, finders and promoters, and insiders collecting cash.

A Net Winner is defined in the Distribution Plan as "any person or entity for which their Verified Withdrawal Amount is in excess of their Verified User Deposit Amount." [Plan, at 5.] Because of the nature of the Rising Tide method of distribution, Net Winners will not receive any distribution [Plan, at 21]. The Distribution Plan further contemplates that the Receiver may make settlement offers to Net Winners, offering a release from litigation by the Receiver in exchange for return of fifty percent of the amounts received by Net Winners. Absent any settlement, Net Winners may be subject to potential affirmative Causes of Action brought by the Receiver. [*Id.*]

The Receiver is continuing to investigate finders and promoters of EminiFX, as well as the insiders who the Receiver understands were collecting cash directly from Users. Many of these same individuals or entities were also Users themselves, and may be Holders of User Claims or User Convenience Class Claims. As the Receiver's investigation continues, it may be necessary for the Receiver to place Review Holds on their User accounts, or take other action with an eye to determining whether viable claims exist against those parties.

26

Should the Receiver litigate to judgement, or otherwise resolve, such claims, the Distribution Plan provides that the recovered sums will become part of the Receivership Assets and distributed in accordance with this Distribution Plan, unless the Receiver moves the Court for an amendment to this Distribution Plan concerning such recovery.  [Plan, at 24.]

## III.    <u>Proposed Notice Procedures</u>

Contemporaneously with the filing of this Motion, the Receiver is making a full copy of the Distribution Plan available on the Receiver's website, alongside a summary "explainer," substantially in the form of the draft website page attached to the Castleman Affidavit as Exhibit 2, that describes the Distribution Plan's relevant provisions.  Additionally, a link to the Distribution Plan and "explainer" will be e-mailed to all Users, Non-User Claimants, and other parties in interest at their provided e-mail address.  The e-mail to Users will be substantially in the form of the draft email attached to the Castleman Affidavit as Exhibit 3.  The foregoing will be mailed to Users and or Non-User Claimants, including any governmental entities, to the extent that e-mail is unavailable.  A copy of the Distribution Plan, this Motion and its supporting documentation, as well as the explainer, will be mailed to Alexandre.

Users will have the opportunity to respond to the Plan via the User Portal, which will be updated with a feature allowing Users to input and submit responses their responses.  The updated interface will also include links to the Distribution Plan, explainer, and other relevant documents.

Under the Distribution Plan Schedule approved by the Court, the Receiver will submit a compendium of User responses on September 10, 2024.  Along with that compendium, the Receiver will submit an affidavit of service reflecting the parties served in accordance with the procedures described herein.

# ARGUMENT

## I.    STANDARD OF REVIEW

Consideration and approval of the Receiver's proposed Distribution Plan falls well within this Court's equitable authority.   Generally, the Court possesses broad authority over the administration of receivership assets, including to "determine how and to whom the money will be distributed."   *S.E.C. v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997); *see also Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008); *C.F.T.C. v. Rolando*, 589 F. Supp. 2d 159, 172 (D. Conn. 2008) ("The Second Circuit has . . . grant[ed] broad equitable powers to district courts in enforcement matters brought by federal agencies."); *see generally S.E.C. v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986) ("[A] district court's power to supervise an equity receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad.").   A district court has "equitable discretion" to decide whether to approve a distribution plan in a federal receivership.   *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80, 82-83 (2d Cir. 2002).

A Court may approve a proposed Distribution Plan if it is fair and reasonable.   *See S.E.C. v. Varacchi*, 2021 WL 10361074, at *6 (D. Conn. July 30, 2021) ("A distribution plan proposed by a receiver should be 'reviewed under [the District Court's] general equitable powers to ensure that it is fair and reasonable.'") (quoting *S.E.C. v. Wang*, 944 F.2d 80, 81 (2d Cir. 1991)); *see also S.E.C. v. Enter. Tr. Co.*, 2008 WL 4534154, at *3 (N.D. Ill. Oct. 7, 2008), *aff'd,* 559 F.3d 649 (7th Cir. 2009) ("There are no hard rules governing a district court's decisions in matters like these. The standard is whether a distribution is equitable and fair in the eyes of a reasonable judge.").

