UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X
                                 :

COMMODITY FUTURES TRADING        :
COMMISSION,

                                :          22-CV-3822 (VEC)

                          Plaintiff,   :

                                :         __OPINION & ORDER__

          -against-              :

                                :

EDDY ALEXANDRE, EMINIFX, INC.,     :

                                :

                       Defendants.   :

------------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

     Plaintiff Commodity Futures Trading Commission (the "CFTC") alleges that Defendant

Eddy Alexandre's company, Defendant EminiFX, Inc., operated as a Ponzi scheme. Upon the

filing of this action, the Court appointed an equity receiver, David Castleman (the "Receiver"),

to oversee "all customer funds and property and other assets traceable to customers in the

possession of or under the control of Eddy Alexandre." Statutory Restraining Order, Dkt. 9,

¶ 30. The Receiver filed a motion to approve his proposed plan for distributing the

Receivership's assets. The Receiver's motion is GRANTED.

BACKGROUND

**I.     History of this Case**

     Founded and led by Alexandre, EminiFX was a self-described "investment club" that

purported to provide investors with "easy access to cryptocurrency and Forex trading."

Castleman Affidavit ("Castleman Aff.") Ex. 5, Dkt. 383-5, at 2. EminiFX reported an

astonishing return on investment ("ROI") of 5.00% to 9.99% per week for its investors, who also

received commission bonuses if they referred new users to the platform.  Castleman Aff., Dkt.

383, ¶ 36.  Over the course of the eight months it existed, EminiFX users deposited

approximately $260 million into their accounts and were told they had realized gains of over

$262 million in ROI, plus $56.6 million in commission bonuses.  *Id.* ¶¶ 37, 41, 50, 54;

Castleman Aff. Ex. 9, Dkt. 383-9.

But the gains and bonuses were illusory.  In reality, approximately 95% of investor

deposits were never invested at all, but rather sat in two accounts.  Castleman Aff. ¶¶ 38, 71;

Castleman Aff. Ex. 13, Dkt. 383-13.  EminiFX made no efforts to segregate funds deposited by

different investors.  Castleman Aff. ¶¶ 19, 75.  When investors made withdrawals, the money

came from that pool of commingled funds.  *Id.* ¶¶ 75, 80.  Of the approximately $14 million of

deposits that actually were invested, the results were disastrous:  despite falsely reporting

approximately $319 million in ROI and referral bonuses for investors, EminiFX's investments

incurred net losses of more than $49 million.  *See id.* ¶ 77; Castleman Aff. Ex. 14, Dkt. 383-14;

*see also* Castleman Aff. ¶¶ 60, 62, 64–68, 70 (linking EminiFX's losses to downturns in the

cryptocurrency market, volatility in an investment account in Alexandre's name that was funded

primarily with EminiFX funds, and EminiFX's entry into 48 separate real estate contracts,

among other things).

In May 2022, the CFTC commenced this action alleging that Alexandre operated

EminiFX "in the manner of a Ponzi scheme."[1]  Complaint ("Compl."), Dkt. 5, ¶ 31.  When the

case was filed, the Court granted the CFTC's *ex parte* motion for a statutory restraining order,

---

[1]    On the day the CFTC filed its complaint, Alexandre was charged criminally with commodities fraud and wire fraud.  *See United States v. Alexandre*, No. 22-CR-326 (S.D.N.Y.), Complaint, Dkt. 1.  Several months later, Alexandre pled guilty and agreed, among other things, to forfeit over $248 million to satisfy the money judgment against him.  *See* Forfeiture Order, 22-CR-326, Dkt. 74, at 2–3.  The Forfeiture Order further provided that "[a]ll assets distributed to the victims by the Receiver in the CFTC Action that were obtained from the Defendant and EminiFX shall be applied towards the satisfaction of the Money Judgment."  *Id.* at 6.

which froze certain of Defendants' assets and appointed the Receiver to oversee "all customer funds and property and other assets traceable to customers in the possession of or under the control of Eddy Alexandre." Statutory Restraining Order ¶ 30. The statutory restraining order granted the Receiver "full control of the Receivership Defendants" and "exclusive custody, control, and possession of the Receivership Estate." *Id.* ¶ 31. Two months later, the parties consented to an order providing that the statutory restraining order would "remain in full force and effect until the final trial of this case, or until further order of this Court." Consent Order for Preliminary Injunction, Dkt. 56, ¶ 59. That Order also permitted the Receiver to demand turnover of assets in Alexandre's name to the extent the Receiver had a "reasonable good-faith belief that the assets [were] traceable to EminiFX customers." *Id.* ¶¶ 15, 38.

