**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | |
| **Plaintiff,** | 22 Civ. 3822 (VEC) |
| -against- | |
| **EDDY ALEXANDRE and EMINIFX, INC.,** | |
| **Defendants.** | |

### 2024 ANNUAL STATUS REPORT OF RECEIVER DAVID A. CASTLEMAN

### (ELEVENTH STATUS REPORT)

David A. Castleman
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Tel: (212) 661-9100
*Receiver*

Jennifer S. Feeney
William M. Moran
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Tel: (212) 661-9100
*Counsel for the Receiver*

January 31, 2025

## TABLE OF CONTENTS

I.  INTRODUCTION ................................................................................................... 1

II.  PROCEDURAL HISTORY ................................................................................... 5

III.  RECEIVERSHIP FINANCES .............................................................................. 10

IV.  EMINIFX USER TRANSACTIONS AND CLAIMS .......................................... 12

    A.  Background ................................................................................................ 12

    B.  Disputed Transaction Review Process ..................................................... 15

    C.  Revised User Portal .................................................................................. 18

    D.  Non-User Claims ...................................................................................... 19

V.  PLAN OF DISTRIBUTION ................................................................................. 21

VI.  ASSET RECOVERY ............................................................................................ 23

    A.  Investigation into Undisclosed Luxury Items .......................................... 23

    B.  Investigation into Currency Fraud ........................................................... 24

    C.  Investigation into Unreported Cash .......................................................... 25

    D.  Third Party Litigation .............................................................................. 26

    E.  Net Winners .............................................................................................. 27

VII.  RECEIVERSHIP COMMUNICATIONS .............................................................. 27

VIII.  TAXES .................................................................................................................. 28

IX.  RECOMMENDATIONS AND NEXT STEPS ..................................................... 30

    A.  Distribution Plan and Initial Distributions .............................................. 30

    B.  Resolution of Remaining Disputed Transactions and Claims ................. 31

    C.  Resolution of Tax Issues .......................................................................... 32

    D.  Litigation Claims ...................................................................................... 32

X.  CONCLUSION ..................................................................................................... 33

David A. Castleman (the "**Receiver**"), as Receiver pursuant to the Consent Preliminary Injunction (the "**Consent Order**"), entered by this Court in this action (the "**Civil Action**") on June 15, 2022 [Dkt. 56], files this Eleventh Status Report (the "**Report**") to apprise the Court of the activities of the receivership (the "**Receivership**") for the 2024 calendar year (the "**Annual Period**"), with a detailed focus on the period from October 1, 2024 through and including December 31, 2024 (the "**Fourth Quarter**").[1]  To the extent that events since January 1, 2025 are relevant for context, the Report will generally so note.

## I.    INTRODUCTION

During 2024, the primary focus throughout the year was on three related tasks—completing the transaction review process, filing a plan of distribution, and collecting user payment information in anticipation of making an initial distribution upon approval of the proposed plan. At the start of the year, over six thousand EminiFX users (otherwise referred to as "**users**" in this Report) had transactions in dispute.  On October 30, 2024, the Receiver filed a lengthy schedule of nearly 120,000 user transactions, each representing an actual deposit or withdrawal into EminiFX [Dkt. 417].  After the 45-day objection period concluded on December 16, 2024, many users accepted the Receiver's determinations, and some users provided the missing documentation necessary to resolve the dispute in their favor.  By December 31, 2024, less than 650 users had transaction disputes or review holds.

On January 21, 2025, after the close of the Fourth Quarter, but before the filing of this Report, the Court entered an *Opinion and Order* (the "**Distribution Plan Order**") [Dkt. 431] approved the plan of distribution (the "**Plan**"), as proposed by the Receiver.  A clean copy of the

---

[1] The Receiver already reported on certain Fourth Quarter 2024 activities in the Third Quarter 2024 Report of Receiver David A. Castleman [Dkt. 418], which was filed on November 8, 2024. For the sake of continuity and clarity, this Report may include descriptions by the Receiver of activities that occurred in January 2025. This Annual Report will also include descriptions of other Receivership activities throughout 2024.

approved Plan is annexed to this Report.[2]  With the Plan now approved, the initial phase of the transaction review process complete (as discussed further below), the Receiver will continue to collect payment information from users with undisputed claims who are eligible to receive a distribution.  On January 23, 2025, the Receiver announced a $100 million distribution and set the rising tide percentage at 45% (with an additional 10% for users with deposits of $1,000 or less as they are eligible for a single distribution) (the "**Notice of Initial Distribution**") [Dkt. 434].  The Receiver and his team will commence distributions to such users in accordance with the approved Plan in the first half of February.

As described in detail in prior quarterly reports, the Receiver launched an online portal (the "**Portal**") at the end of the third quarter of 2023 to provide users with a streamlined process to verify, update, or supplement their transactions in accordance with the court-approved Procedures (the "**Procedures**") [Dkt. 228]. The transaction review process was an extensive and complex effort, necessary to ensure the fair and accurate treatment of EminiFX users' claims. The Portal enabled users to validate deposits and withdrawals and, in cases of disputes, to submit corroborating evidence. The data verified through this process became the foundation for users' claims and the basis for distributions.

Throughout 2024, the Receiver focused extensively on the transaction verification and claims resolution process, addressing tens of thousands of claims submitted by users and non-users. By the time the Portal closed to all users at the end of the first quarter[3], 110,318 transactions had been verified, representing approximately 30,000 users, which is 98% of the transactions

---

[2] The clean copy of the Plan removes the disclaimer on the cover page that then-Proposed Plan was subject to Court approval and updates the header to indicate this is the "Court Approved Plan."  No other modifications have been made.  This version will replace the Proposed Plan on the Receivership website.

[3] References to the first quarter, second quarter, and third quarter throughout this Report are refer to the calendar year 2024, unless expressly stated otherwise to indicate a different year.

originally identified by the Receiver. Another 11,778 transactions were disputed or added by EminiFX users ("**Disputed Transactions**"), representing about 6,500 users.

On October 30, 2024, the Receiver filed a Schedule of User Transactions, outlining all verified and disputed transactions. [Dkt. 417]. As a result of efforts to resolve and validate remaining Disputed Transactions, over 3,000 of the users who Disputed Transactions had their transactions fully resolved and became eligible for distribution. The process also resulted in the validation of 4,892 added transactions, not previously reflected on the Portal, resulting in over $26.4 million in additional claims that will form the basis for distributions to the affected users. Only 7,030 Disputed Transactions remained at the end of the third quarter, representing under 6% of the 119,850 total user transactions.

Additionally, the Receiver revised the Portal in the Fourth Quarter to provide users with updated transaction logs reflecting the Receiver's review and analysis. The revised Portal also allowed users with Disputed Transactions have the opportunity, through the revised Portal, to either accept or object to the Receiver's proposed resolution, and to provide additional documentation or information that corroborates the claimed Transaction in dispute. More importantly, the revised Portal also enabled users to provide payment information in anticipation of distributions. By year-end, over 15,000 users had submitted payment details, and only 650 users had Disputed Transactions.

The Receiver also resolved all non-user claims during 2024. As noted in previous quarterly reports, only one non-user claim remained at the end of the third quarter. This final claim was resolved through mediation in the Fourth Quarter, after which the Receiver filed an Amended Claims Analysis Report on January 6, 2025 [Dkt. 427].

