**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **COMMODITY FUTURES TRADING COMMISSION,** | |
| **Plaintiff,** | 22 Civ. 3822 (VEC) |
| **-against-** | |
| **EDDY ALEXANDRE and EMINIFX, INC.,** | |
| **Defendants.** | |

**FIRST QUARTER 2025 REPORT OF RECEIVER DAVID A. CASTLEMAN**

**(TWELFTH STATUS REPORT)**

David A. Castleman
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Tel: (212) 661-9100
*Receiver*

Jennifer S. Feeney
William M. Moran
OTTERBOURG P.C.
230 Park Avenue
New York, NY 10169
Tel: (212) 661-9100
*Counsel for the Receiver*

April 30, 2025

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................. 1

II.    PROCEDURAL HISTORY ................................................................................ 4

III.   RECEIVERSHIP FINANCES ........................................................................... 7

IV.    RESOLUTION OF REMAINING USER TRANSACTIONS AND CLAIMS ................. 9

V.     PLAN OF DISTRIBUTION ............................................................................. 11

VI.    ASSET RECOVERY AND AFFIRMATIVE ACTIONS ................................ 12

VII.   RECEIVERSHIP COMMUNICATIONS ......................................................... 14

VIII.  TAXES ............................................................................................................. 16

IX.    RECOMMENDATIONS AND NEXT STEPS ................................................ 18

X.     CONCLUSION ................................................................................................. 19

David A. Castleman (the "**Receiver**"), as Receiver pursuant to the Consent Preliminary Injunction (the "**Consent Order**"), entered by this Court in this action (the "**Civil Action**") on June 15, 2022 [Dkt. 56], files this Twelfth Status Report (the "**Report**") to apprise the Court of the activities of the receivership (the "**Receivership**") for January 1, 2025 through March 31, 2025 (the "**First Quarter**").  The Report may also include events that occurred after the First Quarter if useful in providing a complete report on a particular matter.

## I.    INTRODUCTION

During the First Quarter, the Receiver and his team distributed approximately $76.8 million to nearly 18,000 eligible EminiFX users (the "**Initial Distribution**") in accordance with the approved plan of distribution (the "**Plan**").[1]  The Initial Distribution, announced on January 23, 2025 (the "**Notice of Initial Distribution**") [Dkt. 434], will ultimately entail a distribution of approximately $100,000,000 among eligible EminiFX users ("**users**"), applying a rising tide percentage of 45% (with an additional 10% for users with total deposits of $1,000 or less, who are eligible for a single distribution).  The Initial Distribution is the culmination of the Receiver and his team's efforts over the last several quarters, including the First Quarter, to finalize users' claims by resolution of the remaining transactions subject to a dispute ("**Disputed Transactions**") and review holds, as well as the collection of payment information, all through the online portal (the "**Portal**").  The primary reason users have not received distributions is that they have not provided the Receiver with valid payment information.  ***The Receiver encourages all users who have not provided payment information to do so on the User Portal at their earliest convenience.***

The Receiver has also continued efforts to recover estate assets, including by the investigation and prosecution of litigation claims of the estate. During the First Quarter, the

---

[1] An additional $6.6 million was distributed to nearly 3,000 users as of April 25, 2025.

Receiver commenced a new action against Clarelle Dieuveuil, the former Chief Financial Officer of EminiFX, in the Supreme Court for the County of New York.  In the filed complaint, the Receiver alleges that the CFO is liable for breach of fiduciary duty and for fraud, arising from specific actions she took as CFO in furtherance of the operation of EminiFX.  The Receiver also litigated jurisdictional issues arising from his litigation against Interactive Brokers, which was commenced in late 2024 in state court and was recently remanded to that court.  The Receiver further continued his efforts related to various investigations, including those previously discussed in prior status reports.  Consistent with the authority granted in the approved Plan, the Receiver commenced a settlement process to voluntarily recover funds for users who withdrew more than they deposited during EminiFX's operation ("**Net Profit Settlements**").

In addition to these tasks, the Receiver continued to address tax-related issues during the First Quarter. Specifically, the Receiver filed a pre-Receivership tax return for EminiFX ("**Corporate Tax Return**") with a tax liability of $0, which, as previously indicated, the Receiver believes is correct under the applicable circumstances.[2] This remains pending, along with the qualified settlement fund tax return ("**QSF Tax Return**") filed for post-Receivership activity. Both returns were filed with a request for prompt assessment. A prompt assessment is granted at the discretion of the Internal Revenue Service ("**IRS**"). As a result, the Receiver cannot say when a decision on the request will be made or what the outcome will be.   The Receiver continues to maintain a reserve to ensure compliance with all applicable laws, including the payment of any tax liability if such is found to exist.  To the extent that any reserves are no longer needed, the Receiver will advise the Court and release such reserves to enable a subsequent distribution to users.