In making that determination, a receiver's choices regarding the details of the plan proposed are entitled to deference.   *See S.E.C. v. Amerindo Inv. Advisors Inc.*, 2016 WL 10821985, at *3 (S.D.N.Y. May 20, 2016) ("[I]t is within a district court's discretion to approve a distribution plan proposed by a receiver—and to defer to the receiver's choices for the plan's details—so long

as the plan is 'fair and reasonable.'").[15]  As the Fourth Circuit recently explained "receivers 'have a duty to avoid overly costly investigations, and at a certain point, the costs of such individualized determinations outweigh the benefits.'"  *CCWB Asset Invs., LLC v. Milligan*, --- F.4th ----, No. 22-2256, 2024 WL 3658780, at *3 (4th Cir. Aug. 6, 2024) (quoting *S.E.C. v. Wealth Mgmt. LLC*, 628 F.3d 323, 336 (7th Cir. 2010)).

## II.    THE CALCULATION AND DISTRIBUTION OF USER CLAIMS UNDER THE DISTRIBUTION PLAN IS EQUITABLE

The Distribution Plan as a whole is fair and reasonable, and its proposed method of calculating distributions (*i.e.*, the Rising Tide method) and the method of calculating Allowed User Claims (ignoring fictitious ROI, bonuses and internal transfers) promotes equity under the facts of this case.  The Receiver has determined that EminiFX operated as a Ponzi scheme.  It had no legitimate business operations and none of the money contributed by Users was actually invested.  Users of EminiFX therefore could not have made genuine profits or ROI.  Yet, every week Users' account balances would increase by approximately 5%-10%, and Users were able to—and often did—withdraw cash or Bitcoin based on those increases.  With no actual earnings or ROI, those withdrawals could only be the product of money contributed by other investors.  In that way, EminiFX had all the classic indicia of a Ponzi scheme, and should be treated as such.

Where an entity is found to have operated as a Ponzi scheme, courts in and outside of this Circuit have found that the best resolution for investors, as a group, entails making a *pro rata* distribution based of the total funds recovered using the Rising Tide method.  That method recognizes only actual deposits made by investors (not "fictitious profits").  It also treats

---

[15] In addition, "substantial weight" should be afforded to the position of the relevant agency—here, the CFTC—on the merits of the proposed plan.  *Amerindo Inv. Advisors Inc.*, 2016 WL 10821985, at *3.  The CFTC has indicated to the Receiver that it does not oppose the proposed Distribution Plan.  The CFTC's brief in response is due on September 10, 2024, and the Receiver will address any issues raised by the CFTC (or other responding parties) in his September 27, 2024 reply brief.

withdrawals as equivalent to pre-receivership distributions, given that both withdrawals and distributions come from the same pot of commingled funds.

A.    EminiFX's Operations Contain the Indicia of a Ponzi Scheme[16]

While a "Ponzi scheme" has never been precisely defined, courts can identify one based on its adherence to a "general pattern, rather than specific requirements." *Bear, Stearns Sec. Corp. v. Gredd* (*In re Manhattan Inv. Fund Ltd.*), 397 B.R. 1, 12 (S.D.N.Y. 2007).  That pattern entails "any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of the fraud." *Id.* at 12 (internal quotation marks omitted).  This is readily apparent where the entity used for operation of the scheme suffers significant losses.  *See id.*

Courts in this district have also looked to certain "badges" in identifying the Ponzi-scheme pattern.  These include:

> the absence of any legitimate business connected to the investment program, the unrealistic promises of low risk and high returns, commingling investor money, the use of agents and brokers paid high commissions to perpetuate the scheme, misuse of investor funds, the "payment" of excessively large fees to the perpetrator and the use of false financial statements.