Since his appointment, the Receiver has tried to collect as many of EminiFX's assets as possible in order to return proceeds of the fraud to the defrauded investors. The assets recovered to date include accounts in EminiFX and Alexandre's names, cryptocurrency, vehicles, office property, and settlements secured in litigation over EminiFX's real estate portfolio. Castleman Aff. ¶¶ 13–14. The total value of assets currently under the Receiver's control is approximately $153 million. *Id.* ¶ 14.

## II.    The Plan of Distribution

This motion concerns the Receiver's proposed plan of distribution for the assets he has recovered. The plan is set forth in full in Exhibit 1 of Mr. Castleman's Affidavit (the "Distribution Plan"), Dkt. 383-1, and summarized in Exhibit 2 of that Affidavit, Dkt. 383-2. The Court will not reprint the entirety of the Distribution Plan but will discuss its key features in sufficient detail to address the objections that have been asserted.

The purpose of the Distribution Plan is "to distribute the recovered funds to investors who made contributions to EminiFX and to satisfy any other liabilities of the Receivership."

Memorandum of Law in Support of the Receiver's Motion for Entry of an Order Approving the Receiver's Distribution Plan; the Determination of Allowed User Claims; Notice of Distribution Plan; and Authority to Pursue Causes of Action ("Receiver Mem."), Dkt. 382, at 1.  To accomplish that, the Distribution Plan creates a hierarchy of classes for the different types of claims to an interest in the Receivership's assets.  *See id*. at 14–17.  For example, claims asserted by the Receiver and his retained professionals, as well as claims asserted by state or federal taxing authorities, are given the highest priority and are entitled to full cash payment.  *Id*. at 15. Other claims, such as fines and penalties levied by the CFTC in connection with this action, are treated as "[s]ubordinated" and "are not entitled to a distribution until all other Claimants receive a distribution."  *Id*. at 16–17.  And one category of claims — those by Alexandre himself, asserting equity interests in EminiFX — is not "entitled to any distribution" and "will be extinguished upon the dissolution of EminiFX."  *Id*. at 17.

The largest class of claims is comprised of people and entities who made "an alleged investment in the investment club operated by EminiFX."[2]  *Id*. at 15.  Over 25,000 alleged EminiFX investors have filed claims that fall into this class.  Castleman Aff. ¶ 11.  The difficulty with administering distributions for these claims — and the challenge that the Distribution Plan seeks to address — is that the amount of money that investors contributed to EminiFX exceeds the amount of assets that have been recovered.  Investors deposited more than $260 million into accounts operated by EminiFX, but, to date, the Receiver has secured and liquidated only approximately $153 million.  Receiver Mem. at 1; Castleman Aff. ¶¶ 13–16, 37–44.  Given this shortfall, it is not possible for the Receiver to return to investors 100% of all invested funds.

---

[2]    The Distribution Plan also contemplates a class of "Other Claims," which consists of non-investor claims that do not fall into any of the other classes of claims.  Receiver Mem. at 16.  The Plan "proposes to give these Claims *pari passu* treatment" with investor claims.  *Id*.

Instead, the Distribution Plan calls for funds to be distributed on a *pro rata* basis, meaning that all investor claims are to be calculated pursuant to a fixed formula. The formula proposed is referred to as the "Rising Tide" method of *pro rata* distribution. Receiver Mem. at 17. This method calculates an investor's total claim by taking the amount the investor deposited into his or her EminiFX account, multiplying that amount by a fixed percentage (the "Rising Tide Percentage"), and then subtracting any withdrawals the user made from the account prior to the Receivership. *Id.* Critically, under the formula proposed by the Receiver, only actual cash deposits and withdrawals are considered; purported ROI, bonuses, and internal transfers among EminiFX users are ignored. *Id.* at 35–37.

The Rising Tide Percentage is set by the Receiver in light of all available information, chiefly the amount of funds the Receiver is holding in reserve and able to release and the number of additional claims that need to be processed. *Id.* at 18. The initial Rising Tide Percentage is to be set conservatively for the first distribution and increased from time to time for subsequent distributions as more funds become available for distribution. *Id.*

The procedure for calculating claims differs slightly for investors who deposited $1,000 or less in their EminiFX accounts. Claims by investors in this class, which the Receiver calls the "Convenience Class," are also calculated using the Rising Tide method, but payments are made in a single distribution rather than in multiple rounds. *Id.* at 3–4. The Rising Tide Percentage used to calculate these claims is "higher than the initial Rising Tide Percentage [for claims over $1,000] but may be lower than the Final Rising Tide percentage [for claims over $1,000], to avoid as many distributions under $50 as possible." *Id.* at 3.