In addition to these tasks, the Receiver continued to address tax-related issues throughout the year. In the Fourth Quarter, the Receiver filed the 2023 qualified settlement fund tax return (the "**QSF Tax Return**") and requested a prompt assessment, the granting of which is in the discretion of the Internal Revenue Service ("**IRS**").  With the assistance of his tax advisors at Deloitte Tax LLP, the Receiver is—concurrently with the filing of this Report or shortly thereafter—filing a pre-receivership tax return for EminiFX, Inc. (the "**Corporate Tax Return**"). The Corporate Tax Return reflects substantial tax auditing and forensic accounting given the substantial uncertainty inherent in a Ponzi scheme receivership.  The Corporate Tax Return was filed with a tax liability of $0, which the Receiver believes is correct under the applicable circumstances and foregoing caveats.  The Receiver's tax advisors have also provided him with estimates of reasonable worst-case scenarios under different possible interpretations of the tax liability owed under both QSF Tax Return and Corporate Tax Return.  Given in inapplicability of 11 U.S.C. § 505(b) to federal equity receivers, who nevertheless remain bound by the Federal Priority Statute, 31 U.S.C. § 3713, the Receiver has reserved conservatively to ensure compliance with all applicable laws.  To the extent that any reserves are no longer needed, the Receiver will advise the Court and release such reserves to enable a subsequent distribution.

As of December 31, 2024, the Receivership estate earned nearly $4.6 million in interest, removed the encumbrances on $841,000 in recoveries through the non-user claims process, and incurred nearly $5.9 million in expenses, primarily comprising Court-approved professional fees expenses. The Receivership's assets at year-end include held approximately $152 million in cash and potential litigation claims.  The Receivership's liabilities consist of $1.3 million in professional fees and expenses for the Fourth Quarter 2024 contingent on Court approval, as well as refund claims for users (*i.e.*, Class 3/3A Claims).  As a result of the conclusion of the transaction

4

verification process, the Receiver was able to determine a preliminary value for the total amount of claims approved to date, which is just under $228 million.  That liability may increase somewhat as disputed claims are resolved.  A full ledger of the Receivership's financial transactions for 2024 is attached as Exhibit 1, with additional financial data presented in Exhibit 2.[4]

Looking forward, as a result of the efforts undertaken during the calendar year 2024, and given the court's approval of the Plan, the Receiver is prepared to commence distributions to eligible users by the first week of February.  Additionally, the Receiver expects to spent the first two quarters of 2025 on seeking to resolve the remaining Disputed Transactions, filing the returns and requests for prompt assessments necessary to resolve the tax situation, and completing investigation of, and commencing, any third-party claims.  Based on the current status, the Receiver expects that the estate will be substantially administered by the third quarter of 2025.

## II.    PROCEDURAL HISTORY

On May 11, 2022, the CFTC filed the Complaint [Dkt. 5] and a motion for an *ex parte* Statutory Restraining Order [Dkt. 6], which the Court granted on the same day, appointing the Receiver initially as Temporary Receiver [Dkt. 9].  On June 15, the Court entered the Consent Order that appointed the Receiver [Dkt. 56].  On February 15, 2024, Mr. Alexandre's counsel at the time filed a letter [Dkt. 257], stating Mr. Alexandre no longer agreed to the CFTC's proposed consent order, and requesting permission to withdraw as counsel, which the Court granted on February 21, 2024.  Mr. Alexandre has since been proceeding *pro se*.[5]  Additional procedural

---

[4] These financial statements are illustrative and are not intended to be in accordance with generally accepted accounting principles (GAAP), nor are they intended to be used in connection with determining the taxable income (if any) of the Receivership.  The Receiver includes these statements to provide the Court and other interested parties a high-level overview of the financial condition of the Receivership during the Fourth Quarter, as applicable.

[5] In light of Mr. Alexandre's *pro se* status, the Receiver has continued to send Mr. Alexandre docket entries of Orders of the Court when they are posted on ECF [Dkts. 378, 379, 380, 413, 414, 416], as well as paper copies via U.S. Mail.

history is set forth in detail in the ten prior status reports [Dkts. 71, 163, 192, 195, 218, 234, 251, 301[6], 370, 418].  The procedural history relevant to this Status Report follows.

**The Laptop Application**.  On March 15, 2024, Mr. Alexandre filed an application requesting that the Receiver return a laptop currently held in storage by the Receiver [Dkt. 278] (the "**Laptop Application**").  Following the Receiver's response filed on March 25, 2024 [Dkt. 284], the Court denied the Laptop Application [Dkt. 287], finding that the "Receiver's possession of the laptop is an appropriate exercise of his authority to take control of assets belonging to the EminiFX that may aid in his efforts to return stolen funds to EminiFX customers." Mr. Alexandre filed a motion seeking reconsideration of the Court's denial [Dkt. 305], which the Court also denied [Dkt. 309]. Mr. Alexandre filed a notice of appeal of these decisions, seeking to appeal the Court's decision to the United States Court of Appeals for the Second Circuit (the "Second Circuit") [Dkt. 330].  Because the appeal was of an interlocutory order, this Court declined to enter a stay [Dkt. 331].  On June 26, 2024, the CFTC filed a motion with the Second Circuit to dismiss the appeal for lack of appellate jurisdiction [Dkt. 20.1, 24-1493].  On October 23, 2024, the Second Circuit granted the CFTC's motion to dismiss, finding, among other things, that the Second Circuit lacks jurisdiction over the appeals and dismissing the appeals for lack of jurisdiction [Dkt. 28.1, 24-2008; *mandate docketed* Jan. 2, 2025, Dkt. 426].

**Motion to Dismiss**.  On April 4, 2024, Mr. Alexandre filed a motion to dismiss the Complaint and compel arbitration ("**Motion to Dismiss**") [Dkt. 291], and on April 22, 2024, the

---

[6]  On April 26, 2024, the Receiver filed the Eighth Status Report [Dkt. 301].  On June 21, 2024 Mr. Alexandre filed application in opposition of the adoption of the Eight Status Report [Dkt. 345]. On July 1, 2024, the Court denied Mr. Alexandre's application in opposition [Dkt. 353]. Mr. Alexandre filed a notice of appeal of these decisions [Dkt. 366]. Because the appeal was of an interlocutory order, this Court declined to enter a stay [Dkt. 368]. On June 26, 2024, the CFTC filed a motion with the Second Circuit to dismiss the appeal for lack of appellate jurisdiction. [Dkt. 20.1, 24-1493].  On October 23, 2024, the Second Circuit granted the CFTC's motion to dismiss [Dkt. 28.1, 24-2008] and the mandate was docketed on January 2, 2025 [Dkt. 426].

CFTC filed its opposition [Dkt. 296].  Mr. Alexandre filed his reply on May 15, 2024 [Dkt. 322].

On July 10, 2024, the Court denied Mr. Alexandre's Motion to Dismiss and issued an Opinion and

Order [Dkt. 355].  Mr. Alexandre filed a notice of appeal of these decisions [Dkt. 330]. Because

the appeal was of an interlocutory order, this Court declined to enter a stay [Dkt. 337]. On June

26, 2024, the CFTC filed a motion with the Second Circuit to dismiss the appeal for lack of

appellate jurisdiction. [Dkt. 20.1, 24-1493].  On October 23, 2024, the Second Circuit granted the

CFTC's motion to dismiss for lack of jurisdiction [Dkt. 28.1, 24-2008; *mandate docketed* Jan. 2,

2025, Dkt. 426].