---

[2] Soon after the close of the First Quarter, the Receiver also filed a tax return for New York with the relatively de minimis tax liability of $9,750.  Both tax returns were prepared by the Receiver's experienced tax professionals at Deloitte Tax LLP ("**Deloitte Tax**").

During the First Quarter, the Receivership earned approximately $650,000 in interest and paid approximately $1,300,000 in expenses, primarily comprising Court-approved professional fees. After completing the initial waves of distribution payments, the Receivership held approximately $74 million in cash as of the end of the First Quarter, along with potential litigation claims. A full ledger of the Receivership's financial transactions for the First Quarter is attached as Exhibit 1, with additional financial data presented in Exhibit 2.[3]

Looking forward, the Receiver will continue to make periodic payments to users from the Initial Distribution as such users' claims become eligible and/or payment information is provided. The Receiver expects these distributions to continue through 2025. In furtherance of that aim, the Receiver and his team will continue to resolve as many of the remaining Disputed Transactions as possible and for those Disputed Transactions that are the subject of a user objection that cannot be resolved, in the coming weeks, the Receiver will be filing one or more motions seeking approval of the Court to confirm the Receiver's determination, in accordance with Section 2.E.VII of the Transaction Verification and User Claims Procedures (the "**Claims Procedures**") [Dkt. 228]. The Receiver expects that the vast majority—if not all—of the user objections will be submitted to the Court in the second quarter 2025. Once those objections are resolved, the Receiver will file a final claims analysis report.

The Receiver expects that, apart from any litigation commenced in connection with the resolution of net profit claims, all major litigation for the benefit of the estate will also have been commenced before the end of the second quarter 2025. Excluding litigation that may continue

---

[3] These financial statements are illustrative and are not intended to be in accordance with generally accepted accounting principles (GAAP), nor are they intended to be used in connection with determining the taxable income (if any) of the Receivership. The Receiver includes these statements to provide the Court and other interested parties a high-level overview of the financial condition of the Receivership during the First Quarter, as applicable.

past 2025, and the tax liability where the timing of final resolution cannot be definitively determined, the Receiver otherwise expects that the estate will be substantially administered by the end of the third quarter 2025—with a substantial tax reserve available for a second distribution once the tax liabilities are resolved.

## II.    PROCEDURAL HISTORY

On May 11, 2022, the CFTC filed the Complaint [Dkt. 5] and a motion for an *ex parte* Statutory Restraining Order [Dkt. 6], which the Court granted on the same day, appointing the Receiver initially as Temporary Receiver [Dkt. 9] (the "**SRO**").  On June 15, the Court entered the Consent Order that appointed the Receiver [Dkt. 56] (the "**Consent Order**").  On February 15, 2024, Mr. Alexandre's counsel at the time filed a letter [Dkt. 257], stating Mr. Alexandre no longer agreed to the CFTC's proposed consent order, and requesting permission to withdraw as counsel, which the Court granted on February 21, 2024.  Mr. Alexandre has since been proceeding *pro se*.[4] Additional procedural history is set forth in detail in the eleven prior status reports [Dkts. 71, 163, 192, 195, 218, 234, 251, 301, 370, 418, 444].  The procedural history relevant to the First Quarter follows.

**Approval of Plan.**  The Court entered an Opinion and Order approving the Plan on January 21, 2025 [Dkt. 431] (the "**Distribution Order**").  On January 28, 2025, Mr. Alexandre filed a document titled, "Emergency Motion for Leave to Proceed on an Interlocutory Appeal," seeking leave to appeal the Distribution Order, as well as an additional order, discussed further below, dismissing counterclaims filed by Mr. Alexandre against the CFTC and the Receiver [Dkt. 433]. The same day, the Receiver filed a letter confirming his intent to continue with distributions under

---

[4] In light of Mr. Alexandre's *pro se* status, the Receiver has continued to email Mr. Alexandre via his CorrLinks account docket entries of Orders of the Court when they are posted on ECF [Dkts. 431, 434, 441, 442, 447, 462, 464], as well as paper copies via U.S. Mail.

the Plan [Dkt. 440], as the Distribution Order provides that "[t]he Receiver is authorized to commence distributions as set forth in the . . . Plan at any time after of the entry of this Order," Distribution Order" [Dkt. 431, at 20].  On January 30, 2025, the Court ordered that this provision remains effective unless and until a motion to stay the Distribution Order is granted.  To date, no such order has been entered.