*Gowan v. Amaranth Advisors L.L.C. (In re Dreier LLP)*, 2014 WL 47774, at *9 (Bankr. S.D.N.Y. Jan. 3, 2014); *see also Pergament v. Torac Realty, LLC (In re Diamond Fin. Co., Inc.)*, 658 B.R. 748, 766 (Bankr. E.D.N.Y. 2024) (noting the use of a similar four-factor test: "1) deposits were made by investors; 2) the [d]ebtor conducted little or no legitimate business operations as represented to investors; 3) the purported business operation of the Debtor produced little or no profits or earnings; and 4) the source of payments to investors was from cash infused by new

---

[16] The Receiver sets forth herein all of the aspects of EminiFX's operation that denote a Ponzi scheme primarily to establish why the Rising Tide method of distribution is most equitable here, as well as to explain why exclusion of ROI and bonuses from User Claims is appropriate, and why he has a good faith basis to assert claims against Net Winners (those Users who withdrew more than they deposited).

investors") (quoting *S.I.P.C. v. Bernard L. Madoff Inv. Sec. LLC (In re Bernard L. Madoff)*, 531 B.R. 439, 471 (Bankr. S.D.N.Y. 2015)).

EminiFX fits the pattern of a Ponzi scheme in that it (i) engaged in commingling, (ii) lacked meaningful investment operations, (iii) transferred substantial funds to Alexandre's personal accounts, and, all the while, (iv) promised unrealistic returns to its Users.

*First*, User funds were commingled in EminiFX's several accounts. *See Diamond Fin. Co., Inc.*, 658 B.R. at 767. Cash contributions from Users generally went to EminiFX's TD Bank or Bank of America account, and a majority of Bitcoin was directed to EminiFX's Coinpayments account. [*See* Castleman Aff. ¶ 38, 41-42.] Though EminiFX generally logged Users' transactions, these records were incomplete, and the funds themselves were not segregated within EminiFX's accounts. [*See id.* ¶¶ 19, 25, 42.]. Most importantly, all withdrawals were paid from commingled EminiFX funds consisting of User deposits. [*Id.* ¶ 75.]

*Second*, EminiFX engaged in minimal, if any, legitimate business operation. While its stated purpose was to enable Users to engage in trading and provide investment opportunity, of the total funds contributed by Users, only a minimal amount—approximately $14 million—was invested. [*Id.* ¶ 71.] The balance of Users funds sat, commingled, in EminiFX's accounts. And even then, the majority of the investment activity consisted of a diversion of User funds into Alexandre's personal Interactive Brokers account. That, in addition to the investments made in Kot4X, Gemini, and later, in real estate transactions, all resulted in losses. [*Id.* ¶¶ 59-71.]

That EminiFX lacked legitimate business operation is further evidenced by the absence of any formal record-keeping at the company. As noted, the Receiver has not found any indication that EminiFX kept a ledger or any accounting records. [*Id.* ¶ 34.] The Database used by EminiFX

employees was used mainly to assign values to User accounts based on the amount that they deposited into the system, not for any formal accounting [*Id.* ¶ 26.]

*Third*, the Receiver has identified the transfer of over $15 million of User funds to Alexandre's personal TD Bank account. [*Id.* ¶ 74.] Moreover, that personal TD Bank account was used to conduct EminiFX business, as shown by the funding of Alexandre's personal Interactive Brokers account with EminiFX funds, and using that account to receive deposits from EminiFX Users. [*Id.*]

*Fourth*, despite considerable losses, EminiFX offered high weekly ROI to Users, and rewarded Users who recruited new Users to the scheme with bonuses. As discussed, however, these awards of additional sums had no connection to the value of EminiFX's investments, and eventually far exceeded the value of its assets. [*Id.* ¶¶ 77-80.]

Thus, EminiFX contained most, if not all, of the flags that courts use to identify a Ponzi scheme. As set forth below, the Distribution Plan's calculation of claims and method of distribution properly reflects this.

B.    Rising Tide is Appropriate Where Distributions are Based on
      Refunds of Deposits in a Ponzi Scheme

In Ponzi scheme cases where funds are commingled, as here, the Second Circuit has made clear that distribution plans should be based on a *pro rata* distribution of the entire receivership estate, rather than attempting to trace individual contributions. In *Credit Bancorp*, the Second Circuit held that "*pro rata* distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders," and found the use of a *pro rata* distribution . . . "especially appropriate for fraud victims of a 'Ponzi scheme.'" *S.E.C. v. Credit Bancorp, Ltd.*, 290 F.3d 80 (2d Cir. 2002) (citing *Cunningham v. Brown*, 265 U.S. 1 (1924) (the original case involving Charles Ponzi's scheme));

*accord S.E.C. v. Malek*, 397 F. App'x 711, 715-16 (2d Cir. 2010) (explaining the preference of *pro rata* to traceability in Ponzi scheme cases).  There are two types of commonly used pro rata distribution schemes in Ponzi scheme cases—"Rising Tide" (*pro rata* based on deposits, treating pre-receivership withdrawals as equivalent to prior distributions), or "Net Investment" (*pro rata* based on the net of deposits less withdrawals).