### III.    Procedural History

On August 9, 2024, the Receiver moved for approval of the Distribution Plan. *See* Motion, Dkt. 381. The Receiver sent a link to the Distribution Plan and his motion to all

EminiFX investors and served it on all other EminiFX creditors via email and U.S. Mail.  *See* July 16, 2024, Order, Dkt. 359, at 1; Notice of Filing of EminiFX User Responses to Receiver's Motion ("Notice of User Responses"), Dkt. 390, at 1.

Investors were given several weeks to object or comment on the Distribution Plan.  July 16, 2024, Order at 1.  After the response period closed, the Receiver filed copies of the comments he received.  *See* Notice of User Responses, Ex. A ("Critical User Comments"), Dkt. 390-1; Notice of User Responses, Ex. B ("Supportive User Comments"), Dkt. 390-2; Notice of User Responses, Ex. C ("User Plan and Distribution Comments"), Dkt. 390-3; Notice of User Responses, Ex. D ("Miscellaneous User Comments"), Dkt. 390-4.  Alexandre and the CFTC also filed responses to the proposed Distribution Plan; Alexandre opposes it and the CFTC supports it.  *See* Alexandre's Amended Motion in Opposition to the Receiver's Proposed Distribution Plan ("Alexandre Opposition" or "Alexandre Opp."), Dkt. 394; CFTC's Reply Memorandum of Law in Support of Distribution Plan ("CFTC Mem."), Dkt. 398.  The Receiver responded to investors' criticisms of the Distribution Plan and to Alexandre's Opposition.  *See* Reply in Further Support of the Receiver's Motion ("Receiver Reply"), Dkt. 399.

## DISCUSSION

### I.    Legal Standard

In reviewing an equity receiver's proposed method of distributing assets, courts have broad discretion to "determine how and to whom the money will be distributed."  *Sec. & Exch. Comm'n v. Fischbach Corp.*, 133 F.3d 170, 175 (2d Cir. 1997); *see also Eberhard v. Marcu*, 530 F.3d 122, 131 (2d Cir. 2008); *Commodity Futures Trading Comm'n v. Rolando*, 589 F. Supp. 2d 159, 172 (D. Conn. 2008) ("The Second Circuit has . . . grant[ed] broad equitable powers to district courts in enforcement matters brought by federal agencies."); *Sec. & Exch. Comm'n v. Hardy*, 803 F.2d 1034, 1037 (9th Cir. 1986) ("[A] district court's power to supervise an equity

receivership and to determine the appropriate action to be taken in the administration of the receivership is extremely broad.").  The goal is to establish a plan of distribution that is "fair and reasonable" in light of the specific circumstances of the case.  *Sec. & Exch. Comm'n v. Varacchi*, No. 3:17-CV-00155, 2021 WL 10361074, at *6 (D. Conn. July 30, 2021) ("A distribution plan proposed by a receiver should be 'reviewed under [the District Court's] general equitable powers to ensure that it is fair and reasonable.'") (quoting *Sec. & Exch. Comm'n v. Wang*, 944 F.2d 80, 81 (2d Cir. 1991)); *see also Sec. & Exch. Comm'n v. Enter. Tr. Co*., No. 08 C 1260, 2008 WL 4534154, at *3 (N.D. Ill. Oct. 7, 2008), *aff'd*, 559 F.3d 649 (7th Cir. 2009) ("There are no hard rules governing a district court's decisions in matters like these. The standard is whether a distribution is equitable and fair in the eyes of a reasonable judge.").  "[I]t is within a district court's discretion to approve a distribution plan proposed by a receiver—and to defer to the receiver's choices for the plan's details—so long as the plan is 'fair and reasonable.'"  *Sec. & Exch. Comm'n v. Amerindo Inv. Advisors Inc.*, No. 05-CV-5231, 2016 WL 10821985, at *3 (S.D.N.Y. May 20, 2016) (quoting *Sec. & Exch. Comm'n v. Byers*, 637 F. Supp. 2d 166, 174–75 (S.D.N.Y. 2009), *aff'd sub nom. Sec. & Exch. Comm'n v. Malek*, 397 F. App'x 711 (2d Cir. 2010), *and aff'd sub nom. Sec. & Exch. Comm'n v. Orgel*, 407 F. App'x 504 (2d Cir. 2010)); *see also CCWB Asset Invs., LLC v. Milligan*, 112 F.4th 171, 178 (4th Cir. 2024).