  **Motion for Supplemental Instructions.**  On May 14, 2024, the Receiver filed a motion

requesting supplemental instructions to (1) modify the June 1, 2022 Order Granting the Receiver's

Emergency Request for Instructions [Dkt. 42] so that the Receiver no longer be required to hold

in reserve purported salaries of Mr. Alexandre and Clarelle Dieuveuil (the former Chief Financial

Officer and Mr. Alexandre's wife), and (2) allowing the Receiver to redact certain information

from public filings without further order of the Court ("**Motion for Supplemental Instructions**")

[Dkt. 317-20].  Alexandre opposed the Motion for Supplemental Instruction on June 28, 2024

[Dkt. 349],[7] and the Court entered an order granting the Motion on July 3, 2024 [Dkt. 354].

  **Responses to CFTC Complaint**.  On February 29, 2024, the Receiver, solely on behalf of

EminiFX, filed a Qualified Answer to the Complaint [Dkt. 264].  On April 4, 2024, Mr. Alexandre

filed a Motion to Dismiss the Complaint [Dkt. 291], and on April 22, 2024, the CFTC filed its

opposition [Dkt. 296].  Mr. Alexandre filed his reply on May 15, 2024 [Dkt. 322].  On July 10,

2024, the Court denied Mr. Alexandre's Motion to Dismiss and issued an Opinion and Order [Dkt.

---

[7] The Receiver had filed a Notice of Non-Opposition on June 27 [Dkt. 347], as Mr. Alexandre's opposition was due on June 14, and Mr. Alexandre did not serve his opposition on the Receiver.  After Mr. Alexandre's opposition was docketed, the Receiver immediately filed an amended reply [Dkt. 350].

355].  Mr. Alexandre ultimately filed his Answer to the Complaint on August 5, 2024, which included multiple counterclaims and affirmative defenses [Dkt. 377].  The Receiver and the CFTC filed motions to dismiss the respective counterclaims against them [Dkts. 386-89], to which Mr. Alexandre filed a response [Dkts. 400-01].  The Receiver and the CFTC filed replies [Dkts. 403, 404].  Because Mr. Alexandre asserted that he did not initially receive the Receiver's motion to dismiss, his deadline to respond to the Receiver's motion was extended to November 21, 2024 [Dkt. 416].[8]  On November 25, 2024, Mr. Alexandre filed his response to the Receiver's motion to dismiss [Dkt. 423], in which he also sought to withdraw certain counterclaims and cross-claims against the Receiver. On December 2, 2024, the Court entered an order dismissing certain counterclaims and cross-claims against the Receiver. After the close of the Fourth Quarter, but before the filing of this Report, the Court issued an Opinion and Order [Dkt. 433] granting the CFTC's motion to dismiss, which resulted in the dismissal of the counterclaims against the CFTC. The portion of the Receiver's motion seeking to strike any affirmative defense of contributory negligence was denied as moot.

**Summary Judgment.**  On July 16, 2024, the Court approved a briefing schedule for the CFTC's motion for summary judgment with respect to the Complaint [Dkt. 358]; consistent with that schedule, the CFTC filed its motion on September 23, 2024 [Dkts. 395-96].  The Receiver filed a response to the CFTC's motion on October 11, 2024, stating, in relevant part, that the Receiver did not oppose the motion as it related to EminiFX, but that his position was without prejudice to Mr. Alexandre's right to contest any of the motion's factual statements or legal conclusions [Dkt. 411].  Mr. Alexandre's deadline to respond to the motion was extended to

---

[8] As reflected in the Receiver's letter dated October 9, 2024, Mr. Alexandre contacted the Receiver via CorrLinks asserting that he did not receive the Receiver's motion [Dkt. 408].  The Receiver thereafter mailed Mr. Alexandre an additional copy of his motion on October 9, 2024 [*Id.*].

November 29, 2024 [Dkt. 413].  On November 15, 2024, the Court extended Mr. Alexandre's deadline to response to the motion to December 27, 2024, and extended the CFTC's deadline to reply to January 24, 2025.  After the close of the Fourth Quarter, but before the filing of this Report, Mr. Alexandre filed a response to the CFTC's motion on January 3, 2025 [Dkt. 428], and the CFTC filed a reply in support of its motion for summary judgment on January 24, 2025 [Dkt. 436].

**Plan Motion.**    On July 17, 2024, the Court approved a schedule for submission of the Receiver's Proposed Plan and Plan Motion, as well as responses thereto [Dkt. 359].  The Motion, which included a copy of the Proposed Plan [Dkt. 383-1], was filed on August 9, 2024 [Dkts. 381-84].  Through the Portal, the Receiver solicited responses from users from August 9, 2024, the date the Distribution Plan was filed, until the morning of August 27, 2024 (this included a grace period of several hours after the published response deadline of August 26, 2024).  The Receiver complied and filed those responses on September 10, 2024 [Dkt.  390].  Mr. Alexandre filed opposition to the Proposed Plan [as amended, Dkt. 294]; the CFTC filed a response reflecting the Commission's support [Dkt. 398].  The Receiver filed his reply in support of the Plan Motion and Proposed Plan on September 26, 2024 [Dkt. 399], completing the briefing contemplated by the approved scheduling order.  The Court entered an Opinion and Order approving the Plan on January 21, 2025 [Dkt. 431].

**Schedule of User Transactions**.  On October 30, 2024, the Receiver filed the Schedule of User Transactions [Dkt.417], which includes: (i) a list of all Disputed Transactions, (ii) a list of all Verified Transactions, and (iii) a list of Approved Added Transactions.

**Non-User Claims Report.**   In accordance with the Procedures, on August 2, 2024, the Receiver filed the Non-User Claims Report ("Claims Analysis Report") [Dkt. 369], which provided a comprehensive summary of all non-user claims submitted in the Receivership. The

report detailed claims resolved through settlement, the Receiver's determinations on the allowance, partial allowance, or disallowance of each claim, and the rationale for those determinations. At the time of filing of the Claims Analysis Report, one non-user claim remained outstanding. During the Fourth Quarter, the Receiver engaged in mediation with the remaining claimant, and the parties successfully resolved the claim. Following the conclusion of the Fourth Quarter, but prior to the filing of this Report, the Receiver filed an Amended Non-User Claims Report ("**Amended Claims Analysis Report**") on January 6, 2025 [Dkt. 427], which reflects the resolution of the final claim and the completion of the non-user claims process.

   **Applications for Fees and Expenses**.  On April 26, 2024, the Receiver filed an application for fees and expenses incurred in the first quarter 2024 [Dkts. 303-304], which was granted on May 7, 2024 [Dkt. 307]. A subsequent application for fees and expenses incurred in the second quarter 2024 was filed on August 2, 2024 [Dkts. 371-72], and granted on August 16, 2024 [Dkt. 385]. Most recently, the Receiver filed an application for fees and expenses incurred in the third quarter 2024 on November 8, 2024 [Dkt. 419], which was granted on November 26, 2024 [Dkt. 424].

## III.    RECEIVERSHIP FINANCES

   As noted in the Financial Condition Report [Dkt. 199], the Receiver believes that all material EminiFX assets, as reflected on the EminiFX and Mr. Alexandre's account statements, have been turned over to the Receivership. The Receiver, however, continued to investigate any unknown or suspicious transfers to determine if there is any additional property or funds that should be returned to the estate.  As described below (section VI.A), the Receiver has uncovered that EminiFX funds were used by Mr. Alexandre for the purchase of expensive personal items and has made demand for the turnover of such property, while reserving all rights to take appropriate action.  The Receiver will continue to uphold his fiduciary obligation to investigate any suspicious

activity or fraudulent transfers and, in his sound judgment, will evaluate any such situation and act or seek relief accordingly, including pursuing claims against third parties as appropriate.