**Responses to CFTC Complaint**.  On February 29, 2024, the Receiver, solely on behalf of EminiFX, filed a Qualified Answer to the Complaint [Dkt. 264].  On April 4, 2024, Mr. Alexandre filed a Motion to Dismiss the Complaint [Dkt. 291], and on April 22, 2024, the CFTC filed its opposition [Dkt. 296].  Mr. Alexandre filed his reply on May 15, 2024 [Dkt. 322].  On July 10, 2024, the Court denied Mr. Alexandre's Motion to Dismiss and issued an Opinion and Order [Dkt. 355].  Mr. Alexandre ultimately filed his Answer to the Complaint on August 5, 2024, which included multiple counterclaims and affirmative defenses [Dkt. 377].  The Receiver and the CFTC filed motions to dismiss the respective counterclaims against them [Dkts. 386-89], to which Mr. Alexandre filed a response [Dkts. 400-01].  The Receiver and the CFTC filed replies [Dkts. 403, 404].  On November 25, 2024, Mr. Alexandre filed his response to the Receiver's motion to dismiss [Dkt. 423]. By Order entered on January 22, 2025 [Dkt. 433], the Court granted the CFTC's motion to dismiss, and denied the Receiver's motion as moot.

**Intervention Motion.** On January 27, 2025, a group of EminiFX users led by Pierre Acluche filed a renewed motion to intervene in this case [Dkt. 439].[5]  The motion was accompanied by a letter request from Mr. Acluche in opposition to the Plan [Dkt. 438].  By Order entered January

---

[5] For the avoidance of doubt, the Receiver clarifies that distributions to eligible users that were a part of this motion (and/or prior intervention motions) were not in any way altered as a result of these motions.   To the extent these users were eligible and had input their payment information, they received a distribution in the ordinary course.

Mr. Acluche is identified by name as he has signed multiple pleadings appearing on the docket, acting *pro se*.

30, 2025 [Dkt. 442], the court denied the renewed motion based on the same reasons articulated in the Court's orders denying the prior intervention motions [Dkts. 256, 316, 365], and rejected Mr. Acluche's opposition to the Plan. Mr. Alexandre filed a motion to reconsider the Court's January 30 order [Dkt. 453], which the Court denied by order entered February 21, 2025 [Dkt. 457]. One day earlier, on February 20, 2025, Mr. Acluche filed a notice of appeal from the January 30 order [Dkt. 452]. That appeal has been docketed and, as of this writing, is pending with the Second Circuit [25-632].[6]

**Motion to Compel.** On February 19, 2025, the Receiver filed a motion to compel (the "**Motion to Compel**"), Mr. Alexandre's compliance with the SRO and Consent Order, both of which required EminiFX and Mr. Alexandre to turn over all EminiFX assets and assets held by Mr. Alexandre traceable to EminiFX [Dkt. 448-451]. Specifically, the motion seeks to compel Mr. Alexandre to turn over: (1) two luxury watches purchased with EminiFX funds (the "**Watches**"), (2) cash physically given to EminiFX at its offices by EminiFX users (the "**Cash Deposits**") for investment, but that was not deposited into EminiFX accounts and (3) any cryptocurrency withdrawn by Alexandre or any of EminiFX's or Alexandre's agents from EminiFX (the "**Cryptocurrency**"); (4) passwords and any other necessary authentication to access Mr. Alexandre's laptop and Gmail account (the "**Gmail Account**"), which Mr. Alexandre used for EminiFX business [*see* Dkt. 449]. Following the First Quarter, but prior to the filing of this Report, the Court granted a request by Mr. Alexandre for additional time to respond to the Receiver's motion [Dkt. 464], and Mr. Alexandre filed a response on April 1, 2025 [Dkt. 466]. The Receiver

---

[6] Subsequent to the First Quarter, on April 25, 2025, Mr. Acluche filed a letter with the Court seeking a stay of the proceedings pending the appeal of the Court's denial of his motion to intervene [Dkt. 472]. On the morning of April 28, 2025, the Receiver provided Mr. Acluche with a copy of his previously filed Financial Condition Report (which is also available in the "Key Documents" section of the Receiver's website), in the belief that such information would address several of the issues raised in Mr. Acluche's letter requesting a stay. Shortly thereafter on April 28, 2025, the Court entered an order denying Mr. Acluche's request for a stay [Dkt. 473].

filed a reply on April 15, 2025 [Dkt. 470]. The motion remains pending as of the date of this Report.