The Receiver proposes "rising tide" in the Distribution Plan.  "[C]ourts have tended to favor the 'rising tide' approach as more equitable because it prevents an investor who previously received funds as a withdrawal from benefitting at the expense of other investors in the scheme who did not receive any withdrawals and therefore, lost the entire amount of their investment in the Ponzi scheme." *Callahan*, 193 F. Supp. 3d at 199; *see also Huber*, 702 F.3d at 906-07 ("Rising tide appears to be the method most commonly used (and judicially approved) for apportioning receivership assets. . . An investor has no entitlement to money stolen from other people.  When investors' funds are commingled, none being traceable to a particular investor, no part of whatever funds are recovered is property of any investor.") (collecting cases); *Milligan*, --- F.4th ----, 2024 WL 3658780, at *3 (approving a rising tide plan and noting that the goal of a receivership is a "fair distribution of the liquidated assets," and that "an equitable plan is not necessarily a plan everyone will like" (cleaned up)).

As set forth above, the funds that Users deposited into the EminiFX System were commingled, each User achieved no actual profit from their individual deposits into the EminiFX System.  Those Users who did make withdrawals were actually withdrawing Funds of other Users that were deposited and all commingled in the EminiFX accounts.  In response to Ponzi scheme investors arguing that "they shouldn't be penalized for having withdrawn some of 'their' money," Judge Posner explained: "But it was not *their* money; they withdrew portions of the commingled

assets in the Ponzi schemer's funds.  Those were stolen moneys, albeit stolen in part from the eleven appellants.  An investor has no entitlement to money stolen from other people. When investors' funds are commingled, none being traceable to a particular investor, no part of whatever funds are recovered is property of any investor."  *Huber*, 702 F.3d at 906-07.  Because the funds available for distribution under the Distribution Plan are the same funds that Users withdrew prior to the Receivership, the Distribution Plan treats pre-Receivership withdrawals as distributions ("**EminiFX Pre-Receivership Withdrawals**").    Otherwise, Users who happened to make withdrawals prior to the Receivership would benefit significantly over those Users who did not. *See C.F.T.C. v. Lake Shore Asset Mgmt. Ltd.*, 2010 WL 960362, at *9 (N.D. Ill. Mar. 15, 2010), *aff'd*, 646 F.3d 401 (7th Cir. 2011) ("[U]nlike the 'Net Investment' method, the 'Rising Tide' method does not penalize investors based upon the timing of their investments because all investors share equally in the available monies.").

Courts have rejected the Rising Tide approach only in limited circumstances, not present here, where "a significant number of investors withdrew their money from the Ponzi scheme at issue and would not be entitled to a distribution." *Callahan*, 193 F. Supp. 3d at 199.  For example, in *S.E.C. v. Byers*, the court rejected the Rising Tide approach in the W*extrust* scheme where "using the rising tide approach would mean that 45% of investors would receive no distribution." 637 F. Supp. 2d 166, 182 (S.D.N.Y. 2009), *aff'd sub nom. S.E.C. v. Malek*, 397 F. App'x 711 (2d Cir. 2010).  Here, based on the Receiver's modeling, only 10% of Users might not receive an initial distribution—and most of these Users are Net Winners (received more than they ever contributed to EminiFX).  [Castleman Aff. ¶ 84 & Ex. 16.][17]  *Cf. Huber*, 702 F.3d at 907 ("[O]nly 18 percent

---

[17] The Receiver's model is based on current estimates, and is not intended to be an exact calculation of the eventual distribution to EminiFX users if the Distribution Plan is approved.  Actual results may vary.

of the investors in Huber's scheme receive nothing under rising tide, and so in this case that method is an acceptable alternative to net loss.").