## II.     The Proposed Distribution Plan is Fair and Reasonable

In assessing the fairness and reasonableness of the Distribution Plan, the Court pays particular attention to Alexandre's Opposition and to the critical comments submitted to the Receiver by EminiFX investors.  Because Alexandre is proceeding *pro se*, the Court construes his Opposition "to raise the strongest arguments that [it] suggest[s]."  *Pabon v. Wright*, 459 F.3d 241, 248 (2d Cir. 2006).  The Court applies a similarly liberal construction to feedback from investors, recognizing that they do not appear to have the benefit of counsel.

The objections focus on five features of the Distribution Plan: the use of a *pro rata* distribution method generally; the use of the Rising Tide *pro rata* distribution method specifically; the exclusion of internal transfers from the *pro rata* claims calculation; the treatment of the Convenience Class; and provisions of the Distribution Plan that Alexandre asserts enable the CFTC and the Receiver to enrich themselves. The Court will address these five issues in turn. The Court will also briefly address a portion of the Plan that neither Alexandre nor the users challenged but which is a component of the requested relief contained in the motion: the Receiver's authority to pursue further litigation on behalf of EminiFX.

### A. The *Pro Rata* Distribution Model

The most common over-arching objection to the Distribution Plan is that it adopts a *pro rata* model of distribution rather than repaying investors directly for the full amount they lost. *See, e.g.*, Critical User Comments at ¶ 6 ("I want to receive my entire $3500.00 that I personally put in"), ¶ 84 ("I would like a full refund and not 30 %."), ¶ 104 ("I think it's unfair for not getting back 100% of the money invested"). Alexandre similarly argues that all contributions should "be returned to the investors dollar for dollar" in "one LARGE LUMP SUM." Alexandre Opp. at 7.

It is true, of course, that the ideal outcome would be for all investors to be made whole by receiving the full amount that they deposited. But conditions are not ideal. As it stands, investors contributed approximately $260 million to EminiFX but only about $153 million is available for distribution. Castleman Aff. ¶ 14; Castleman Aff. Ex. 9. Alexandre's desire to have the investors receive a "dollar for dollar" distribution is impossible under these circumstances. Instead, the question is how to make a fair and reasonable distribution in light of the unfortunate reality that complete recovery is impossible.

The Receiver advocates for a *pro rata* model of distribution because EminiFX functioned as a Ponzi scheme.  Courts recognize that the *pro rata* approach, pursuant to which "each investor . . . receive[s] a distribution based on a certain percentage . . . of the amount originally invested," is appropriate in cases involving Ponzi schemes where more precise methods of tracing and recovering assets are generally not possible.  *Byers*, 637 F. Supp. at 171; *see also Sec. & Exch. Comm'n v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88–89 (2d Cir. 2002) ("Courts have favored *pro rata* distribution of assets where, as here, the funds of the defrauded victims were commingled and where victims were similarly situated with respect to their relationship to the defrauders.").  In a typical investment fraud scheme, if an investor "invests money with a trustee, and the trustee improperly takes a portion of the money and places it into his personal account," the investor may recover by "plac[ing] a constructive trust or equitable lien on the assets that remain in the investment account and the traceable assets that were placed into the trustee's personal account."  *Sec. & Exch. Comm'n v. Callahan*, 193 F. Supp. 3d 177, 191 (E.D.N.Y. 2016).  That type of tracing is not possible in a Ponzi scheme where investors' contributions are commingled; when funds are commingled, every deposit goes into, and every withdrawal comes out of, the same pool of funds.  "In such a scheme, whether at any given moment a particular customer's assets are traceable [to the defrauder] is 'a result of the merely fortuitous fact that the defrauders spent the money of the other victims first.'"  *Id.* (quoting *Credit Bancorp*, 290 F.3d at 89).

For those reasons, the Distribution Plan's use of a *pro rata* distribution model is appropriate if EminiFX was a Ponzi scheme.  "[T]he label 'Ponzi scheme' has been applied to any sort of inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired investment funds to pay off previous investors in order to forestall disclosure of

the fraud." *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1, 12 (S.D.N.Y. 2007).  Rather than adopt

a strict definition, courts generally identify Ponzi schemes by looking to various "badges" of

fraud, such as

> the absence of any legitimate business connected to the investment program, the
> unrealistic promises of low risk and high returns, commingling investor money,
> the use of agents and brokers paid high commissions to perpetuate the scheme,
> misuse of investor funds, the "payment" of excessively large fees to the
> perpetrator and the use of false financial statements.

*Gowan v. Amaranth Advisors LLC (In re Dreier LLP)*, No. 08–15051, 2014 WL 47774, at *9

(Bankr. S.D.N.Y. Jan. 3, 2014).  EminiFX exhibits at least five of the "badges" of a Ponzi

scheme and can appropriately be labeled as such.