In the Fourth Quarter, the Receivership earned $1.0 million in interest and spent a net $2.1 million in cash for expenses, consisting almost entirely of Court approved-professional fees and expenses for work performed in the third quarter 2024 and a $3,500 mediation fee for resolution of the one non-remaining user claim. The total cash position of the Receivership as of December 31, 2024 was $151.8 million.

The fees and expenses for the Receiver and his professional firms that have been incurred during the Fourth Quarter total $1.3 million, subject to review and approval by the Court pursuant to the Employment Order [Dkt. 47]. These fees reflect the considerable activity in this case during the Fourth Quarter, although significantly less than the prior quarter. The fees incurred largely related to management of the user transaction verification and review process, responding to various filings on the docket, and undertaking investigations, as set forth therein. The Receiver will file a separate application to seek authority to pay such fees and expenses simultaneously with this Report. Interest income continues to cover the bulk of expenses.

The financial statements attached as Exhibit 2 show the post-appointment balance sheet, income statement, and cash flows for the Receivership during the Fourth Quarter. As noted above, these financial statements are illustrative and are not intended to be in accordance with generally accepted accounting principles (GAAP), nor are they intended to be used in connection with determining the taxable income (if any) of the Receivership or EminiFX. The Receiver includes these statements to give the Court and other interested parties a high-level overview of the financial condition of the Receivership.

11

IV.    **EMINIFX USER TRANSACTIONS AND CLAIMS**

A.    *Background*[9]

EminiFX purported to be a multi-level "investment club" that received over $260 million in contributions from around 35,000 users.  EminiFX users accessed the platform via an online dashboard (the "**Dashboard**") and created accounts ("**User Accounts**") through which they could contribute funds.  The Dashboard represented to users that they accrued a fixed weekly return on the pooled holdings between 5.00% and 9.99% per week (the "**ROI**") and certain users accrued bonuses, including those related to the recruitment of other users.  EminiFX also satisfied requests from certain users to withdraw funds from EminiFX, which could and did sometimes include accrued ROI and bonuses.  The User Accounts were maintained in an EminiFX MySQL database (the "**Database**"), which was recovered by the Receiver.  The Database contained records related to EminiFX users' contributions, withdrawals, as well as detailed records of the weekly accrual of the ROI and bonuses shown on the Dashboard.

Although the Receiver was able to recover a substantial number of records from EminiFX (including the Database) and from certain third parties (largely financial institutions where EminiFX maintained accounts), there were significant deficiencies in the maintenance of records. Significantly, the Receiver and his team have found no evidence of any regularly issued user account statements outside of the Database or even a general ledger of any kind.  The Receiver and his team undertook a detailed forensic investigation to be able to report on the financial condition of EminiFX, as set forth in the Financial Condition Report, filed on May 16, 2023 [Dkt. 199], and to also enable the Receiver to initiate a claims process by piecing together the record of

---

[9] The detail in this section IV.A has been provided in prior status reports, and is included here for completeness, solely to aid the Court and other interested parties as background information.

contributions made to and withdrawals made from the EminiFX system and to identify User Accounts that may have been created, but no contribution or withdrawal identified.

The Database contained a substantial amount of information deemed reliable that assisted the Receiver in attributing most transactions to specific users or purposes. The Receiver and his team also obtained bank account statements, brokerage statements, and cryptocurrency data from the various financial institutions, which the Receiver considers to be the best and most reliable evidence that a specific transaction had actually occurred.

Combining the various bank and cryptocurrency financial data with records from the Database allowed the Receiver and his team to construct a ledger with sufficient reliability to assess the overall financial condition of EminiFX on a weekly basis to coincide with the ROI schedule and to ascertain contributions and withdrawals made to and from EminiFX User Accounts. The Receiver and his team were able to preliminarily attribute 92% of the cryptocurrency contributions, 85% of the bank deposit contributions, and 95% of the cryptocurrency withdrawals, by dollar amount.[10] This left *thousands* of transactions on the bank statements that were not attributable to specific users, especially with respect to the thousands of individual cash contributions, as well as 6,609 unattributable transactions made through CoinPayments. Moreover, users would often give money to another user to contribute on their behalf, which was typically not reflected in the EminiFX system.

In view of these deficiencies, to determine the users that may be entitled to an eventual distribution, and to establish bar dates and procedures to determine the identity of non-users and the amount of their non-user claims, on August 10, 2023, the Receiver filed a motion seeking the approval of the Procedures for the verification of user transactions, the establishment of bar dates

---

[10] The Receiver and his team were able to attribute 99.8% of cryptocurrency withdrawals by transaction count.

for non-users to assert claims, and a review process for each.[11]   On August 29, 2023, the Court approved the Procedures [Dkt. 228] and the Receiver implemented a process by which users could validate their net contributions to EminiFX using the Portal.  The Procedures also provide a process for claimants, who have a claim against EminiFX not based on their status as a user, to complete and serve a Proof of Claim.

One of the key elements of the Procedures, the online EminiFX user Portal developed by the Receiver provided an opportunity for EminiFX users to review the transactions attributed to their account and provide additional information within prescribed parameters.  The deadline for submitting transactions in this version of the Portal was February 26, 2024 (as discussed below, the Receiver has recently launched an updated version of Portal).  While users could continue to access this version of the Portal, the majority were no longer able to verify, add and/or update transactions as of March 1, 2024 (the deadline plus a four-day grace period).[12]

There was significant user interaction with the Portal.  Approximately 26,000 EminiFX users submitted their transactions (*i.e.*, the user has reviewed all of their transactions and have either verified or disputed transactions (including adding transactions) and then submitted such actions for review by the Receiver).  Over 20,000 of these users affirmatively verified all of their transactions, and another 10,000 neither verified nor disputed their transactions, meaning that their transactions became presumptively verified under the Procedures.

---

[11] As previously reported [Dkt. 251, p. 11], as permitted by the Procedures, on December 14, 2023, the Receiver modified the Procedures, which the Receiver determined did not require Court approval, and posted a notice of the modification to the Procedures on the Receivership website, https://www.eminifxreceivership.com/.

[12] The Receiver re-opened the Portal for a period of two weeks in early April 2024 for a selection of users whose transactions had been corrected after it was determined that those users made withdrawals from EminiFX to e-wallets shared with other users.  This determination required the correction of certain withdrawals originally assigned by the Receiver, and the Receiver therefore re-opened those users' portals so that they could verify their transactions as amended.

Over 6,500 users had at least one Disputed Transaction, whether as a result of disputing the amount of a transaction, denying the occurrence of a transaction, transferring a transaction to another user, or adding a transaction that the Receiver had not listed on the user's transaction log in the Portal.  When a user added a transaction that was not reflected in the Receiver's initial attribution, or disagreed with the Receiver's transaction attribution, the Receiver also required that such user provide additional evidence to corroborate that the added transaction occurred, or to otherwise corroborate the dispute.  Of the thousands of users who added Disputed Transactions, most provided documentation or other corroborating information that allowed the Receiver and his team to review the Transaction.