**Summary Judgment.** On September 23, 2024, CFTC filed a motion for summary judgment [Dkts. 395-96]. The Receiver filed a response to the CFTC's motion on October 11, 2024, stating, in relevant part, that the Receiver did not oppose the motion as it related to EminiFX, but that its position was without prejudice to Mr. Alexandre's right to contest any of the motion's factual statements or legal conclusions [Dkt. 411]. On January 3, 2025, Mr. Alexandre filed a response to the CFTC's motion [Dkt. 428]. On January 24, 2025, the CFTC filed a reply brief and counterstatement [Dkt. 436-37]. The motion remains pending as of the date of this Report.

**Amended Non-User Claims Report.** In accordance with the Procedures, on August 2, 2024, the Receiver filed the Non-User Claims Report [Dkt. 369], which provides a comprehensive summary of all non-user claims submitted in the Receivership. The report details claims resolved through settlement, the Receiver's determinations on the allowance, partial allowance, or disallowance of each claim, and the rationale for those determinations. At the time of filing of the report, one non-user claim remained outstanding, which was resolved thereafter. On January 6, 2025, the Receiver filed an Amended Non-User Claims Report [Dkt. 427], which reflects the resolution of the final claim. That claim was paid in full in the Initial Distribution, which completed the non-user claims and distribution process.

**Applications for Fees and Expenses**. On January 31, 2025, the Receiver filed an application for fees and expenses incurred in the fourth quarter 2024 [Dkt. 445], which was granted on March 7, 2025 [Dkt. 459].

## III.   RECEIVERSHIP FINANCES

As noted in the Financial Condition Report [Dkt. 199], other than as set forth in the Motion to Compel and certain sums of cash collected from late March 2022 to early May 2022 by certain

EminiFX insiders, the Receiver believes that all material EminiFX assets, as reflected on the EminiFX and Mr. Alexandre's account statements, have been turned over to the Receivership. If any additional assets come to light as a result of the Receiver's investigation, the Receiver will evaluate any such situation and act or seek relief accordingly, including pursuing claims against third parties as appropriate.

In the First Quarter, the Receivership earned $658,759 in interest and spent a net $1,302,417 in cash for expenses, which included: (i) Court approved professional fees and expenses of $1,299,317 for work performed in the Fourth Quarter 2024, and (ii) $3,100 in expenses incidental to a potential litigation. The Receiver also distributed $76,066,376 to Class 3 claimants, $774,839 to Class 3A Claimants, and $249,750 to the remaining Class 4 claimant. The total cash position of the Receivership as of March 31, 2025 was $74,708,171. Although interest rates have declined somewhat, the primary reason for the decrease in interest income is a reduction in principal as a result of the aforementioned disbursement of payments to EminiFX users.

The fees and expenses for the Receiver and his professional firms that have been incurred during the First Quarter total $1,237,919,[7] subject to review and approval by the Court pursuant to the Employment Order [Dkt. 47]. These fees reflect the considerable activity in this case during the First Quarter, largely related to effectuating the Initial Distribution, management of the user transaction verification and review process, responding to various filings on the docket, and undertaking investigations, as set forth therein. The Receiver will file a separate application to seek authority to pay such fees and expenses simultaneously with this Report.

---

[7] This includes a voluntary reduction in the fees requested by Stretto, in the amount of $6,059, related to the service issue that occurred in January [*see* Dkt. 444, at 22 n. 18].

The financial statements attached as Exhibit 2 show the post-appointment balance sheet, income statement, and cash flows for the Receivership during the First Quarter. As noted above, these financial statements are illustrative and are not intended to be in accordance with generally accepted accounting principles (GAAP), nor are they intended to be used in connection with determining the taxable income (if any) of the Receivership or EminiFX. The Receiver includes these statements to give the Court and other interested parties a high-level overview of the financial condition of the Receivership.