While there may be some Users that do not receive a distribution, they only represent a very small percentage of the total number of Users, and they have already received distributions from EminiFX in the form of Pre-Receivership Withdrawals. By contrast, the vast majority of Users who made no withdrawals will receive a greater distribution under the Rising Tide method as compared to the Net Investment method of distribution. Even though the calculation is the same for each such investor given the lack of withdrawals, the *pro rata* percentage applied to the investor's deposits is higher under the Rising Tide method than under the Net Investment method for the same amount of funds distributed, as reflected in the Receiver's model. [Castleman Aff. ¶ 84 & Ex. 17.] Under the facts and circumstances in this case, the Receiver respectfully submits that the Rising Tide method of distribution is the most fair and equitable method of distribution in this case.

C.    The Distribution Plan Properly Excludes ROI, Bonuses, and Internal Transfers

In calculating each User's claim, the Distribution Plan properly excludes from consideration ROI, bonuses, and internal transfers, while including only Verified User Deposit Amounts and Verified User Withdrawal Amounts.

i.    ROI

Any ROI attributed to Users were fake profits: as described above, the additional sums attributed to Users' accounts were entirely divorced from EminiFX's actual investment activity and finances. Where a Rising Tide method of distribution is employed, Courts have approved the exclusion of fictitious profits from claims. *See C.F.T.C. v. Equity Fin. Grp., Inc.*, 2005 WL 2143975, at *23 (D.N.J. Sept. 2, 2005), *report and recommendation adopted sub nom. C.F.T.C. v. Equity Fin. Grp., LLC*, 2005 WL 2864783 (D.N.J. Oct. 26, 2005) ("The Court agrees [with the

Receiver's approach] that recognizing profits or other earnings in claims for distribution would be to the detriment of later investors and would therefore be inequitable."); *Lake Shore Asset Mgmt. Ltd.*, 2010 WL 960362, at \*4 (approving Receiver's plan where "the receiver credited investors for actual deposits and did not credit any alleged gain to any investor when calculating the Approved Claims Base.").  Because the ROI applied to EminiFX User accounts were merely fictitious profits, their exclusion is appropriate here.

ii.    Bonuses

Bonuses similarly were unconnected to any investment activity, and, to the extent withdrawn, could have consisted only of other Users' commingled contributions [Castleman Aff. ¶¶ 79-80].  In that way, the bonuses are integral to the Ponzi-like nature of EminiFX's operations, and are justifiably excluded from the calculation of User Claims.  *See Smith v. Suarez (In re IFS Fin. Corp.)*, 417 B.R. 419, 440 (Bankr. S.D. Tex. 2009) ("The high interest rates promised and the promoter commission structure are hallmarks of a classic Ponzi scheme.").  To the extent that recognition of these amounts would, in effect, reward recruitment of participants in a Ponzi scheme, their exclusion is equitable.  *Gordon v. Dadante*, 2010 WL 4137289, at \*2-3 (N.D. Ohio Oct. 14, 2010) ("It is undisputed that the payments at issue here were commissions for bringing investors into the fund . . . To characterize these commission payments as distribution of profit would permit Frank to gain from the very investors that he persuaded to participate in this Ponzi scheme.").

iii.    Internal Transfers

The Receiver does not credit "transfers" between Users within the EminiFX system in the Distribution Plan.  Transfers decreased a User's total EminiFX balance, and therefore could consist of a combination of actual deposits, ROI, and bonuses.  [Castleman Aff. ¶¶ 55-58.] While transfers were not necessarily comprised of fictitious profits in every instance, it would be extremely

36

burdensome, and require relying on EminiFX transfer records that may not be entirely accurate or complete, to conduct a User by User accounting to determine whether transfers in fact corresponded with actual deposits of US Dollars or BTC.  While the inter-account method has been used elsewhere to determine which portion of a transfer can be credited to a transferee and deducted from a transferor, *see e.g.*, *Diana Melton Tr. v. Picard (In re Bernard L. Madoff Inv. Sec., LLC)*, 2016 WL 183492, at \*1 (S.D.N.Y. Jan. 14, 2016), here, given the relatively low median value of each transfer ($500), and the high volume of transfers (over 45,000), it would be cost prohibitive to undertake that analysis.  [Castleman Aff. ¶¶ 56-58.]  In a recent case considering a rising tide distribution plan proposed by a Receiver involving a Ponzi Scheme, the Fourth Circuit agreed with the receiver's determination that attempting to trace using the maximum balance approach involving 76 transactions would be "administratively difficult" and approved of "rejecting a calculation that 'would impose a massive new administrative burden on the receiver.'" *Milligan*, --- F.4th ----, 2024 WL 3658780, at \*4 (citing *S.E.C. v. Cap. Consultants, LLC*, 397 F.3d 733, 745 (9th Cir. 2005)).  Here, there were over 45,000 transfers with a total transfer amount of over $77 million and a median value of just $500, making tracing all the more difficult. [Castleman Aff. ¶ 55.]  Moreover, the Receiver believes that, even if using the inter-account method were feasible (and it is not), recognizing internal transfers would fail to promote equity, as it would require to deducting from a transferor a portion of their actual deposits to credit the transferee. [Castleman Aff. ¶ 58.]