 *First*, EminiFX's commingled the funds it received.  The Receiver's review of

EminiFX's account records from the two accounts it held at Bank of America and TD Bank

revealed "no evidence of any segregated accounts for any individual Users."  Castleman Aff.

¶ 19.  "All withdrawals were paid from commingled EminiFX funds consisting of User

deposits."  *Id.* ¶ 75.

 *Second*, EminiFX engaged in little, if any, legitimate investment activity.  Of the more

than $260 million investors deposited into EminiFX — which was marketed as an "investment

club" — only about $14 million was ever actually invested.  *Id.* ¶ 71; Castleman Aff. Ex. 13.

And, of that $14 million, approximately $9 million was transferred into Alexandre's personal

investment account with the online trading platform Interactive Brokers.  Castleman Aff. ¶ 60.

Those investments, along with Alexandre's investments in real estate and various

cryptocurrencies, resulted in significant losses.  *Id.* ¶¶ 59–71.

 *Third*, EminiFX failed to observe any formal recordkeeping practices, further confirming

the inference that its operations were illegitimate.  Despite maintaining hundreds of millions in

deposits from tens of thousands of investors, the Receiver has identified no evidence that EminiFX kept a ledger or any accounting records. *Id.* ¶ 34.

*Fourth*, Alexandre misused EminiFX's funds, transferring at least $15 million from an EminiFX bank account into his personal bank account. *Id.* ¶ 74. Alexandre also used his personal bank account to receive deposits from EminiFX investors and to fund his personal Interactive Brokers account. *Id*.

*Fifth*, EminiFX falsely represented extraordinary returns of 5.00% to 9.99% per week for its investors, in addition to the lucrative bonuses it purported to pay to investors who recruited new investors. *Id*. ¶¶ 50–54. These reported gains — which exceeded $319 million —are entirely fictional. *Id*. ¶ 77.

Because EminiFX exhibited many of the hallmarks of a Ponzi scheme, a *pro rata* model of distribution appropriate.

## B. The Rising Tide *Pro Rata* Distribution Model

Having concluded that a *pro rata* method of distribution is appropriate, the question turns to which method of *pro rata* distribution is most appropriate in light of the circumstances of this case. As discussed, the Receiver proposes the Rising Tide method of distribution, which calculates claims by multiplying the amount deposited by the claimant by the Rising Tide Percentage, then subtracting withdrawals paid to the claimant. In his submission, the Receiver notes that he also considered a "Net Investment" method. Receiver Mem. at 19. That method uses the same inputs as the Rising Tide method (deposits, withdrawals, and a fixed percentage), but changes the order of operations. Unlike the Rising Tide method, which multiplies the deposit amount by a fixed percentage and then subtracts the amount withdrawn, the Net Investment method subtracts the amount withdrawn from the deposit amount and then multiplies the difference by the fixed percentage. *Id.* at 19–20.

In his explanation of the Distribution Plan, the Receiver sets forth several hypothetical examples of what various investors might recover under the Rising Tide method of distribution. *See* Castleman Aff. Ex. 2 at 4.  That table, recreated below, illustrates what four investors who contributed an equal amount into EminiFX accounts would stand to receive under the Distribution Plan, depending on how much they withdrew from their accounts prior to the Receivership.  The hypothetical contemplates a distribution using an initial Rising Tide Percentage of 30%, followed by a second distribution after the Rising Tide Percentage increases to 50%.

| Sample User | Receiver Distribution 1 (30% Initial Rising Tide Percentage) | Receiver Distribution 2 (50% Initial Rising Tide Percentage) | Sum of Receiver Distributions | Sum of Withdrawals and Receiver Distributions |
|---|---|---|---|---|
| **User A** Deposits: $10,000 Withdrawals: $0 | $3,000 | $2,000 | $5,000 | $5,000 |
| **User B** Deposits: $10,000 Withdrawals: $2,000 | $1,000 | $2,000 | $3,000 | $5,000 |
| **User C** Deposits: $10,000 Withdrawals: $4,000 | $0 | $1,000 | $1,000 | $5,000 |
| **User D** Deposits: $10,000 Withdrawals: $8,000 | $0 | $0 | $0 | $8,000 |