B.    *Disputed Transaction Review Process*

Leading up to the closure of the Portal on March 1, 2024, and throughout the third quarter, the Receiver and his team focused their forensic efforts on addressing all Disputed Transactions by reviewing information and documents submitted by users and information compiled by the Receiver and have also reviewed other submissions made by users in the Portal.  In the first two quarters of 2024, the Receiver and his team developed, implemented, and refined a process to facilitate and streamline the review of the Disputed Transactions, to ensure accuracy and consistency as efficiently as possible.  While the Portal allowed the Receiver and his professionals to save a substantial amount of time because they were not required to manage and review the submission of documentation for the over 80,000 transactions that have been verified, the remaining tasks of reviewing and processing the Disputed Transactions had to be completed manually.  Though the Disputed Transactions made up a small portion of the aggregate total of transactions, reviewing each of those transactions was an intensive process, though one that is critical to developing a register of verified and resolved deposits and withdrawals—that the Receiver believes is both accurate and fair.  Indeed, the Receiver has been mindful throughout this

process that the vast majority of the more than 36,000 EminiFX Users are looking to the Receivership as their primary (or even sole) source of restitution from this Ponzi scheme. As a result, the review of the Disputed Transactions has been the most labor-intensive aspect of the Receiver's efforts to execute the Procedures, given the need to give proper attention to each user's claim and the transactions that form the basis of that claim.

Specifically, while the Receiver and his team made efforts to automate aspects of the Disputed Transaction review where appropriate, for thousands of users, reviewing Disputed Transactions required a careful review of what a user submitted, what they were claiming, and identifying how best to use the documents in the Receiver's possession to corroborate those claims. Often, as a result of human error or deficient record-keeping on the part of EminiFX, reviewing and comparing documents and users' additions required an exercise of judgment. In some instances, it also required contacting a user directly in an effort to gain clarity about and, in some instances, resolve a Disputed Transaction.[13] Moreover, the review process was complicated by how large numbers of users engaged with EminiFX before it was shut down. In many cases, users provided cash directly to other users to deposit into EminiFX on their behalf. The receiving user might, in turn, make an internal transfer to the original user. However, the Procedures (and the Plan) recognize only cash or cryptocurrency into or out of the EminiFX system as verifiable transactions, and each such transaction cannot be double counted and applied to multiple users.

The Receiver and his team substantially completed their review of the Disputed Transactions in the third quarter. As a result of his review, the Receiver was able to validate 4,892 added transactions, resulting in over $26.4 million in additional claims that will form the basis for

---

[13] As noted in prior reports, the Receiver introduced a messaging system within the Portal that allows the Receiver's professionals to correspond with users through the portal system to seek additional information or clarification regarding Disputed Transactions.

a distribution to the affected people. Approximately 3,000 users with Disputed Transactions had their transactions fully resolved and will be eligible for a distribution under the Plan. Nearly 33,000 Users now have fully resolved transactions, and the Receiver projects that over 30,000 users will be eligible for an initial distribution under the Plan.

However, some Disputed Transactions remain. For 4,486 added Transactions, the Receiver determined that the transaction was not an actual contribution to or withdrawal from EminiFX (*e.g.*, the payment of ROI or bonuses, a payment from one user to another, a transaction that another user had made, and so forth), and therefore should not be used in calculating distributions. For 2,544 added transactions, despite the Receiver's best efforts, there was insufficient corroboration to validate that the transaction occurred, and such users will get a second opportunity in the objection process to provide such information. These 7,030 Disputed Transactions represent just under 6% of the 119,850 total transactions, and account for 3,627 users.

Due to the progress made in the first three quarters of 2024, the Receiver was able to file the Receiver's Schedule of User Transactions, which outlined the full scope of verified and disputed transactions [Dkt. 417]. As detailed in Part IV.C below, alongside this filing, the Receiver launched the next stage of the review process with the revised Portal.

In the Fourth Quarter, the Receiver used the revised Portal to focus on resolving the remaining Disputed Transactions, aiming to provide clarity for users and reduce the need for court intervention. The deadline for users to object to or accept the Receiver's determinations through the Portal was December 16, 2024. Leading up to this date, the Receiver and his team worked diligently to address disputes, offering users opportunities to submit additional documentation or accept the Receiver's decisions.

By year-end, significant progress had been made, with the number of users with unresolved Disputed Transactions reduced to less than 650. The Receiver expects to continue efforts to resolve these disputes in the first quarter of 2025. For those disputes that cannot be resolved directly with users, the Receiver will prepare and submit omnibus claims objections to the Court for resolution

C.    *Revised User Portal*

In addition to completing the review of Disputed Transactions, the Receiver and his team also prepared for the next step in the review process, which formally began in October 2024 and is ongoing through the date of this Report—namely, the resolution of the remaining Disputed Transactions.  To resolve these remaining disputes (and to facilitate the payment of distributions to claimants throughout the Receivership), through the end of the year, the Receiver and his team developed a revamped Portal that provides users with revised transaction logs, each updated to reflect the results of the Receiver's review and analysis of the user's submissions.

The Revised Portal was launched in conjunction with the filing of the Schedule of User Transactions with the Court. In an effort to educate users on the revised portal, the Receiver held a town hall and published an explainer[14] on the Receiver's website, outlining the Portal's features, including an explanation of the categories of Disputed Transactions and guidance on resolving disputes.

In the revised Portal, users with Disputed Transactions had the opportunity to either accept or object to the Receiver's proposed resolution, and to provide additional documentation or information that corroborates the claimed Transaction or dispute.   Users with Disputed Transactions could also see the total deposits and withdrawals asserted by the user as compared to

---

[14] The explainer is available at https://www.eminifxreceivership.com/updatedportalinstructions.  These categories are also explained in the Receiver's Schedule of User Transactions [Dkt. 417].

the total deposits and withdrawals agreed to by the Receiver. Those users who wished to accept the Receiver's determinations were able to use a feature on the revised Portal that required only a simple click and confirmation of such acceptance.[15]

Additionally, users are able to use the updated portal to submit payment information in anticipation of any distribution to which they may be entitled. By the end of the Fourth Quarter, the Receiver collected payment information from over 15,000 users,[16] positioning themselves for distribution once the Court approved the plan.

D.    *Non-User Claims*

As described above, the Procedures also provided an opportunity for claimants, who have a claim against EminiFX not based on their status as a user, to complete and serve a Proof of Claim. The general non-user claim bar date was October 30, 2023 (5:00 p.m. ET) and the governmental bar date was December 27, 2023 (5:00 p.m. ET). The Internal Revenue Service is not subject to the Procedures, and taxes are addressed separately in Part VII, *infra*.

On August 2, 2024, the Receiver filed a Claims Analysis Report detailing the resolution or determination of eight non-duplicative Proofs of Claim submitted by non-users[17] [Dkt. 369]. As detailed in the amended Claims Analysis Report, but summarized here, seven of these claims were fully resolved and extinguished by the time of the filing, while one claim (Claimant A0001)

---

[15] Initial submission data in the week between the launch of the revised Portal and the submission of this Report indicate that many Users will avail themselves of this option. The Receiver and his team will work to resolve consensually as many objections as possible before submitting the remainder to the Court for determination.

[16] As of the date of this filing, and in anticipation of the imminent distribution, over 20,000 users have provided payment information.