## IV. RESOLUTION OF REMAINING USER TRANSACTIONS AND CLAIMS

The Receiver has described the transaction review in detail in prior reports [*see, e.g.*, Dkt. 444, at 12-19] and in the Schedule of User Transactions [Dkt. 417] ("**Disputed Transaction Schedule**"), and will focus this section on the resolution of the remaining Disputed Transactions. The vast majority of the 3,627 users with disputed transactions as set forth in the Disputed Transaction Schedule were resolved during the objection period. By the time of the Notice of Initial Distribution on January 23, 2025, only 630 users remained with disputed transactions or temporary review holds [Dkt. 434, at 2 & Ex. 5]. The Receiver and his team have been working in the First Quarter to resolve as many of the remaining accounts as possible. The Disputed Transactions generally fall within one of two categories:

**Non-Factual Disputes**. The first category of Transaction Objections, are objections for which the Receiver and the user do not dispute the facts surrounding the dispute, but rather, dispute whether such transaction is entitled to be credited under the terms of the Plan. The most common instances of this are transactions added by the user that are for returns on investment ("**ROI**"), bonuses or internal transfers, all of which were specifically excluded as transactions to be counted for purposes of calculating claims under the Plan. *See* Plan [Dkt. 444-3] at 13-14 and Opinion and Order [Dkt. 431] at 19-20.

**Factual Disputes**.  The second category of Transaction Objections, are objections in which there is a factual dispute regarding whether the transaction in question occurred.  An example of such dispute would be one in which the Receiver determined that the user did not provide sufficient documentation to support that a deposit was made into EminiFX and there is no record of an unassigned deposit matching the information provided.

Pursuant to Section 2.E.VII of the Procedures, the Receiver must file with the Court a summary of User Objections with respect to each of the Disputed Transactions, and a proposed resolution.  The Receiver is aiming to file an omnibus summary of User Objections with respect to the remaining Non-Factual Disputes with the Court on or about May 23, 2025.  The Receiver is also attempting to resolve as many Factual Disputes as possible, including by compromise where feasible, and is aiming to file one or more summaries of User Objections with respect to any unresolved Factual Disputes throughout May and June 2025.

A related effort to resolve "review holds" has also been ongoing during this period. Consistent with the Plan, certain users' accounts with verified transactions were placed on a distribution hold pending resolution of certain outstanding issues related to those accounts.  By way of example, holds might have been placed on accounts that might be impacted by the resolution of a Disputed Transaction on another user's account (as when a user is claiming another's verified transaction), or where a pending or recommended merger of accounts would impact a user's ultimate claim total.  The Receiver and his team have used the Portal to communicate with users regarding these holds, and to resolve them as appropriate.  While the deadline for resolving review holds is July 20, 2025, the Receiver is aiming to resolve all holds (or to apply to the Court for specific relief if necessary) by June 30, 2025.

## V.    PLAN OF DISTRIBUTION

On August 9, 2024, the Receiver submitted the Plan Motion and Proposed Plan, which was fully briefed as of September 27, 2024. On January 21, 2025, the Court approved the Plan as proposed by the Receiver [Dkt. 433].

Under the Court approved Plan, allowed investor claims are defined based only upon each investor's actual deposits into, and withdrawals from, EminiFX. The Plan excludes (i) the ROI, representing fictitious profits not related to any actual investing activity, (ii) recruitment and multilevel marketing bonuses, and (iii) internal transfers from the definition of an investor's claim. The Plan provides for a pro rata distribution using the "rising tide" method, which calculates claims based on pre-receivership deposits and treats pre-receivership withdrawals as distributions on such claims, acknowledging that pre-receivership withdrawals were paid from the pool of commingled investor deposits—the same pool of funds that is used to make distributions under the Plan. Under the Rising Tide method, the pro rata distribution percentage will be higher than such percentage under a "Net Investment" distribution method (where withdrawals are subtracted from deposits to determine a net claim) for the same number of dollars distributed.

Upon the Court's approval of the Plan, the Receiver and his team began the process of making the Initial Distribution. The process of accurately disbursing funds to tens of thousands of users is a labor-intensive one.  Users were able to submit payment information to enable the Receiver to make distributions to which they may be entitled. The original deadline to submit payment information to participate in the first wave of the Initial Distribution was January 31, 2025, and there will be subsequent deadlines throughout the year.  While the payment information panel is frozen in advance of distribution waves so that payment information is not changed once a distribution is in process, it has been, and will continue to be, reopened in advance of subsequent waves to allow users to submit payment information as they become entitled to participate in a

distribution.  Building on the efforts that began in prior quarters through the Portal, the Receiver was able to commence the first wave of the Initial Distribution in February 2025, which included all eligible users that had provided payment information, and were not otherwise subject to a review hold, and made a subsequent wave of payments in March 2025.  Additional waves of the Initial Distribution will be made to more users as they become eligible and provide their payment information.