## III.    THE DISTRIBUTION PLAN PROPERLY PRIORITIZES CLAIMS

### A.    The Distribution Plan Properly Treats User and Investor Claims *Pari Passu*

While a Receiver is given wide latitude to determine the classification of claims, including the subordination of non-investor claims, the Receiver has determined to afford Class 4 Other Claims (*i.e.*, Non-User Claims that do not fall in any other Class) the same treatment as Holders

of Class 3 User Claims.[18]    This treatment promotes equity because each User's individual distribution would be minimally affected, if at all, by *pari passu* treatment of the Other Claim, while in contrast, the remaining creditor would receive no recovery at all if subordinated to investors solely because of its status as a Class 4 Other Claim.  *See C.F.T.C. v. Rust Rare Coin, Inc.*, 2020 WL 4904165, at *4 (D. Utah Aug. 20, 2020) ("[T]he Receiver notes that if the unsecured creditors were placed in a class below the investors, none of the unsecured creditors would receive any recovery . . . Weighing all of these factors—the relative innocence of the unsecured creditors, the fact that the recovery is built on funds contributed by defrauded investors, and the need to help as many victims as possible—the court agrees with the Receiver that these groups should be treated the same. Accordingly, all of the above objections are overruled."); *see also S.E.C. v. TCA Fund Mgmt. Grp. Corp.*, 2022 WL 17816956, at *5 (S.D. Fla. Dec. 2, 2022) ("[C]ourts have not hesitated to group unsecured creditors and defrauded investors together for purposes of equity receivership distribution plans.").

The inequity would be particularly acute here, when there is currently only one potential Other Claim.  Although the Receiver has disallowed that one claim, if it is ultimately allowed in whole or in part, it would be inequitable to deny that Claimant any recovery.  On the other hand, treating that Claimant's Allowed Other Claim the same as the EminiFX User Claims, will not materially impact the distributions received by Users.  Thus, the Court should approve the Receiver's treatment of the Other Claim *pari passu* with User Claims.

---

[18] The Receiver retains the right under the proposed Distribution Plan to seek subordination of the remaining claim within Class 4.  However, should any or all of that claim not be subordinated, it would be entitled to *pari passu* treatment as described here.

B.    <u>The Distribution Plan Properly Maintains the Priority of any Tax Claims</u>

The Receiver does not dispute that claims of the United States government, as applicable here, for taxes owed by EminiFX and the EminiFX QSF, have priority pursuant to 31 U.S.C. § 3713, which provides that "[a] claim of the United States Government shall be paid first when . . . a person indebted to the Government is insolvent and . . . the debtor without enough property to pay all debts makes a voluntary assignment of property . . ."  Further, "[a] representative of a person or an estate . . ." here the Receiver "paying any part of a debt of the person or estate before paying a claim of the Government is liable to the extent of the payment for unpaid claims of the Government."  31 U.S.C. § 3713(b).