Meanwhile, the table below illustrates what the same investors would receive pursuant to a Net Investment method of distribution, applying the same fixed percentages of 30% in the first distribution and 50% in the second:

| Sample User | Receiver Distribution 1 (30% Initial Net Investment Percentage) | Receiver Distribution 2 (50% Final Net Investment Percentage) | Sum of Receiver Distributions | Sum of Withdrawals and Receiver Distributions |
|---|---|---|---|---|
| **User A** Deposits: $10,000 Withdrawals: $0 | $3,000 | $2,000 | $5,000 | $5,000 |
| **User B** Deposits: $10,000 Withdrawals: $2,000 | $2,400 | $1,600 | $4,000 | $6,000 |
| **User C** Deposits: $10,000 Withdrawals: $4,000 | $1,800 | $1,200 | $3,000 | $7,000 |
| **User D** Deposits: $10,000 Withdrawals: $8,000 | $600 | $400 | $1,000 | $9,000 |

The tables above highlight a key difference between the Rising Tide and Net Investment methods: while both methods distribute more funds to investors who made smaller (or no) pre-Receivership withdrawals, the Rising Tide method treats such withdrawals as functionally equivalent to Receivership distributions. Under the Rising Tide method, if any of the money an investor contributed to her EminiFX account made its way back to her, it is treated as recovered; it makes no difference whether the money is returned due to a payout from the Receiver or a voluntary withdrawal the investor made from her account at some point before the Receivership was established.

In his Opposition, Alexandre states that he supports the Net Investment method "so all the members can get their money back." Alexandre Opp. at 7. But the method of distribution Alexandre describes, whereby funds would be returned to investors "dollar for dollar," bears no resemblance to the Net Investment method; both distribution methods are *pro rata*. *Id.* Regardless, courts have recognized the Rising Tide method as superior to the Net Investment method in cases involving Ponzi schemes because "it prevents an investor who previously

received funds as a withdrawal from benefitting at the expense of other investors in the scheme who did not receive any withdrawals and therefore, lost the entire amount of their investment in the Ponzi scheme." *Callahan*, 193 F. Supp. 3d at 199.  It is "the method most commonly used (and judicially approved) for apportioning receivership assets. . . .  An investor has no entitlement to money stolen from other people. When investors' funds are commingled, none being traceable to a particular investor, no part of whatever funds are recovered is property of any investor." *Sec. & Exch. Comm'n v. Huber*, 702 F.3d 903, 906–07 (7th Cir. 2012) (collecting cases).

Put simply, because EminiFX was a Ponzi scheme that did not generate any actual profits, every withdrawal from an EminiFX account came out of the same commingled pool of funds into which all investors unknowingly contributed.  Any pre-Receivership withdrawal from that pool of funds accomplished the same goal that the Distribution Plan now aims to achieve: returning to investors as much of the money they contributed to EminiFX as possible.  Because the Rising Tide method treats withdrawals as the equivalent of Receivership distributions, it is the appropriate distribution method in this case.

### C.  Internal Transfers

Another point of contention raised by Alexandre and some EminiFX investors is the fact that the Distribution Plan calculates claims "based only upon each investor's actual deposits into, and withdrawals from, EminiFX."  Receiver Mem. at 8.  This formulation "exclude[s] (i) the ROI, representing fictitious profits not related to any actual investing activity, (ii) recruitment and multilevel marketing bonuses, and (iii) internal transfers," *i.e.*, transfers of funds from one investor to another within the EminiFX system.  *Id*.  Alexandre objects to the exclusion of internal transfers on the ground that such transfers were "a valid method of moving funds across the EminiFX platform" and that investors "did nothing wrong in effecting [internal] tranfer[s]."

Alexandre Opp. at 6.  Many investors echo this objection.  *See, e.g.*, Critical User Comments ¶ 17 ("I disagree to the decision of eliminating the internal transfer between members. Many members rely on internal transfers as their only means of accessing BTC, as setting up wallets is not feasible."), ¶ 81 ("Eliminating internal transfers means lost money for me in particular and the majority of my downlines."); ¶ 87 ("Internal transfers deposits should [be] equally accepted as the other form of deposits that were made in the system.")

Alexandre is, of course, correct that investors did nothing wrong by transferring what they believed to be legitimate funds from their accounts to other investors' accounts.  The problem has nothing to do with investors and everything to do with Alexandre and EminiFX, who, unbeknownst to their customers, fraudulently inflated investors' account balances with fabricated ROI and bonuses.  Castleman Aff. ¶¶ 77, 80.  The influx of non-existent money into account balances makes it difficult — if not impossible — to distinguish internal transfers of actual assets from transfers of fictitious assets.  As the Receiver explains:

> While [internal] transfers were not necessarily comprised of fictitious profits in every instance, it would be extremely burdensome, and require relying on EminiFX transfer records that may not be entirely accurate or complete, to conduct a User by User accounting to determine whether transfers in fact corresponded with actual deposits of US Dollars or [Bitcoin].  While the inter-account method has been used elsewhere to determine which portion of a transfer can be credited to a transferee and deducted from a transferor, here, given the relatively low median value of each transfer ($500), and the high volume of transfers (over 45,000), it would be cost-prohibitive to undertake that analysis.