[17] For those "non-user" claims submitted by users based upon their status as a user, the Procedures authorized the Receiver to reject, without further review by the Court, any Proof of Claim submitted by a user based solely on their status as user. (Procedures, Sec. 3.C.(I)). The Receiver emailed each of those users informing them that their submitted Proof of Claim did not verify their user transactions and all such Proofs of Claim would be denied by the Receiver. The email further directed those users to the Portal where they were able to review and add transactions.

remained unresolved. The resolved claims included those asserting amounts both above and below $50,000, with settlements finalized in the first and second quarters of the year. These included the CoinPayments Settlement in January 2024 [Dkt. 248, 249], the 34th Street Suites Settlement in April 2024 [Dkt. 288, 298], and the Beils Settlement in May 2024 [Dkt. 338, 339]. Additionally, three claims in which the value did not exceed $50,000 (Claimants A0005-A0007) and one claim from the New York State Workers' Compensation Board (Claimant A0008) were all resolved prior to the second quarter of this year. Each settlement achieved significant reductions to the claimed amounts or appropriate distributions, releasing funds back to the Receivership estate.

At the beginning of the Fourth Quarter, Claim A0001 was the sole unresolved claim. This claim sought recovery for goods and labor provided to EminiFX, for which the Claimant had already received $904,258.81 prior to the Receivership. Initially asserting a claim of $992,614.05, the Claimant later amended it to exceed $2 million, citing additional amounts owed for services rendered. At the time the Claim A0001 was submitted, the Claimant did not have retained counsel and provided limited supporting documentation. The Receiver deemed the Claimant a potential insider due to their critical role in establishing EminiFX's technology infrastructure, which led to the Receiver reserving the right to subordinate the claim. Following an extensive review, the Receiver disallowed the claim in its entirety, determining that the payments already received exceeded the value of the services provided.

In the Fourth Quarter, the Receiver and Claimant A0001 engaged in a mediation process to resolve the dispute. Prior to mediation, the Claimant retained counsel, further amended the claim to $1,003,064.39, clarified the amount sought, and submitted additional documentation. The parties participated in a one-day mediation session with a neutral, highly experienced mediator, during which they reached a settlement. The agreement allowed the claim in the amount of

$555,000, with a recovery cap of 45% ($249,750) if distributions to users exceeded this percentage. This represented a significant reduction from the amended claim amount and ensured a resolution that was both fair and equitable under the circumstances.

The Receiver carefully considered multiple factors in determining the fairness of the settlement. Given the totality of the circumstances, including the additional documentation provided, the substantial payments already received by the user, and the insider status of the Claimant balanced against their financial losses due to fraud, the Receiver determined that the settlement was reasonable and equitable. While the Receiver had reserved the right to subordinate the claim, the reduced claim amount and recovery cap achieved a similar economic effect for a portion of the claim. By reaching this agreement, the Receivership avoided the significant costs of litigation and resolved the final non-user claim without the need for court intervention.

With the resolution of Claim A0001, after the close of the Fourth Quarter, but before filing of this Report, the Receiver filed an Amended Claims Report, reflecting that all non-user claims have now been addressed and resolved. The Receiver personally reviewed and approved each settlement, ensuring that the outcomes represented fair compromises, minimized costs, and served the best interests of the Receivership. This process concludes all non-user claims, providing finality to this important component of the Receivership's effort.

## V.    PLAN OF DISTRIBUTION

As detailed above, on August 9, 2024, the Receiver submitted the Plan Motion and Proposed Plan, which was fully briefed as of September 27, 2024. On January 22, 2025, the Court approved the Plan as proposed by the Receiver [Dkt. 433]. Throughout the year, the Receiver and his team devoted considerable attention to crafting the Plan and its supporting papers, reviewing responses received by users, and preparing a response to those users concerns as reflected in the Receiver's reply.

Under the Court approved Plan, allowed investor claims are defined based only upon each investor's actual deposits into, and withdrawals from, EminiFX. The Plan excludes from the calculation of an investor's claim (i) the ROI, representing fictitious profits not related to any actual investing activity, (ii) recruitment and multilevel marketing bonuses, and (iii) internal transfers. The Plan provides for a pro rata distribution using the "rising tide" method, which calculates claims based on pre-receivership deposits and treats pre-receivership withdrawals as distributions on such claims, acknowledging that pre-receivership withdrawals were paid from the pool of commingled investor deposits—the same pool of funds that will be used to make distributions under the Plan. Under the Rising Tide method, the pro rata distribution percentage will be higher than such percentage would have been under a "Net Investment" distribution method (where withdrawals are subtracted from deposits to determine a net claim) for the same number of dollars distributed.

With the Court's approval of the Plan and the Receiver's Notice of Initial Distribution, the Receiver advised users of the applicable rising tide percentages. The Notice of Initial Distribution divided claimants in to five groups: (1) Class 3 users entitled to an initial distribution, (2) Class 3 users who are not entitled to an initial distribution because pre-Receivership withdrawals exceeded the amount that the user would have received under the rising tide percentage, (3) Class 3A users entitled to a single distribution, (4) Class 3A users who are not entitled to an initial distribution because pre-Receivership withdrawals exceeded the amount that the user would have received under the rising tide percentage and (5) users with disputed claims or holds on their accounts who are not entitled to receive a distribution at this time.[18] The Receiver will make the initial wave of

---

[18] The emails to users were sent by the Claims Agent on January 23, 2025. Due to an error by the Claims Agent, the text of the emails sent to Class 3 Claimants over the Rising Tide and Class 3A Claimants under the Rising Tide was transposed. The error was resolved and corrected emails were sent on January 24, 2025.

distributions in early February 2025 and will continue to make distributions throughout the year as additional users provide the Receiver with payment information on the User Portal.

## VI.    ASSET RECOVERY

As noted above, the Receiver continues to investigate any unknown or suspicious transactions that may have occurred prior to the Receivership.    The Receiver has and will also continue to pursue litigation claims against third parties for which the estate has standing and which present a potential for return on investment. A summary of the receiver's ongoing investigations and litigations follows.

### A.    *Investigation into Undisclosed Luxury Items*

As noted above, the Receiver continues to investigate any unknown or suspicious transactions that may have occurred prior to the Receivership.  In the Second Status Report[19], the Receiver has identified all outgoing transactions over $100,000 (excluding transfers between Bank 1, Bank 2, and Brokerage 1), in order to determine whether such transactions warrant further action.  Among those transactions were the following transactions, both of which were processed through CoinPayments transferring funds from EminiFX accounts to unknown destinations, with a note in the CoinPayments indicating the smaller payment was for Claimant A0001:

| PAYMENTS AND WITHDRAWALS IN EXCESS OF $100,000 | | | | |
|---|---|---|---|---|
| **Date** | **Amount** | **Account** | **Description** | **Further Action** |
| 04/06/22 | $139,629 | Cr Ex 4 | Payment to Tech Provider | Expected receivership claimant |
| 04/06/22 | $377,164 | Cr Ex 4 | Unknown Payment | Receiver investigating |

However, in the Fourth Quarter, as a result of Claimant A0001's repeated denials that he was the recipient of the $139,629 transfer, the Receiver investigated the transaction further.  Due to advancements in Bitcoin tracing technology, the Receiver's investigation identified that both

---

[19] *See* Second Status Report, Part IV, Dkt. 163 (Oct. 12, 2022).

transactions—totaling $509,986—were sent to a luxury watch retailer to purchase two high-value watches: a Patek Philippe Rose Gold Nautilus for $351,509 (plus taxes) and an Audemars Piguet Royal Oak 41 Chronograph Black Men's Watch for $129,609 (plus taxes).

The Receiver's investigation further revealed that Mr. Alexandre was the purchaser of the two watches, a detail that Mr. Alexandre did not disclose to the Receiver, as required by the Consent Order. Claimant A0001 further denied that he received either of these watches. As a result of the Receiver's investigation, on November 25, 2024, the Receiver issued a formal demand letter to Mr. Alexandre, requiring him to disclose the location and status of the watches and facilitate their turnover to the Receiver by December 13, 2024.