As reflected in the Notice of Initial Distribution [Dkt. 434], the Receiver allocated $100,000,000 for the Initial Distribution, with Class 3 and Class 3A claimants will receive distributions based on Rising Tide percentages of 45% and 55%, respectively.  As of March 31, 2025, which encompassed two waves of the Initial Distribution, distributions were made to a total of 17,906 users, in the aggregate amount of $76,841,214.52.  Several thousand users received around $6.6 million in distributions in April, and payments will continue throughout 2025.

## VI.    ASSET RECOVERY AND AFFIRMATIVE ACTIONS

During the First Quarter, the Receiver and his team continued to work on various recovery efforts detailed in prior reports, including through the filing of the Motion to Compel, detailed above, and through third-party litigation, detailed below.   In addition to these efforts, the Receiver also implemented the Net Profit Settlement process—that is, a settlement process for collecting a portion of the net profits from users without the need for litigation over the collection of those funds, as contemplated by the Court's Distribution Order. As that order provides,

> With respect to Causes of Action against Net Winners, the Receiver is authorized to settle such Causes of Action for a return to the Receivership estate of fifty percent of the amount by which a Net Winner's Verified User Withdrawal Amount exceeds their Verified User Deposit Amount, in exchange for a release of liability, subject to further terms determined by the Receiver in the best interest of the Receivership estate, including but not limited to the resolution of additional claims against such persons or entities, without further order of this Court. The Receiver is authorized to set a June 30, 2025, deadline to settle such Net Winner Causes of Action, but may for good cause extend that deadline for some or all Net Winners.

[Dkt. 431, at 20.]

To that end, during the First Quarter, the Receiver and his team created a framework and procedure for effecting these settlements through the Portal. The Receiver proposed that if a user received a net profit, and returned 50% of such net profit, the Receiver would provide the user with a release of all claims. Just after the close of the First Quarter, users with net profits were contacted directly via email, and had their Portals updated to include an option to agree to the proposed settlement. Once a user has agreed, they are provided with payment information, and, upon the Receiver's receipt of their settlement payment, users will receive a written settlement and release agreement. All net profits recovered will be added to the Receivership funds to be used for distribution to eligible EminiFX investors.

On March 25, 2025, the Receiver filed a complaint against Clarelle Dieuveuil, the former Chief Financial Officer of EminiFX, captioned *David A. Castleman as Receiver for EminiFX, Inc. v. Clarelle Dieuveuil*, Index No. 651642/2025 in the Supreme Court for the County of New York (the "**CFO Action**"). In the Complaint, the Receiver alleges that the CFO is liable for breach of fiduciary duty and for fraud, arising from specific actions she took as CFO in furtherance of the operation of EminiFX. The Receiver further alleges that the CFO aided and abetted Mr. Alexandre's alleged breach of fiduciary duty and fraud. Finally, the Receiver alleges that the CFO received transfers of over $500,000 from EminiFX, for which no value was provided, and seeks to avoid those transfers.

The Receiver's decision to bring the CFO Action was based in part upon information discovered during the claims and distribution process. Most notably, the Receiver learned that prior to the closure of EminiFX, throughout April and early May 2022, many investors gave cash to various EminiFX personnel, acting as collectors for EminiFX, who would give the cash to the

CFO or Mr. Alexandre. The investor would ultimately be credited with the investment, but the Receiver has no record of the cash entering the EminiFX system. In the complaint, the Receiver alleges that the CFO failed to ensure that millions of dollars of cash deposited by investors via intermediaries was deposited in EminiFX bank accounts.

As detailed in the last report, on December 3, 2024, the Receiver filed a complaint against Interactive Brokers LLC ("**Interactive Brokers**") in the Supreme Court of the State of New York, County of New York. The case, captioned *David A. Castleman as Receiver for EminiFX, Inc. v. Interactive Brokers LLC*, Index No. 659407/2024, seeks damages based on Interactive Brokers' alleged facilitation of transactions connected to EminiFX.

During the First Quarter, on January 2, 2025, Interactive Brokers removed the State Court Action to the United States District Court for the Southern District of New York. The case was accepted as related to the Receivership on January 8, 2025, and assigned to this Court [Case No. 25-cv-00042-VEC]. On January 13, 2025, the Court entered an order directing Interactive Brokers to show cause why the action should not be remanded for lack of jurisdiction. Interactive Brokers briefed its position and the Receiver responded [Dkts. 12-13]. Ultimately, after the First Quarter but prior to the date of this Report, the Court remanded the action to state court [Dkt. 14]. The Receiver will continue to prosecute his action against Interactive Brokers in state court.