The Receiver's distribution to Holders of lower priority claims (Class 3, 4 and 5 Claims) before payment of the Tax Claims does not violate Section 3713(b), because the Receiver will maintain the priority of the Tax Claims by holding an amount in reserve that is sufficient to pay any Tax Claims.  The amount of the reserve will be based on a reasonable and conservative estimate of the Receivership's potential liability for such Tax Claims as determined by the Receiver in consultation with his advisors and based on discussions with the IRS.  [*See* Plan at 11, 21.]  As the Second Circuit has explained, such a reserve is "hardly novel."  *S.E.C. v. Credit Bancorp., Ltd.*, 297 F.3d 127, 140 (2d Cir. 2002) (explaining that it was improper for the court to permit the receiver to subordinate tax claims because they were undetermined, where "the Receiver could set up a reserve for taxes—a common step—and delay distribution of the reserved portion of the estate until [the insolvent's] tax liabilities are determined . . . Such a reserve by the Receiver would doubtless be approved by the [District Court]."); *see also S.E.C. v. Credit Bancorp, Ltd.*, 290 F. Supp. 2d 418, 420–21 (S.D.N.Y. 2003) (after the Second Circuit's decision, "[t]he Receiver and the IRS are now close to entering into a Closing Agreement pursuant to which the Receiver may distribute assets to CBL customers in a plan of distribution provided that the

Receiver retains a reserve for taxes of at least $5,000,000.")  Thus, while the Receiver recognizes the priority of the government's claims, the uncertainty of those claims (if they are still uncertain at the time of distribution) do not require stalling distributions to Users.  It would be unfair to delay distributions to other EminiFX creditors while the Receiver and the taxing authorities determine whether such authorities have a claim against the EminiFX Receivership and in what amount, particularly when there are sufficient reserves to ultimately satisfy any Tax Claim.

      C.      <u>The Distribution Plan's Subordination Procedures are Proper</u>

The Distribution Plan also contains a subordinated class for a CFTC-imposed fine or penalty or for other claims that should be subordinated in the interest in equity, provided that the affected claimant agrees or that the classification decision is submitted to the Court for summary disposition.  [Plan, at 6, 15.]  Courts in this district have approved both of subordination of claims for those "involved in the fraudulent scheme," and for summary proceedings to determine such classification.  *Byers*, 637 F. Supp. 2d at 184 ("It is well-settled that a District Court has the authority, in implementing a distribution plan in a receivership case, to use summary proceedings to evaluate claims and claim priority, provided the parties have an opportunity to be heard to argue their claims.").  The Distribution Plan provides for notice and an opportunity to be heard, should he decide to subordinate any claims.

The CFTC has already submitted to this Court that it expects to subordinate a claim for a fine to the recovery of EminiFX Users, stating in March 14, 2024 letter that the "monetary penalty against Defendants [in the Consent Order that had been negotiated] would have been subordinated to other claims—including claims made by EminiFX participants—meaning that the penalty would have been collectable only if all valid participant claims were first fully satisfied, which is highly unlikely to occur."  [Dkt. 276, at 1.]  The Receiver understands that the CFTC does not intend to object to this treatment, and will address any issues in reply if necessary.

**IV.     THE COURT SHOULD AUTHORIZE THE RECEIVER'S PROCEDURE FOR PRE-LITIGATION SETTLEMENTS WITH NET WINNERS**

The Consent Order grants the Receiver "[t]he directions, authorizations, duties, and powers of the Temporary Receiver under the SRO" [Dkt. 56, at 13] including to "[i]nitiate, defend compromise, adjust, intervene in, dispose of, or become a party to, any actions or proceedings in state, federal, or foreign court that the Temporary Receiver deems necessary and advisable to preserve or increase the value of the Receivership Estate . . ." [Dkt. 9, at 12].  Pursuant to the Consent Order, the Receiver plans to pursue recovery for fraudulent conveyances against Net Winners, *i.e.*, Users who received payments above the total amount that they deposited into EminiFX.  *See Moran v. Goldfarb*, 2012 WL 2930210, at *7 (S.D.N.Y. July 16, 2012) ("[A]ny payments investors received in excess of their principal investments are voidable as fraudulent transfers.").  The Receiver requests authority from this Court to settle Net Winner claims for 50% of the net winnings, provided that such settlements are completed by June 30, 2025.