Receiver Mem. at 36–37 (citation omitted).  In light of the challenges and costs highlighted by the Receiver, it is fair and reasonable to ignore internal transfers and instead look to the points at which provably real money changed hands — deposits and withdrawals — to calculate claim value.

### D.  The Convenience Class

The Distribution Plan also calls for the creation of a "Convenience Class" consisting of investors who deposited $1,000 or less into their EminiFX accounts.  Under the Distribution Plan, these investors will receive a one-time *pro rata* distribution calculated pursuant to the Rising Tide method.  Receiver Mem. at 16.  The fixed percentage used to calculate this payment is higher than the initial Rising Tide Percentage used to calculate the first distribution to users outside the Convenience Class, but may be lower than the final Rising Tide Percentage that users outside the Convenience Class ultimately receive.  *Id*. at 3.  The purpose of the Convenience Class, according to the Receiver, is to encourage finality and to minimize the administrative costs associated with low dollar value claims.  Receiver Reply at 9–10.

A handful of investors criticized the proposed treatment of the Convenience Class, expressing concern that investors in the Class would benefit from a higher distribution rate than others.  *See, e.g.*, Critical User Comments ¶ 11.  But that is not necessarily the case.  As explained, the key difference between how the Receiver is proposing to treat investors in the Convenience Class from how he is proposing to treat other investors is that Convenience Class members will receive a single lump sum distribution, whereas other investors will receive multiple distributions.  While the lump sum payment to investors in the Convenience Class is calculated using a higher fixed percentage than the initial Rising Tide Percentage, non-Convenience Class investors may reach parity with (or even exceed) the Convenience Class's fixed percentage by the time the final Rising Tide Percentage is determined and the final round of payments is made.  And even if the fixed percentage applied to Convenience Class distributions ends up somewhat higher than the final Rising Tide Percentage, the savings in administrative costs that the Receiver will achieve by distributing low dollar value claims in a single payment, rather than through repeated small dollar distributions, will likely free up funds

for larger distributions to all investors. *See Sec. & Exch. Comm'n v. Wealth Mgmt. LLC*, 628

F.3d 323, 336 (7th Cir. 2010) (internal quotation marks omitted) ("[R]eceivers have a duty to

avoid overly costly investigations, and at a certain point, the costs of such individualized

determinations outweigh the benefits.").

    In short, the proposed treatment of Convenience Class members in the Distribution Plan

is fair and reasonable.

### E.  Mismanagement of Receivership Assets by the Receiver and the CFTC

    Much of Alexandre's Opposition consists of frivolous *ad hominem* attacks on the CFTC,

the Receiver, and the Undersigned that do not warrant a response.  Nevertheless, the Court will

briefly address his allegation that the Receiver and the CFTC are mismanaging the

Receivership's assets.

    First, Alexandre claims that the Receiver is using his position to "eat[] the funds at the

rate of $1.5 million . . . per quarter."  Alexandre Opp. at 2.  The Court presumes Alexandre is

referring to the fact that the Receiver has filed quarterly applications for payment of fees and

expenses, which the Court has granted.  *See, e.g.*, November 26, 2024, Memo Endorsement

Granting Application for Payment of Fees and Expenses (Third Quarter 2024), Dkt. 424; August

16, 2024, Memo Endorsement Granting Application for Payment of Fees and Expenses (Second

Quarter 2024), Dkt. 385; May 7, 2024, Memo Endorsement Granting Application for Payment of

Fees and Expenses (First Quarter 2024), Dkt. 307.  It is well established that a court-appointed

receiver "who reasonably and diligently discharges his duties is entitled to be fairly compensated

for services rendered and expenses incurred" in an amount "to be determined by the court in the

exercise of its reasonable discretion."  *Byers*, 590 F. Supp. 2d at 644.  The Court has reviewed

the Receiver's quarterly reports, which provide detailed explanations of the work that has been

done and the fees that have been incurred, finding that they are fair and reasonable in light of the complex nature of the work performed.