On December 12, 2024, Mr. Alexandre requested a 30-day extension, until January 13, 2025, to consult with a standby attorney and provide a substantive response, which the Receiver did not oppose. After the close of the Fourth Quarter but before the filing of this Report, on January 24, 2025, Mr. Alexandre submitted a response to the Receiver. In his response, Mr. Alexandre did not deny the purchase of the watches, but refused to provide their status and location, in direct violation of the Consent Order, which requires the turnover of all Receivership property. As of the filing of this Report, Mr. Alexandre has not complied with the Receiver's demand letter. Given the significant value of the watches, the Receiver is evaluating next steps to recover the watches for the benefit of EminiFX users.

      B.    *Investigation into Currency Fraud*

During the transaction review process, the Receiver identified suspicious activity involving irregular pre-receivership deposits and withdrawals, suggesting exploitation of the EminiFX system to misappropriate funds by someone with a sophisticated understanding of how the system operated. The Receiver discovered that between March and April 2022, certain users with EminiFX accounts—many of which appear to be dummy accounts—deposited money into the

EminiFX system via CoinPayments, utilizing alternative currencies such as Vietnamese Dong, Iranian Rial, or BTT.TRC20, which are worth a fraction of a penny.  While the actual cost to complete these transactions in the foreign currencies was de minimis, the EminiFX system improperly credited the accounts with the full nominal value of the transactions as though the payments had been made in U.S. dollars, often hundreds of thousands of dollars.  The funds were then moved through the EminiFX system, generally using the internal transfer function, and then withdrawn from dozens of what appear to be dummy accounts and paid in Bitcoin.  The Receiver estimates that between $5 and $10 million was extracted from EminiFX in this manner, including into multiple Bitcoin wallets that have not been accessed (e.g., money withdrawn) since the Receiver was appointed.  The Receiver's investigation is ongoing.

C.    *Investigation into Unreported Cash*

During the transaction review process, based on numerous conversations with users and a review of various documents, the Receiver discovered that in early April 2022, following Bank of America's decision to freeze the EminiFX's accounts and the decision by Alexandre and the CFO to cease using the TD Bank account for deposits, Alexandre, the CFO, and others at EminiFX began accepting cash deposits directly from users.  The Receiver's investigation determined that over $6 million in cash from hundreds of users, often deposited at the 34th Street offices of EminiFX.[20]   The equivalent balances were then funneled through the EminiFX system by Alexandre and the CFO, often using the internal transfer function, to make it appear as those the user had made a deposit.[21]   However, only $1 million was deposited into the EminiFX bank

---

[20] Soon after taking control of EminiFX, two advanced cash counting machines (of the kind often seen at bank teller windows) were delivered to the EminiFX office, further indicating that substantial cash deposits were being received at the EminiFX office and that more were expected.

[21] Those transactions, which represent actual funds deposited by the user to EminiFX personnel, were generally credited to users in the transaction verification process.

accounts that were disclosed to the Receiver.  The Receiver is continuing his investigation into the remainder of the misappropriated funds and is evaluating potential litigation options.

    D.    *Third Party Litigation*

On December 3, 2024, the Receiver filed a complaint against Interactive Brokers LLC ("**Interactive Brokers**") in the Supreme Court of the State of New York, County of New York. The case, captioned *David A. Castleman as Receiver for EminiFX, Inc. v. Interactive Brokers LLC*, Index No. 659407/2024 ("**State Court Action**"), seeks damages based on Interactive Brokers' alleged independent liability to EminiFX.  Because all Class 4 claimants have now been settled and satisfied under the Plan, and because Class 1 and 2 claims are fixed amounts that will be paid from the current corpus of the Receivership, any additional funds recovered from Litigation will inure directly to the benefit of Class 3/3A claimants—*i.e.*, EminiFX investors.

After the close of the Fourth Quarter but before the filing of this Report, Interactive Brokers removed the State Court Action to the United States District Court for the Southern District of New York on January 2, 2025.  On January 13, 2025, while the Receiver was drafting a limited motion for remand for lack of subject matter and removal jurisdiction, the Court issued an order to show cause to Interactive Brokers as to whether subject matter and removal jurisdiction existed. Responses by Interactive Brokers and the Receiver were filed on January 27 and 30, respectively, and the issue of jurisdiction remains *sub judice* as of this Status Report.  The Receiver is prepared to litigate the matter in either federal or state court.

The Receiver is contemplating additional third-party litigation and may file such suits in federal or state court, depending on whether federal jurisdiction exists and on other factors, in accordance with ¶ 37 of the Consent Order (incorporating ¶ 31(*i*) of the SRO), and as confirmed in the Distribution Plan Order [Dkt. 431].

E.    *Net Winners*

Pursuant to the Court's *Order and Opinion* approving the Distribution Plan, the Court approved specific special procedures regarding the treatment of Net Winners, which are users who withdrew more than they deposited. Under the Plan, Net Winners will not receive any further distributions, regardless of whether the Receiver initiates legal action against them. As a result of the transaction verification process, the Receiver generally is able to determine and identify Net Winners. As part of this process submitted to and approved by the Court, the Receiver anticipates making settlement offers to Net Winners in the First Quarter 2025, allowing them to resolve fraudulent transfer claims in exchange for 50% of their net winnings (withdrawals less deposits).

## VII.    RECEIVERSHIP COMMUNICATIONS

During the Fourth Quarter, the Receiver communicated with users through email, and at many times through phone calls, to provide them with pertinent updates in the Receivership, including emails advising of the filing of the Receiver's Proposed Plan and the Receiver's User Claims Report and updates to portals. The Receiver and his team communicated with several users to respond to their questions through the portal and to seek to resolve disputes where possible. The Receivership website (http://www.eminifxreceivership.com), was also updated frequently during the Fourth Quarter, with such updates being made available in English, French, and Haitian Creole, and will continue to be the primary source of information for interested parties.

*Any interested party seeking information concerning the Receivership is encouraged to review the website in the first instance*. The homepage of the website contains the status reports (including this one), a report on asset recovery, key filings, frequently asked questions, and other information about this case. The website also contains a "Civil Docket" section, so that all ECF filings in this case are available to all interested parties without the need for any such party to pay for filings using PACER or ECF. The Receiver's team will aim to have all docket items posted

by the end of each week, and any interested party can subscribe for docket item email updates by clicking the "**Subscribe**" button in the "**Civil Docket**" section.  Under the "**Frequently Asked Questions**" section, the Receiver and his team endeavor to provide answers to common user questions so that answers are available to all interested parties, and the Receiver and his team will update the information over time.  Finally, the website contains a section for EminiFX users or interested parties to update their contact information, especially their email addresses.

EminiFX users may email EminiFX@Stretto.com with questions or concerns.  The Receiver and other employees of his law firm will not, as a general rule, respond directly to inquiries from individual EminiFX users, given that the Stretto conduit remains open to EminiFX users and the need to ensure that communications with EminiFX users remain as cost-effective as possible.  However, the Receiver and his team, in connection with the transaction review process, would directly respond to messages through the user portal where appropriate.

Finally, as noted in the Receiver's response to a motion to intervene filed by certain EminiFX users [Dkt. 250], the Receiver encourages any EminiFX users who wish to file anything directly with the Court to reach out through the various communication channels available—most notably the EminiFX@Stretto.com email address—to see if their concern may be resolved by the Receiver and his professionals.