The Receiver is contemplating one additional action against certain senior EminiFX executives for aiding and abetting fraud and other claims, which may take the form of its own action or may be joined (via amendment) to the CFO Action. At present, the Receiver is not contemplating any additional affirmative litigation outside the net profit resolution process.

## VII.    RECEIVERSHIP COMMUNICATIONS

During the First Quarter, the Receiver and his team communicated with users through various means—including email and Portal message, phone calls, and, in some cases, via

videoconference platform—to provide pertinent updates in the Receivership, and to resolve Disputed Transactions and review holds. The Receivership website (http://www.eminifxreceivership.com), was also updated frequently during the First Quarter, with such updates being made available in English, French, and Haitian Creole, and will continue to be the primary source of information for interested parties. In a continuing effort to continue to keep users informed with easy to understand and up to date information, the Receiver expects to launch a wholesale update of the website during the current quarter.

*Any interested party seeking information concerning the Receivership is encouraged to review the website in the first instance*. The homepage of the website contains the status reports (including this one), a report on asset recovery, key filings, frequently asked questions, and other information about this case. The website also contains a "Civil Docket" section, so that all ECF filings in this case are available to all interested parties without the need for any such party to pay for filings using PACER or ECF. The Receiver's team will aim to have all docket items posted by the end of each week, and any interested party can subscribe for docket item email updates by clicking the "**Subscribe**" button in the "**Civil Docket**" section. Under the "**Frequently Asked Questions**" section, the Receiver and his team endeavor to provide answers to common user questions so that answers are available to all interested parties, and the Receiver and his team will update the information over time. Finally, the website contains a section for EminiFX users or interested parties to update their contact information, especially their email addresses.

Finally, as noted in the Receiver's response to a motion to intervene filed by certain EminiFX users [Dkt. 250], the Receiver encourages any EminiFX users who wish to file anything directly with the Court to reach out through the various communication channels available—most

notably the EminiFX@Stretto.com email address—to see if their concern may be resolved by the Receiver and his professionals.

## VIII.   TAXES

As noted in prior reports, as of the Receiver's appointment, the IRS did not have a tax return on file for EminiFX, nor does it appear that one was prepared based on the evidence provided to the Receiver.  The Receiver has a specific obligation to file a tax return for EminiFX (*see* Dkt. 9, ¶ 31(m) (incorporated at Consent Order ¶ 37)).  Ultimately, Deloitte Tax prepared and the Receiver filed the Corporate Tax Return covering the pre-Receivership period during the First Quarter. The Corporate Tax Return filed with a tax liability of $0, which, as previously indicated, the Receiver believes is correct under the applicable circumstances.

The Receiver has been required to address other tax issues in the Receivership.  Pursuant to applicable United States Treasury Regulations, the EminiFX Receivership estate is treated as a Qualified Settlement Fund ("**QSF**") effective as of the date of the commencement of the Receivership, May 11, 2022.  A QSF is a separate entity created in conjunction with the Receivership that is subject to federal income tax requirements that are independent of EminiFX and individual users' tax requirements.  By operation of law, EminiFX's assets were transferred to the QSF on May 11, 2022.  To the extent that assets transferred to the QSF produce includable income, less certain expenses, the QSF will be required to pay tax at the maximum tax rate in effect for that tax year under the Internal Revenue Code.

The Receiver filed the QSF Tax return for 2023, the year in which all Bitcoin held by the Receivership was sold, in the fourth quarter of 2024. The total tax liability was just under $25,000. Both the Corporate Tax Return and QSF Tax Return were filed with a request for prompt assessment.  The exact timeline for the IRS to issue final determinations remains uncertain.

Additionally, during the First Quarter, Deloitte Tax began preparation of a New York State tax return for the pre-receivership activities of EminiFX, which resulted in taxes owed of $9,750. The Receiver filed that return in April 2025 prior to the filing of this Report.