The Receiver has a good faith basis to assert claims against Net Winners as voidable transactions.  First, the Receiver's claims against the New Winners are timely, because the statute of limitations for claims under Section 273 of the NY Debtor Creditor Law is four years from the date the transfer occurred.  N.Y. Debt. & Cred. Law § 278.[19]  The earliest a transfer could have occurred in this case is September 2021 when EminiFX was first launched, meaning that all claims will be timely as of June 30, 2025.  Second, the transferor's actual intent to defraud (as required for a claim for fraudulent conveyance) is presumed because EminiFX was operated as a Ponzi scheme.  *See Picard v. Citibank, N.A. (In re Bernard L. Madoff Inv. Sec. LLC)*, 12 F.4th 171, 181 (2d Cir. 2021) ("Under the so-called 'Ponzi scheme presumption,' 'the existence of a Ponzi scheme

---

[19] Because the withdrawals by Net Winners occurred during the period that EminiFX was operating from September 2021 through May 2022, the New York Debtor Creditor Law, as amended by the Uniform Voidable Transactions Act on April 4, 2020, applies to analysis of those transfers.  N.Y. Legis. 580 § 7 (2019).

demonstrates actual intent as [a] matter of law because transfers made in the course of a Ponzi scheme could have been made for no purpose other than to hinder, delay or defraud creditors.'"); *Johnson v. Neilson (In re Slatkin)*, 525 F.3d 805, 814 (9th Cir. 2008) ("We hold that once the existence of a Ponzi scheme is established, payments received by investors as purported profits— *i.e.*, funds transferred to the investor that exceed that investor's initial 'investment'—are deemed to be fraudulent transfers as a matter of law."); *Moran*, 2012 WL 2930210, at *5 ("[I]n the context of a Ponzi scheme, '"[c]ourts have uniformly recognized a presumption of actual intent to defraud on the part of the transferor.'" (quoting *Gowan v. The Patriot Grp. LLC (In re Dreier LLP)*, 2011 WL 2412581, at *24 (Bankr. S.D.N.Y. June 16, 2011)).

The Receiver believes that offering a release is in the best interests of all Users, because it will create a greater likelihood of recovery for the estate, and the Court may properly approve the Receiver's settlement procedures in advance. *See, e.g. S.E.C. v. Nationwide Automated Sys. Inc.*, 2015 WL 13710945, at *3 (C.D. Cal. Apr. 21, 2015) (approving the Receiver's proposed procedures, as described in the Receiver's motion in that case [Dkt. 64], which included offering to settle claims against net winners without litigation, for 70 percent of the total transfers).  Given the fraud that occurred here and the fact that the investor base is comprised mostly of individuals and not institutional investors, the Receiver believes an offer to accept 50% of the net winnings for settlements completed by June 30, 2025, is fair, reasonable, and in the best interest of the estate. Any settlements recovered will return money that can be used for distribution to other creditors

(*i.e.*, net losers), while not placing an undue burden on the net winner, and a uniform settlement offer is both fair to similarly situated investors and reduces the cost of administration.

## V.    THE DISTRIBUTION PLAN AFFORDS CLAIMANTS THE REQUISITE NOTICE AND OPPORTUNITY TO BE HEARD

The Notice procedures outlined in Section III of the Distribution Plan summary, *supra*, are appropriate. The Receiver will provide notice to all claimants of this Motion through ECF Filing. The Receiver will provide notice specifically to Users by email directly to each User and by posting on the EminiFX Receivership Website. As such, all creditors whose claims may be impacted by the Distribution Plan are being afforded notice and an opportunity to be heard, as is required. *See Callahan*, 193 F. Supp. 3d at 204; *see also Byers*, 637 F. Supp. 2d at 184 (approving summary proceedings to evaluate claims). The proposed notice procedures for the Motion are consistent with previous notice procedures proposed by the Receiver and approved by this Court. [Dkts. 77, 79, 91, 225].

*[Remainder of Page Intentionally Left Blank]*

## CONCLUSION

For the reasons set forth herein, the Receiver respectfully requests that the Court enter an Order substantially in the form attached to this Motion, granting the Motion approving the Distribution Plan and related procedures, and granting such other and further relief as the Court deems just and proper.

Dated: New York, New York
      August 9, 2024

                                 **OTTERBOURG P.C.**

                                 By: */s/ Jennifer S. Feeney*
                                 Jennifer S. Feeney
                                 William M. Moran
                                 James V. Drew
                                 230 Park Avenue
                                 New York, New York 10169
                                 Tel.:  (212) 661-9100
                                 Fax:  (212) 682-6104
                                 E-mail: jfeeney@otterbourg.com
                                              wmoran@otterbourg.com
                                              jdrew@otterbourg.com

                               *Attorneys for David A. Castleman, as Receiver*