Second, Alexandre suggests that the Distribution Plan is part of "a scheme by the [R]eceiver to create 4 groups of investors and hide the CFTC . . . so nobody can see that he is setting funds aside to give the CFTC over $18 million."  Alexandre Opp. at 7.  The Court assumes that Alexandre is referring to the penalty that the CFTC has sought in this action.  *See* Compl. at 20.  His accusation that the CFTC is attempting to funnel money out of the Receivership by levying a penalty on him is unfounded.  First, if the Court were to grant the CFTC's request for a penalty in connection with this action, the penalty would be payable to the United States Treasury, not to the CFTC.  *See* March 14, 2024, CFTC Letter, Dkt. 276, at 1. Second, the CFTC has already consented — and reaffirmed in its reply brief in support of this motion — that any monetary penalty would be subordinated to other claims.  In lay terms, the CFTC agrees that any penalty will be collectable only if all valid participant claims have been fully satisfied.  *Id.*; CFTC Mem. at 1–2 (citations and internal quotation marks omitted) ("[T]he plan specifically states that any penalty levied by the CFTC in connection with this case should be subordinated to valid claims submitted by the users, who are the victims of the fraud. . . . Such a complete recovery is unlikely because Alexandre squandered tens of millions of dollars of victim money through ill-considered trading and profligate spending.").

### F.  Authority to Pursue Litigation

Finally, the Receiver seeks to preserve his right to commence litigation, settle, or otherwise resolve claims and causes of action held by EminiFX as part of the Receivership's assets.  Receiver Mem. at 26.  The Receiver notes that "certain [EminiFX] investors may be the target of litigation to the extent that, among other things, they are deemed insiders, may have aided and abetted the fraudulent scheme, or may have received fraudulent transfers."

Distribution Plan at 20.  Inasmuch as the settlements or judgments arising out of these causes of action, if obtained, would constitute Receivership assets that could lead to larger distributions, there is no doubt that allowing the Receiver to pursue such causes of actions would be fair, reasonable, and beneficial to investors.

The Receiver also proposes special procedures for potential causes of action involving so-called "Net Winners," *i.e.*, people or entities that withdrew more from their EminiFX accounts than they contributed.  Receiver Mem. at 26; Distribution Plan at 5.  Given the nature of the Rising Tide method of distribution, Net Winners will not be entitled to any distribution. Receiver Mem. at 26; Distribution Plan at 21.  They may, however, be subject to litigation by the Receiver — particularly to the extent that they may have contributed to the scheme to defraud. "The Receiver contemplates making settlement offers to Net Winners, offering a release from litigation by the Receiver in exchange for return of a portion of amounts received by Net Winners.  Absent any settlement, Net Winners may be subject to potential affirmative Causes of Action brought by the Receiver."  Distribution Plan at 21.  The Court finds the Receiver's proposed treatment of Net Winners to be fair and reasonable, as it avoids time-consuming and costly litigation and seeks to maximize recovery for injured investors.

## CONCLUSION

For the foregoing reasons, the Receiver's Motion is GRANTED and the Distribution Plan is APPROVED in all respects.  The Clerk of the Court is respectfully directed to terminate the open motion at Dkt. 381.

The Allowed Claims of Class 3 and Class 3A Claimants, as those terms are defined in the Distribution Plan, shall be based solely on their Verified User Deposit Amounts, as that term is

defined in the Distribution Plan, and shall not include ROI, bonuses, or internal transfers between users in the EminiFX System, as set forth in the Distribution Plan.

With respect to Causes of Action against Net Winners, the Receiver is authorized to settle such Causes of Action for a return to the Receivership estate of fifty percent of the amount by which a Net Winner's Verified User Withdrawal Amount exceeds their Verified User Deposit Amount, in exchange for a release of liability, subject to further terms determined by the Receiver in the best interest of the Receivership estate, including but not limited to the resolution of additional claims against such persons or entities, without further order of this Court. The Receiver is authorized to set a June 30, 2025, deadline to settle such Net Winner Causes of Action, but may for good cause extend that deadline for some or all Net Winners.

With respect to any other Causes of Action or Net Winner Causes of Action not settled on the foregoing terms, the Receiver may bring such claims in accordance with the Consent Order for Preliminary Injunction, Dkt. 56, ¶ 37, and may settle or compromise such claims consistent with the Court's Order on Supplemental Procedures dated August 5, 2022, Dkt. 91, provided that the Receiver may, without further order of the Court, seek approval of any settlement under seal if such settlement agreement contains a confidentiality provision.

The Receiver is authorized to commence distributions as set forth in the Distribution Plan at any time after of the entry of this Order. The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order, as well as other matters for which this Court retains jurisdiction as specified in the Distribution Plan. This Order shall be immediately effective and enforceable upon its entry.

**SO ORDERED.**

**Date:  January 21, 2025**
          **New York, NY**

_____
            **VALERIE CAPRONI**
        **United States District Judge**