## VIII.  TAXES

As noted in prior reports, as of the Receiver's appointment, the IRS did not have a tax return on file for EminiFX, nor does it appear that one was prepared based on the evidence provided to the Receiver.  The Receiver has a specific obligation to file a tax return for EminiFX (*see* Dkt. 9, ¶ 31(m) (incorporated at Consent Order ¶ 37)), and during the Fourth Quarter, the Receiver continued to work with his tax and accounting teams to take prudent steps towards preparing a tax return for EminiFX, which was especially difficult given the lack of accounting

records for EminiFX or any sort of legal structure around the contributions from EminiFX users. The Receiver is aiming to file an initial corporate return for EminiFX as soon as possible, with the twin goals of—to the extent possible—minimizing the tax burden to the estate while expediting certainty on such return from the IRS.

In addition to preparing the EminiFX tax return, the Receiver must address other tax issues in the Receivership. Pursuant to applicable United States Treasury Regulations, the EminiFX Receivership estate is treated as a Qualified Settlement Fund ("**QSF**") effective as of the date of the commencement of the Receivership, May 11, 2022. A QSF is a separate entity that is subject to federal income tax requirements that are independent of EminiFX and individual users' tax requirements. By operation of law, EminiFX's assets were transferred to the QSF on May 11, 2022. To the extent that assets transferred to the QSF produce includable income, less certain expenses, the QSF will be required to pay tax at the maximum tax rate in effect for that tax year under the Internal Revenue Code. During the third quarter, the Receiver worked with his tax and accounting teams to prepare the QSF tax return for the receivership for 2023.

In the Fourth Quarter, the Receiver filed the QSF Tax Return for 2023, the year in which all Bitcoin held by the Receivership was sold. The total tax liability was just under $25,000. Along with the filing, the Receiver requested a prompt assessment from the IRS, the granting of which is in the discretion of the IRS. Concurrently with the filing of this Status Report, or shortly thereafter, the Receiver is filing the Corporate Tax Return with a $0 tax liability, along with a similar request for a prompt assessment. The exact timeline for the IRS to issue final determinations remains uncertain.

In accordance with the Court's approval of the Plan and in consultation with his tax advisors, the Receiver has conservatively reserved funds during any distributions to eligible users

to account for reasonable worst-case tax liabilities related to the Corporate Tax Return (pre-receivership) and the QSF Tax Return (post-receivership). These reserves are detailed in the Receiver's reply brief in support of the Plan [Dkt. 399, at 3, 12-13] and are necessitated by the inapplicability of 11 U.S.C. § 505(b) to federal equity receiverships, which remain subject to the Federal Priority Statute, 31 U.S.C. § 3713. *See also S.E.C. v. Credit Bancorp., Ltd.*, 297 F.3d 127, 140 (2d Cir. 2002). Additional reserves will also be maintained to address disputed transactions, review holds, and other contingencies. The Receiver and his team are actively working to minimize and expedite the tax finalization process. Any funds not required to satisfy tax obligations will be distributed to eligible users.

Further, the Receiver does not intend to issue 1099s to EminiFX users that received funds from EminiFX, including those who received more funds than they contributed, as the Receiver does not believe that such excess amounts represented profits from actual investing activity, but instead were paid using the contributions from other EminiFX users and are properly reflected as partial refunds on money contributed to EminiFX.

Nothing in the foregoing is intended to be tax advice for any EminiFX user, and ***each EminiFX user is responsible for his or her own personal tax situation***.

## IX.    RECOMMENDATIONS AND NEXT STEPS

While the litigation in the Civil Action continues, the Receiver anticipates the following next steps to administer the Receivership in the coming quarters:

### A.    *Distribution Plan and Initial Distributions*

The Receiver began collecting payment information from users through the designated Portal in the Fourth Quarter. Given the Court's approval of the Plan, before the filing of this Report, the Receiver filed the Notice of Initial Distribution, announcing a $100 million initial distribution. This amount represents a significant portion of the $152 million currently held in the

Receivership. Class 3 and Class 3A claimants will receive distributions based on Rising Tide percentages of 45% and 55%, respectively. The Receiver also updated the user portals to include an update for users entitled to receive a distribution of the Rising Tide Percentage and the amount of that user's initial distribution based upon the user's verified deposits and withdrawals.

The Receiver will commence distributions in February 2025. To facilitate these efforts, the Portal will be temporarily closed after the initial collection period to process payments and ensure the accuracy of data. It will reopen shortly thereafter, allowing users who have not yet submitted their payment information to do so.

Those users who provide their payment information by the end of January 2025 will receive a payment in the first wave of payments in early February 2025. As users continue to provide payment information, periodic waves of payments will be made throughout 2025. This phased approach ensures that verified claimants receive timely payments while maintaining sufficient reserves to address contingent liabilities, including unresolved tax matters.

B.    *Resolution of Remaining Disputed Transactions and Claims*

The Receiver and his team will continue their efforts to resolve as many Disputed Transactions as possible to create certainty for users and minimize the need for court intervention. This process is expected to continue through the first half of 2025. Following this review, any unresolved Disputed Transactions will be addressed through one or more omnibus claims objections submitted to the Court.

As appropriate, the Receiver will submit an updated schedule of approved and disputed User Claims to the Court based on Verified and Disputed Transactions. Additionally, insider claims and settlements with net winners under the Plan or as otherwise approved by the Court will be addressed during the first half of 2025.

31

C.    *Resolution of Tax Issues*

The primary tax returns where liability could be reasonably and materially contested are the QSF Tax Return and the Corporate Tax Return, the former of which was filed and the latter of which will be filed concurrently with or shortly after this Status Report.  The Receiver will continue to work with his tax advisors to encourage the IRS to expedite its review if any of those returns, and the Receiver is prepared to provide the IRS with whatever data it needs in such efforts. The Receiver cannot determine with certainty when these issues will be resolved—even the granting of a request for a prompt assessment reducing the time to audit from 36 to 18 months is in the discretion of the IRS.

D.    *Litigation Claims*

As part of the administration of the estate, the Receiver will continue to evaluate additional potential litigation claims against third parties for which the estate has standing and which present a potential for return on investment, and will continue to litigate the Interactive Brokers case as set forth above.  The Receiver expects that most if not all affirmative litigation will be filed in 2025, and such litigation may extend into 2026 and beyond.

## X.    CONCLUSION

The Receiver will provide a further report within 30 days of the end of the First Quarter

2025, or at such other time as the Court may direct.  The Receiver remains available to provide

any further information or advice that the Court may require.

Dated: New York, New York
       January 31, 2025

Respectfully Submitted,

By: _____

David A. Castleman
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Tel: (212) 661-9100
*Receiver*

Jennifer S. Feeney
William M. Moran
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Tel: (212) 661-9100
*Counsel for the Receiver*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 31, 2025, I electronically filed the 2024 Annual Report of David A. Castleman (Eleventh Status Report), with the Clerk of the Court using the Court's CM/ECF system, which shall send notice to all counsel of record. I also served, or cause to be served, copies of the Eleventh Status Report on Defendant Eddy Alexandre by U.S. mail to Eddy Alexandre, Reg. No. 00712-51, FCC Allenwood-Low, P.O. Box 1000, White Deer, PA 17887.

Dated: New York, New York
      January 31, 2025

                                                 */s/ David A. Castleman*
                                                 David A. Castleman