In accordance with the Court's approval of the Plan and in consultation with his tax advisors, the Receiver has conservatively reserved funds during any distributions to eligible users to account for reasonable worst-case tax liabilities related to the Corporate Tax Return (pre-receivership) and the QSF Tax Return (post-receivership).  These reserves are detailed in the Receiver's reply brief in support of the Plan [Dkt. 399, at 3, 12-13] and are necessitated by the inapplicability of 11 U.S.C. § 505(b) to federal equity receiverships, which remain subject to the Federal Priority Statute, 31 U.S.C. § 3713.  *See also S.E.C. v. Credit Bancorp., Ltd*., 297 F.3d 127, 140 (2d Cir. 2002).  Additional reserves will also be maintained to address Disputed Transactions, review holds, and other contingencies. The Receiver and his team are actively working to minimize and expedite the tax finalization process.  Any funds not required to satisfy tax obligations will be distributed to eligible users.

As stated in prior reports, the Receiver does not intend to issue 1099s to EminiFX users that received funds from EminiFX, including those who received more funds than they contributed, as the Receiver does not believe that such excess amounts represented profits from actual investing activity, but instead were paid using the contributions from other EminiFX users and are properly reflected as partial refunds on money contributed to EminiFX.  Nothing in the foregoing is intended to be tax advice for any EminiFX user, and ***each EminiFX user is responsible for his or her own personal tax situation***.

## IX.    RECOMMENDATIONS AND NEXT STEPS

While the litigation in the Civil Action continues, the Receiver anticipates the following next steps to administer the Receivership in the coming quarters:

**Initial Distribution**.  The Receiver will continue to make the Initial Distribution in "waves" throughout 2025 as Disputed Transactions are resolved and users provide their payment information using the Portal.  This phased approach ensures that verified claimants receive timely payments while maintaining sufficient reserves to address contingent liabilities, including unresolved tax matters.  Distributions will continue to follow the terms set forth in the Notice of Initial Distribution—Class 3 and Class 3A claimants will receive distributions based on Rising Tide percentages of 45% and 55%, respectively—until further notice.  The distributions to the Class 3A claimants are likely the only distribution that such claimants will receive.

**Resolution of Remaining Disputed Transactions and Review Holds.**  As set forth above, the Receiver intends to file an omnibus summary of User Objections with respect to the remaining Non-Factual Disputes and one or more schedules of User Objections with respect to any unresolved Factual Disputes in the Second Quarter 2025.  The Receiver also expects to resolve all Review Holds and, if necessary, will apply to the Court to resolve in the second quarter 2025.  Once all claims are resolved, the Receiver intends to file a final Claims Analysis Report, with the Court.

**Resolution of Tax Issues**.  The primary tax returns where liability could be reasonably and materially contested are the QSF Tax Return and the Corporate Tax Return.  The Receiver will continue to work with his tax advisors to encourage the IRS to expedite its review if any of those returns, and the Receiver is prepared to provide the IRS with whatever data it needs in such efforts. The Receiver cannot determine with certainty when these issues will be resolved.

**Litigation Claims**.  As part of the administration of the estate, the Receiver has been evaluating potential litigation claims against third parties for which the estate has standing and which present a potential for return on investment. Based on ongoing investigations, the Receiver expects to determine in the coming weeks whether any additional litigation should be commenced or additional claims or parties added to existing litigation.  This litigation is in addition to any actions to recover net profits that the Receiver may initiate. As to those litigation efforts that have already commenced, the Receiver will continue to pursue that litigation in the quarters that follow.

## X.    CONCLUSION

The Receiver will provide a further report within 30 days of the end of the second quarter 2025, or at such other time as the Court may direct.  The Receiver remains available to provide any further information or advice that the Court may require.

Dated: New York, New York
        April 30, 2025

Respectfully Submitted,

By: _____
        David A. Castleman
        OTTERBOURG P.C.
        230 Park Avenue
        New York, NY 10169
        Tel: (212) 661-9100
        *Receiver*

        Jennifer S. Feeney
        William M. Moran
        OTTERBOURG P.C.
        230 Park Avenue
        New York, NY 10169
        Tel: (212) 661-9100
        *Counsel for the Receiver*

19

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on April 30, 2025, I electronically filed the First Quarter 2025 Report of David A. Castleman (Twelfth Status Report), with the Clerk of the Court using the Court's CM/ECF system, which shall send notice to all counsel of record.  I also served, or cause to be served, copies of the Eleventh Status Report on Defendant Eddy Alexandre by U.S. mail to Eddy Alexandre, Reg. No. 00712-51, FCC Allenwood-Low, P.O. Box 1000, White Deer, PA 17887.

Dated: New York, New York
       April 30, 2025

                                        <u>*/s/ David A. Castleman*</u>
                                        David A. Castleman